ORIGINAL

Approved: _____
         RICHARD COOPER/TIMOTHY T. HOWARD
         Assistant United States Attorneys

U.S. DISTRICT COURT
FILED
DEC 17 2015
S.D. OF N.Y.

DOC #_____

Before:   HONORABLE FRANK MAAS
         United States Magistrate Judge
         Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>     - v. -<br><br>ROGER THOMAS CLARK,<br>  a/k/a "Variety Jones,"<br>  a/k/a "VJ,"<br>  a/k/a "Cimon,"<br>  a/k/a "Plural of Mongoose,"<br><br>     Defendant. | **AMENDED COMPLAINT**<br><br>15 Mag. 1335<br><br>Violations of<br>21 U.S.C. §§ 846, 812,<br>841(a)(1),  841(b)(1)(A),<br>841(h); 18 U.S.C. §§<br>1028(a)(2) & (f),<br>1030(a)(2) & (b), 1956, 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

    GARY L. ALFORD, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service ("IRS") and charges as follows:

COUNT ONE
(Narcotics Trafficking Conspiracy)

    1.   From in or about January 2011, up to and including on or about October 2, 2013, in the Southern District of New York and elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2.   It was a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3.    It was further a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, would and did deliver, distribute, and dispense controlled substances by means of the Internet, in a manner not authorized by law, and aid and abet such activity, in violation of Title 21, United States Code, Section 841(h).

4.    The controlled substances that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, conspired to distribute and possess with intent to distribute, and deliver, distribute, and dispense by means of the Internet, in a manner not authorized by law, were (a) one kilogram and more of mixtures and substances containing a detectable amount of heroin; (b) five kilograms and more of mixtures and substances containing a detectable amount of cocaine; (c) ten grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), and (d) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, all in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

COUNT TWO
(Narcotics Trafficking)

5.    From in or about January 2011, up to and including on or about October 2, 2013, in the Southern District of New York and elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, distributed and possessed with the intent to distribute controlled substances, and aided and abetted such distribution and possession with the intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1).

6.    The controlled substances involved in the offense
included, among others, 1 kilogram and more of mixtures and
substances containing a detectable amount of heroin, 5 kilograms
and more of mixtures and substances containing a detectable
amount of cocaine, 10 grams and more of mixtures and substances
containing a detectable amount of lysergic acid diethylamide
(LSD), and 500 grams and more of mixtures and substances
containing a detectable amount of methamphetamine, its salts,
isomers, and salts of its isomers, all in violation of Title 21,
United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Sections 812, 841(a)(1) and
841(b)(1)(A); and Title 18, United States Code, Section 2.)

COUNT THREE
(Distribution of Narcotics by Means of the Internet)

7.    From in or about January 2011, up to and including in
or about October 2013, in the Southern District of New York and
elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a
"VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant,
delivered, distributed, and dispensed controlled substances by
means of the Internet, in a manner not authorized by law, and
aided and abetted such activity, in violation of Title 21,
United States Code, Section 841(h).

8.    The controlled substances involved in the offense
included, among others, 1 kilogram and more of mixtures and
substances containing a detectable amount of heroin, 5 kilograms
and more of mixtures and substances containing a detectable
amount of cocaine, 10 grams and more of mixtures and substances
containing a detectable amount of lysergic acid diethylamide
(LSD), and 500 grams and more of mixtures and substances
containing a detectable amount of methamphetamine, its salts,
isomers, and salts of its isomers, all in violation of Title 21,
United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Sections 812, 841(h)
and 841(b)(1)(A).)

COUNT FOUR
(Conspiracy to Commit and Aid and Abet Computer Hacking)

9.    From in or about January 2011, up to and including in
or about October 2013, in the Southern District of New York and
elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a
"VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant,

3

and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit computer hacking, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1030(a)(2) and 2.

10. It was a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, would and did intentionally access computers without authorization, and thereby would and did obtain information from protected computers, for purposes of commercial advantage and private financial gain, and in furtherance of criminal and tortious acts in violation of the Constitution and the laws of the United States, and would and did aid and abet such unauthorized access, in violation of Title 18, United States Code, Sections 1030(a)(2) and 2.

(Title 18, United States Code, Section 1030(b).)

COUNT FIVE
(Conspiracy to Traffic in Fraudulent Identification Documents)

11. From in or about January 2011, up to and including in or about October 2013, in the Southern District of New York and elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to traffic in fraudulent identification documents, and to aid and abet the same, in violation of Title 18, United States Code, Sections 1028(a)(2).

12. It was a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, would and did knowingly transfer, in and affecting interstate and foreign commerce, false identification documents and authentication features, knowing that such documents and features were produced without lawful authority, including driver's licenses, personal identification cards, and documents that appeared to be issued by and under the authority of the United States, and would and did aid and abet such transfers, in violation of Title 18, United States Code, Sections 1028(a)(2) and 2.

(Title 18, United States Code, Section 1028(f).)

4

COUNT SIX
(Money Laundering Conspiracy)

13.   From in or about January 2011, up to and including on or about October 2, 2013, in the Southern District of New York and elsewhere, ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

14.   It was a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, with the intent to promote the carrying on of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

15.   It was further a part and an object of the conspiracy that ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

16.   I have been a Special Agent with IRS for approximately seven years.   I am currently assigned to the New York Organized Crime Drug Enforcement Strike Force.   I have been personally involved in the investigation of this matter, along with agents of the Federal Bureau of Investigation, the Drug Enforcement Administration, and Homeland Security Investigations.   This affidavit is based upon my investigation, my conversations with other law enforcement agents, and my examination of reports, records, and other evidence.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW

17.   From in or about January 2011, up to and including on or about October 2, 2013, an underground website known as "Silk Road" hosted a sprawling black-market bazaar on the Internet, where illegal drugs and other illicit goods and services, such as fraudulent identification documents and computer hacking services, were regularly bought and sold by the site's users.

18.   During its more than two-and-a-half years in operation, Silk Road was used by several thousand drug dealers and other unlawful vendors to distribute illegal drugs and other illicit goods and services to well over a hundred thousand buyers, and to launder hundreds of millions of dollars derived from these unlawful transactions.

19.   The owner and operator of Silk Road was Ross Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road," who was convicted on charges, S1 14 Cr. 68 (KBF), relating to his operation of Silk Road following a jury trial in the Southern District of New York on February 4, 2015.   Ulbricht ran the website with the assistance of various co-conspirators, including ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, who served as a trusted advisor of Ulbricht, and a small staff, including customer support staff representatives and several computer programmers.   CLARK and the rest of the staff were paid by Ulbricht for their services.

20.   From at least in or about January 2012, up to and including on or about October 2, 2013, ROGER THOMAS CLARK, a/k/a

"Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, engaged in the following activities among others for Silk Road:

        a.    Hiring and managing a computer programmer who assisted in developing computer code and maintaining Silk Road's technical infrastructure;

        b.    Providing advice to Ulbricht regarding managing and operating Silk Road, including security advice, and advice regarding the rules and policies on Silk Road;

        c.    Assisting in promoting sales on the Silk Road website, including providing help with coordinating a large-scale promotion for the sale of narcotics and other contraband on Silk Road; and

        d.    Conducting research and collecting intelligence on the efforts of law enforcement to investigate Silk Road.

### BACKGROUND ON SILK ROAD[1]

    21.    In the course of investigating Silk Road, I have been involved in undercover purchases of narcotics from the website through an undercover account, which were ordered to and received in the Southern District of New York.  In addition, I have also spoken with, among other law enforcement agents, an agent with Homeland Security Investigations ("HSI Agent-1"), who controlled multiple undercover accounts on the site, through which he conducted extensive undercover activity, including, from July to October 2013, and worked in an undercover capacity as a member of the site's paid customer support staff.  In addition, I have reviewed the contents of computers used to operate Silk Road.  Through these methods and sources, I am familiar with the Silk Road website and how it operated. In particular, I know that:

        a.    Silk Road was operated on what is known as "The Onion Router" or "Tor" network ("Tor"), a special network on the Internet designed to make it practically impossible to physically locate the computers hosting or accessing websites on the network.

---

[1] A more complete description of Silk Road and its operations can be found in the criminal complaint filed against Ross Ulbricht, the founder of Silk Road, see United States v. Ross Ulbricht, 14 Mag. 068 (S.D.N.Y. 2013).

b.   All transactions on Silk Road were required to be paid with "Bitcoins," an electronic currency designed to be as anonymous as cash.

c.   During its operation, Silk Road generated sales revenue totaling over 9.9 million Bitcoins and collected commissions from these sales totaling over 640,000 Bitcoins, worth more than $213 million and $13 million, respectively, based on the prevailing Bitcoin exchange rates when the underlying sales occurred.

d.   The illegal nature of the items sold on Silk Road was readily apparent to any user visiting the site.  The goods sold on Silk Road consisted overwhelmingly of illegal drugs of nearly every variety, which were openly advertised on the site as such and were immediately and prominently visible on the site's home page.

e.   In addition, the site's home page listed "Forgeries" as a category of goods for sale, and users who clicked on the "Forgeries" category were presented with listings for fraudulent identification documents under the categories "Fake IDs" and "Passports."  Based on my review of screen shots from the Silk Road website, I know that listings included, among other things, fraudulent drivers' licenses from various states in the United States and other nations, fraudulent Social Security cards, and fraudulent passports from nations such as the United States, the United Kingdom, and Australia.

f.   In addition, the site's home page listed "Digital goods" as a category of goods for sale, and users who clicked on this category were presented with listings for computer hacking tools and individuals offering their computer hacking services for sales.  For example, based on my review of screen shots from the Silk Road website, I know that listings included, among other things, tools that facilitated stealing passwords and login credentials, and malicious software that allows users remotely to control victim computers without authorization.

g.   As of October 2, 2013, when the website was shut down by law enforcement, there were approximately 13,000 listings for controlled substances on the website, listed under the categories "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants," among others.  The narcotics sold on the site tend to be sold in individual-use quantities, although some vendors sold in bulk.  The offerings for sale on

the site at any single time amounted to multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances, such as LSD.

h.   From in or about November 2011, up to and including at least in or about May 2013, HSI Agent-1 participated in dozens of undercover purchases of controlled substances from Silk Road vendors.  The substances purchased in these undercover transactions included various Schedule I and II drugs, such as ecstasy, cocaine, heroin, LSD, and others. Samples of these purchases were laboratory-tested and almost all tested positive for the drugs the items were advertised to be on Silk Road.

i.   In addition, from in or about September 2011, up to and including at least in or about May 2013, an agent of the Drug Enforcement Administration acting in an undercover capacity participated in over a dozen undercover purchases of controlled substances from Silk Road vendors, which controlled substances were shipped to an undercover mailing address located within the Southern District of New York.  The substances purchased in these undercover transactions included controlled substances, such as heroin, cocaine, cocaine base, oxycodone, and amphetamine.  Samples of these purchases were laboratory-tested and tested positive for the drugs the items were advertised to be on Silk Road.

j.   The only form of payment accepted on Silk Road was Bitcoins.  Bitcoins are an anonymous, decentralized form of electronic currency.   All Bitcoin transactions are recorded on a public ledger known as the "Blockchain," stored on the peer-to-peer network on which the Bitcoin system operates.   The Blockchain serves to prevent a user from spending the same Bitcoins more than once.  However, the Blockchain only reflects the movement of funds between anonymous addresses and therefore cannot by itself be used to determine the identities of the persons involved in the transactions.  Only if one knows the identities associated with each Bitcoin address involved in a set of transactions is it possible to meaningfully trace funds through the system.

k.   Bitcoins are not illegal in and of themselves and have known legitimate uses.  However, Bitcoins are also known to be used by cybercriminals for money-laundering purposes, given the ease with which they can be used to move money anonymously. Further, Silk Road used a so-called "tumbler" to process Bitcoin transactions in a manner designed to frustrate the tracking of

individual transactions through the Blockchain.  According to
the Silk Road wiki, Silk Road's tumbler sent all payments
"through a complex, semi-random series of dummy transactions,
. . . making it nearly impossible to link your payment with any
coins leaving the site."  In other words, if a buyer made a
payment on Silk Road, the tumbler obscured any link between the
buyer's Bitcoin address and the vendor's Bitcoin address where
the Bitcoins would end up - making it fruitless to use the
Blockchain to follow the money trail involved in the
transaction, even if the buyer's and vendor's Bitcoin addresses
were both known.  Based on my training and experience, the only
function served by such "tumblers" is to assist with the
laundering of criminal proceeds.

## ARREST OF ULBRICHT AND RECOVERY OF EVIDENCE
## FROM HIS LAPTOP COMPUTER

22.  On or about October 1, 2013, Ross Ulbricht was
arrested at a public library in San Francisco, California.  At
the time of his arrest, Ulbricht was using a laptop computer,
which was secured by law enforcement agents (the "Ulbricht
Computer").

23.  Pursuant to a search warrant, agents searched the
Ulbricht Computer and recovered, among other things, extensive
evidence reflecting Ulbricht's operation of Silk Road, including
journal entries and logs of chat communications between Ulbricht
(referenced in the chats as "myself") and various co-
conspirators.

24.  Through the journal entries, Ulbricht described in
detail how he created, designed, built, and operated Silk Road.
In a journal entry dated 2011, Ulbricht wrote about the Silk
Road's successful first year in operation, and in the following
excerpt, described how "Variety Jones" provided him with
significant advice and assistance with operating and managing
Silk Road:[2]

> Around this time, Variety Jones showed up.
> This was the biggest and strongest willed
> character I had met through the site thus
> far. He quickly proved to me that he had
> value by pointing out a major security hole

---

[2] All quoted journal entries and chat logs are repeated verbatim
herein, including any errors in spelling, grammar and
punctuation.

in the site I was unaware of. It was an
attack on bitcoind. We quickly began
discussing every aspect of the site as well
as future ideas. He convinced me of a server
configuration paradigm that gave me the
confidence to be the sole server
administrator and not work with someone else
at all. He has advised me on many technical
aspect of what we are doing, helped me speed
up the site and squeeze more out of my
current servers. He also has helped me
better interact with the community around
Silk Road, delivering proclamations,
handling troublesome characters, running a
sale, changing my name, devising rules, and
on and on. He also helped me get my head
straight regarding legal protection, cover
stories, devising a will, finding a
successor, and so on. He's been a real
mentor.

25.    Among these chat logs were over a thousand pages of
chats between Ulbricht and "VJ" and "Cimon," which ranged from
in or about December 2011 through in or about April 2013.  On or
about June 1, 2012, in the course of the chat logs, "VJ"
indicated, in sum and substance that he was no longer using the
online pseudonym "Variety Jones," and agreed to use the
pseudonym "cimon" going forward.  Overall, the chats reflected
that "VJ"/"Cimon" acted as an advisor and confidant to Ulbricht,
and advised Ulbricht on a regular basis regarding various
aspects of operating Silk Road.  From reviewing the contents of
these chats, I have also learned, in sum and substance and in
part, the following:

a.    VJ provided advice to Ulbricht in developing a
"cover story" to make it appear as if he had sold Silk Road,
consistent with the reference in the journal entry, quoted above
in paragraph 16.  For example:

i. During a chat dated December 9, 2011, VJ
advised Ulbricht to be discreet and limit the
number of people who know about his connection
to owning and operating the Silk Road website,
stating, "remember - someday it would be very
valuable information who started SR, and the
person who knows the guy who sold it on could
sell that info - if senators are bitching and

11

DEA is itching, they'd pay 7 figures for info leading to the site - and you will be interviewed someday - from my lips to your ears - be ready for it. . . one of them will someday realize there is lottery winning amounts of cash in giving you up as the creator of the site."

ii. During the same chat, VJ asked Ulbricht, in sum and substance, whether Ulbricht had disclosed to anyone in real life that he was involved in Silk Road: "IRL - is there anyone with a clue at all?  Girlfriend, boyfriend, bunny you talk to, online buddy's who you've know for years? Gramma, priest, rabbi, stripper?"  Ulbricht responded, "unfortunately yes.  They are two, but they think I sold the site and got out. . . and they are quite convinced of it."  VJ replied, "good for that - when do they think you've sold?" and Ulbricht responded, "about a month ago."[3]  Based on my training and experience, and my familiarity with this investigation, I believe that during this conversation, Ulbricht disclosed that he had told two people of his connection to Silk Road, but had lied to them by claiming that he had sold Silk Road to someone else.

iii. In a chat dated January 15, 2012, VJ asked Ulbricht whether he had seen the movie The Princess Bride, and whether he knew the "history of the Dread Pirate Roberts."[4]  VJ

---

[3] During Ulbricht's trial, a former friend of Ulbricht ("Friend-1") testified, in sum and substance, that Ulbricht had previously bragged to him during 2011 that Ulbricht was involved in creating and running Silk Road.  Further, Friend-1 testified that on November 11, 2011 (approximately one month prior to the quoted chat between VJ and Ulbricht), Ulbricht told Friend-1 that he was worried that Ulbricht's girlfriend had been careless with Ulbricht's secret that he ran Silk Road, and had sold Silk Road to someone else.

[4] The Princess Bride was a motion picture that was released in 1984.  Based on my familiarity with the film, I know that the film portrays the legend of the "Dread Pirate Roberts" character as bearing a name not belonging a single individual, but

explained the legend of the character "Dread Pirate Roberts," how "over the years, a new one would take the name, and the old one would retire." VJ insisted that Ulbricht should change his name on the Silk Road website "from Admin, to Dread Pirate Roberts" to "clear your old trail – to be honest, as tight as you play things, you are the weak link from those two prev contacts." Based on my training and experience, and my familiarity with this investigation, I believe that, during this conversation, VJ suggested that Ulbricht adopt the online pseudonym "Dread Pirate Roberts" on Silk Road to promote the lie he had told others that he had sold Silk Road to someone else ("clear your old trial – to be honest . . . you are the weak link from those two prev contacts.")

iv. I have reviewed a post from the Silk Road Forum, dated on or about February 5, 2012, in which the "Admin" account, known to be the chief administrator account for Silk Road, announced that "my new name is: Dread Pirate Roberts." Based on my discussions with agents involved in arresting Ulbricht on October 1, 2013 and my review of evidence collected from his arrest by an FBI computer forensic examiner, I know that at the time of Ulbricht's arrest, Ulbricht was actively logged into the Silk Road website as the "Dread Pirate Roberts" administrator account from his laptop computer.

b. VJ assisted with hiring programmers to help with improving the infrastructure of, and maintaining Silk Road. For example:

---

belonging to a series of individuals, each of whom passes his name and reputation to a chosen successor.

     v. In or about January 2012, VJ proposed to
Ulbricht that he hire a team of developers to
help test, improve, and maintain the computer
code for the Silk Road website.  VJ suggested
that the team be overseen by a programmer who
he referred to in the chats as "Tex".

    vi. By on or about January 15, 2012, VJ indicated
that the programmer was already working on
testing the code underlying the Silk Road
website, stating: "I'm meeting with Tex in a
few hours to go over his progress, his last
email a few hours ago indicated he's got a good
handle on things, and we'll be stress testing
tonight."

   vii. On or about January 17, 2012, VJ confirmed to
Ulbricht, in sum and substance, that the
programmer was aware that the programming work
was for Silk Road, and noted that the
programmer shared VJ's "dream of breaking the
DEA [Drug Enforcement Administration]."

      c. VJ recommended security improvements to the Silk
Road website.  For example, in a chat with Ulbricht dated on or
about December 7, 2011, VJ noted told Ulbricht that was "working
with you first to harden your systems . . . [w]hen we're done,
even getting the server will give them nothing. . . enforce
encryption on all order info – automatically if not done by the
customer/vendor – ditto with PM's – both sender and recip need
to have public keys posted – so only they can read them even if
the server is taken."  Based on my training and experience, and
my familiarity with this investigation, I believe that during
this conversation, VJ recommended to Ulbricht additional
security practices, including requiring that vendors use
encryption when sending delivery addresses, so that if law
enforcement was able to seize and image the Silk Road servers,
law enforcement would not have useable information with which to
target Silk Road users for buying and selling contraband.

      d. VJ communicated with Ulbricht regarding the rules
that were implemented to govern the Silk Road vendor and user
community.  For example, in a chat dated on or about December
28, 2011, Ulbricht and VJ discussed the rules against "out of
escrow" payments on Silk Road.  Based on my training and
experience, and my familiarity with this investigation, I know
that Silk Road handled payments through its own escrow system,
retained a cut of each sale of narcotics or other contraband as

14

a commission.  The rule against "out of escrow" payments forbade
customers from negotiating a sale with vendors, but then paying
for the contraband off the Silk Road system, thereby
circumventing the escrow system from which commission were
withdrawn.  During the conversation, VJ recommended that a
"bounty" or payment be offered to the Silk Road community to
report vendors who sought to perform transactions out of the
escrow system, and Ulbricht confirmed that he liked the idea.

     e.   VJ assisted Ulbricht and provided advice with
respect to promoting sales on the Silk Road website.
Specifically:

          viii.  In a chat dated on or about March 23, 2012, VJ
and Ulbricht discussed an upcoming promotion on
Silk Road, to occur for three days around April
20, 2012, called the "4/20 Sale."  I know,
based on my training and experience, that April
20th is observed as a counterculture holiday,
where drug users gather to celebrate and
consume marijuana.  Ulbricht provided VJ with a
draft announcement for the sale, which read:
"Roll up a doobie and put your party hat on
because the biggest stoner holiday is just
around the corner, and we've got alot of ganja
to deliver! We're pulling out all the stops to
celebrate 420 this year. Starting at 4:20 pm on
4/20/2012, we'll be giving away 420 prizes
every 420 seconds! WOO!!! Gift cards, badass
consumer electronics, real gangsta shit! And to
top it all off, we're sending one lucky buyer
on a dream vacation with all the trimmings!!!
The buzz around this is going to be HUGE!"

          ix.  Later in that conversation, VJ and Ulbricht
discussed various discounts and promotions that
narcotics vendors would offer during the course
of the sale.  In response to a proposal by
Ulbricht that the site not charge commission on
sales of contraband during the promotion, VJ
objected, stating "I'd like to think we can
bring more to the party than just dropped
commissions.  We're filling the prize barrel
already."  VJ noted the opportunity cost
involved in dropping commissions, indicating
that they expected approximately "a mil in
sales."

15

x.  During a chat dated on or about May 3, 2012, VJ
    and Ulbricht discussed the grand prize winner
    of the 4/20 sale, who was awarded an all-
    inclusive paid trip to Thailand, including
    approximately $4,000 in United States currency
    in spending money.  VJ informed Ulbricht that
    he had made the arrangements for the Thailand
    trip for the winner, provided the travel
    itinerary, and confirmed that the total cost to
    Silk Road was approximately $30,000 in United
    States currency.

xi.  During a chat dated on or about May 29, 2012,
     VJ informed Ulbricht that he was concerned
     about the grand prize winner of the 4/20 sale,
     because of his heroin addiction, stating, "I'm
     worried about our winner . . he's trying to dry
     out. . . heroin . . .it's not working . . . and
     I think his recent influx of cash didn't help.
     . . he told me some time ago he was trying to
     quit but SR make it kinda tough."  VJ expressed
     concern that the upcoming trip to Thailand
     (scheduled for mid-July 2012) might be
     problematic, stating, "I'm just worried that
     it's not the kinda place you wanna get caught
     trying to score H, or possessing it."  Ulbricht
     responded, "shoulda thought more carefully
     about dropping $4k on an addict . . . maybe our
     next prize will be 3 months in rehab."

f.  VJ also provided assistance and advice with
respect to the design of the Silk Road marketplace and related
projects.  For example during a chat dated on or about December
8, 2011, VJ provided advice to Ulbricht regarding how to reduce
the time it took for the home page for Silk Road to load onto a
Tor browser, and VJ also indicated that he was going to
undertake a comprehensive review of Silk Road's design.  VJ
wrote "on a browser restart, signed in, got a 9.3 second main
page load . . . we'll have to look at every page template you
have, but it will make a huge different."

g.  Further, VJ provided assistance with
investigating the disappearance of a Silk Road customer support
staff employee, who used the online pseudonym "Digital Alchemy,"
or "DA."  For example, on or about October 29, 2012, Ulbricht
and VJ (now using the pseudonym "cimon") discussed the
disappearance of a member of the Silk Road customer support
staff, who used the user name "Digital Alchemy," and was also

referred to as "DA."  During that conversation, in sum and
substance and among other things, VJ discussed trying to track
down DA's whereabouts, stating, "Bluntly - I need to know if
he's gone off the rails, or is simply fucked up. Off the rails
scares me. Point is, I think in 10 days or less I can find him.
Don't want to do a thing, just watch, learn, and be careful.
This is a whole nother level -- are you all right with this, or
do you want me to pull in my horns?"  Ulbricht responded, "go
for it.  it's a loose end."  Later in the conversation, VJ
opined, "I think someone got to him – not the cops – the
competition," and later stated, "Ha, dude, we're criminal drug
dealers - what line shouldn't we cross?"  Based on my training
and experience, and my familiarity with this investigation, I
believe that during this conversation, VJ informed Ulbricht that
he was trying to locate DA, who had disappeared, to ensure that
he was not cooperating with law enforcement.  Further, I believe
that VJ confirmed his knowledge that he and Ulbricht were
engaged in an illegal enterprise, involved in the sale of
controlled substances ("Ha, dude, we're criminal drug
dealers.").

      26.  Another file recovered from the Ulbricht Computer was
a text file labeled "log," reflecting various actions he took on
various dates in connection with operating Silk Road.  Several
of the log entries refer to VJ as "Cimon" and the work VJ/Cimon
did for Ulbricht.  Among other things, the entries included the
following:

            h.   An entry dated May 31, 2013, which states, "$50k
xferred to cimon."  Based on my training and experience, and my
familiarity with this investigation, I believe that this
indicates that, on or about that date, Ulbricht paid VJ
approximately $50,000 in exchange for his assistance with Silk
Road.

            i.   An entry dated June 3, 2013, which states, "put
cimon in charge of LE counter intel."  Based on my training and
experience, and my familiarity with this investigation, I
believe that in this post, Ulbricht indicated that VJ was in
charge of counter intelligence ("counter intel") on the efforts
that law enforcement ("LE") was making to attempt to investigate
Silk Road.

      27.  Further, another file recovered from the Ulbricht
Computer was a spreadsheet file labeled "sr_accounting,"
reflecting various Silk Road related expenses.  These included
several additional references to payments to VJ (under the

online pseudonym "cimon"), including payments of approximately:
(1) $93,150 in United States currency on or about November 16,
2012; (2) $50,000 in United States currency on or about May 7,
2013; and (3) $57,000 in United States currency on or about July
3, 2013.

## Identification of ROGER THOMAS CLARK as "Variety Jones" a/k/a "VJ" a/k/a "Cimon" a/k/a "Plural of Mongoose"

28.   Based on my review of chat logs between Ulbricht and
various co-conspirators, I know that Ulbricht required staff
members to provide a scanned copy of personal identification
documents, in order to work for him as part of the Silk Road
enterprise.   Based on my review of the contents of the Ulbricht
Computer, I know that it contained a folder labeled "IDs," that
contained a number of encrypted image files, each of which was
entitled with the online pseudonym of a Silk Road co-
conspirator.

29.   I have reviewed the contents of a decrypted version of
the image file entitled "cimon.jpg," which contains a passport
issued by Canada for ROGER THOMAS CLARK, lists his date of birth
as September 13, 1961, and indicates that it was issued in the
United Kingdom of Great Britain and Northern Ireland ("UK").

30.   Based on my review of open source corporate records
for UK businesses that I found on the Internet, I know that
ROGER THOMAS CLARK is listed on a UK corporate filing for a UK-
based company called "Gypsy Nirvana Limited," which indicates
that "Thomas Clark" was a director of the company, and lists him
as a Canadian national, born on September 13, 1961.   In a chat
recovered from the Ulbricht Computer dated June 28, 2012,
"cimon" informed Ulbricht that "cimon" had "created the Gypsy
Nirvana nic," and that "a guy in England started a seed biz
using my name, and me promo'ing it in public."   Based on my
training and experience, and my familiarity with this
investigation, I believe that in this conversation, "cimon"
admitted to being involved with Gypsy Nirvana Limited, which, as
noted above, was a UK-based company for which CLARK served as a
director.

31.   Further, on or about April 21, 2015, a cooperating
witness ("CW-1")[5] advised law enforcement, in substance and in

---

[5]  CW-1 has been charged with federal crimes for his participation
and involvement with Silk Road, and is cooperating with law
enforcement in the hopes of obtaining a cooperation agreement
with the Government, and ultimately leniency at the time that

part, that "Roger Clark" is the individual who used the online
nicknames "Variety Jones," "VJ," in connection with Silk Road,
which corresponds to the name on the identification documents
recovered from the Ulbricht Computer, and that "Roger Clark" has
also used the nickname "Gypsy Nirvana."  Further, CW-1 told law
enforcement, in sum and substance and in part, the following
about "Roger Clark," which is consistent with disclosures made
by "VJ"/"Cimon" in chat logs recovered from the Ulbricht
Computer:

        j.    "Roger Clark" also used the online nickname
"Mongoose."  The chat logs recovered from the Ulbricht Computer
include a June 28, 2012 chat between Ulbricht and "Cimon" in
which Cimon indicated that Cimon has also used the nickname
"Plural of Mongoose" ("I was, and am, Plural of Mongoose. . .
Folks who know and love me, it's Mongoose.").

        k.    "Roger Clark" is a Canadian national that had
previously lived in the UK.  As noted above in paragraph 21, the
scanned version of the ROGER THOMAS CLARK passport recovered
from the Ulbricht Computer indicates that he is a Canadian
national, and that his passport was issued in the UK.  This is
further corroborated by chat logs recovered from the Ulbricht
Computer, which indicate that: (1) on or about May 17, 2012,
"VJ" informed Ulbricht that he was facing deportation
proceedings in the UK; (2) on or about June 28, 2012, "Cimon"
informed Ulbricht that he would be deported to Canada if the
proceedings did not go favorably for him; and (3) on or about
July 6, 2012, "Cimon" informed Ulbricht that UK authorities
agreed to let him depart voluntarily from the UK.

        l.    "Roger Clark" was living in Thailand.  Chat logs
recovered from the Ulbricht Computer include multiple references
to "Cimon" living in Thailand by in or about September 2012, and
through at least February 2013.[6]

---

CW-1 is sentenced.  Information provided by CW-1 about Silk Road
and ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a
"Cimon," a/k/a "Plural of Mongoose," the defendant, is
consistent with evidence collected from the Ulbricht Computer
(including evidence indicating that CW-1 and CLARK had personal
dealings with each other), publicly available information about
UK corporations, and information recovered from the Silk Road
servers.

[6] The chat logs between Ulbricht and "VJ"/"Cimon" terminate on or
about April 3, 2013.  Prior to their termination, there are

32.   Accordingly, I believe that the advisor and confidant who worked with Ulbricht on Silk Road and went by the online nicknames "Variety Jones," "VJ," and "Cimon" is ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant.

WHEREFORE, I respectfully request that an arrest warrant be issued for ROGER THOMAS CLARK, a/k/a "Variety Jones," a/k/a "VJ," a/k/a "Cimon," a/k/a "Plural of Mongoose," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                                  GARY L. ALFORD
                                  Special Agent
                                  Internal Revenue Service

Sworn to before me this
17th day of December, 2015

HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

references to switching over to a different online chat program, called "Pidgin," which was not logged on the Ulbricht Computer.