Roger Thomas Clark
Inmate #85815-054
Metropolitan Detention Center
100 29th Street
Brooklyn, NY   11232

March 19, 2019

The Honorable William H. Pauley, III
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:   United States v. Roger Thomas Clark
      S2 15 Cr. 866 (WHP)

Your Honor,

As was discussed during the status conference on January 25, 2019, I write this letter in support of a request for an adjustment of the motion schedule and trial date. I understand that the Government has apparently agreed to take no position in this regard, and I appreciate Your Honor taking the time to consider this matter.

As the Second Circuit noted in its decision in the appeal of the related case of Ross Ulbricht, "a district court has a great deal of latitude in scheduling trials." United States v. Ulbricht, 858 F.3d 71, 109; 2017 U.S. App. LEXIS 9517 (2d Cir. 2017) quoting United States V Griffiths, 750 F.3d 237, 241; 2014 U.S. App. LEXIS 7863 (2d Cir. 2014) (internal quotation marks omitted). Thus, "trial courts enjoy very broad discretion in granting or denying trial continuances" Ulbricht, 858 F.3d at 109, quoting United States v. Stringer, 730 F.3d 120; 127, 2013 U.S. App. LEXIS 19159 (2d Cir. 2013). I believe there are several reasons that this Court should exercise that discretion in favor of providing me with more time to review the discovery.

As courts have often noted, complex cases require additional time to prepare, and this case is complex in large part because it involves voluminous discovery. See United States v. Astra Motor Cars, 352 F. Supp. 367, 369; 2005 U.S. Dist. LEXIS 577 (E.D.N.Y. Jan 14, 2005) (holding that a complex case designation was justified by the "extraordinary volume of discovery"); Minute Entry, Veliu, No. 17-CR-404 (designating case as complex noting the "voluminous discovery"); Minute Entry, United States v. Webb, No. 15-CR-252 (PKC) (E.D.N.Y. Aug. 14, 2015) (Dkt. 61) (designating FIFA racketeering case as complex and noting that "discovery is voluminous").

1

Your Honor relied on the extreme quantity of discovery in analyzing the propriety of excluding time under the Speedy Trial Act in United States v. Chichakli, S3 09 cr. 1002; 2014 U.S. Dist. LEXIS 154016 (S.D.N.Y. Oct. 16, 2014):

> Exclusion of time under the Speedy Trial Act
>
> Legal Standard
>
> The Speedy Trial Act generally requires that a trial commence within 70 days of the filing of an indictment or the defendant's initial appearance. 18 U.S.C. 3161(c)(1). Recognizing that every criminal case is distinct, that Act contains many specific exclusions from the 70-day period. The Act also includes a more flexible ends-of-justice exclusion, which permits a court to grant a continuance and exclude that time if, after considering certain factors, it makes an on-the-record finding that "the ends of justice served by [granting the continuance] outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. 3161(h)(7)(A). Among that factors courts consider in determining whether to grant an ends-of-justice continuance are avoiding "a miscarriage of justice," allowing "adequate preparation in complex cases" and ensuring "effective preparation of counsel generally." 18 U.S.C. 3161(h)(7)(B)(i)-(ii), (iv); see also United States v. Gambino, 59 F.3d 353, 357-8 (2d Cir. 1995) ("[A] court is vested with broad discretion to grant [an] exclusion when in its view, the case's complexity makes it necessary to grant counsel further time to prepare in order to ensure a fair trial.")(Citations omitted).

This Court in the Chichakli decision went on to note that "Approximately 1.5 terabytes of data were contained in the . . . discovery tranche. Conservatively, that amounts to more than 90 million pages." Id. A couple of years later the Second Circuit compared the capacity of one terabyte of data to that of 12 academic library floors worth of books. See United States v. Ganias, 824 F.3d 199, 217; 2016 U.S. App. LEXIS 9706, (2d Cir. 2016).

By the two metrics above the 8.5+ terabytes (when uncompressed) discovery on the two hard drives supplied to the defense consists of, at a minimum, in excess of 500 million pages, or over 100 library floors worth of books.[1]

---

[1] In addition to the 8.5 terabytes of government-provided discovery I received on the laptop and two hard drives, which can only be viewed by special access to an office in the East Visiting Room of MDC, I also am in receipt of tens

2

In <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972), the United States Supreme Court established a four-part test for determining whether a defendant's right to a speedy trial has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right (to a speedy trial) in the run-up to the trial; and (4) whether the defendant [is being] prejudiced by the failure to bring the case to trial more quickly." <u>United States v. Cain</u>, 671 F.3d 271, 296; 2012 U.S. App. LEXIS 1772 (2d Cir. 2012) (citing <u>Barker v. Wingo</u>, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)). The court in <u>Barker</u> cautioned that none of the four factors has a talismanic quality and that there is "no constitutional basis for holding that the right to a speedy trial can be quantified into a specific number of days or months." <u>Barker</u>, 407 U.S. at 523.

The Second Circuit has observed that, while no one <u>Barker</u> factor is independently dispositive, the reason-for-delay factor "is often critical" in the analysis of a speedy trial claim. <u>United States v. Moreno</u>, 789 F.3d 72, 79; 2015 U.S. Ap.. LEXIS 9382 (2d Cir. 2015). The <u>Barker</u> Court differentiated between three types of delay: (1) deliberate; (2) neutral; and (3) valid. See <u>Barker</u>, 407 U.S. at 531. Each type of delay is assigned a different weight under the <u>Barker</u> analysis. <u>Id</u>. Deliberate attempts to hamper the defense weigh heavily against the Government. Id. Neutral factors, like "negligence and overcrowded courts," weigh against the Government, but not heavily. <u>Id</u>. (reasoning that "the ultimate responsibility for such circumstances must rest with the [G]overnment rather than with the defendant"). Valid reason[s] justify the corresponding delay and do not weigh against any party. See <u>Id</u>.; <u>United States v. Tigano</u>, 880 F.3d 602, 612; 2018 U.S. App. LEXIS 1544 (2d Cir. 2018).

Any delay between my initial arraignment and the trial date would be at the request of the defense, and for the purpose of sifting through an extraordinary if not just voluminous amount of discovery, and would be classified as neutral under a <u>Barker</u> analysis.

In determining whether delay violates due process there is no bright-line limit that applies in all circumstances. <u>United States v. Briggs</u>, 697 F.3d 98, 103; 2012 U.S. App. LEXIS 20831 (2d Cir. 2012). "Indeed, the Second Circuit has acknowledged that long detentions may be justified in part by the inherent complexities of . . . case[s] which present[] defense counsel with voluminous discovery to absorb." <u>United States v. Newbern</u>, 15-CR-98-FPG-2; 2018 U.S. Dist. LEXIS 39943 (W.D.N.Y. Mar. 12, 2018) quoting <u>United States v. Briggs</u>, 697

---

of thousands of pages of printed discovery and research, as well as tens of thousands of pages on optical (CD/DVD) disks provided by my counsel. The former can be studied anytime, and the latter pretty much any time during the afternoon or evening on a discovery computer located on the housing unit, and which allows viewing of (only) optical disks.

F.3d at 102 (citing United States v. Hill, 462 F. App'x 125, 127 (2d Cir. 2012)(summary order)). See also United States v. Wey, 15-cr-611 (AJN); 2017 U.S. Dist. LEXIS 6991 (S.D.N.Y. Jan. 18, 2017) (the court recognized that reviewing and analyzing voluminous discovery is a laborious and time-consuming process, and as a result the trial was set to begin more than two years after Wey was indicted.) In an observation that is stunningly apposite here, "[the Barker Court] wrote that 'the delay that can be tolerated for an ordinary street crime is considerably less than for a complex conspiracy charge'." United States v. Liounis, 12 CR 350 (ILG); U.S. Dist. LEXIS 147476 (E.D.N.Y. Oct. 10, 2013), quoting Barker, 407 U.S. at 531.

The amount of discovery in this case is truly extraordinary, and I have not yet had a significant amount of time to review it. At my arraignment on June 19, 2018, the government indicated that it had made arrangements for a laptop loaded with "voluminous discovery" to be made available to me at the MDC. It was another five months (mid-November, 2018) before a laptop with two external hard drives arrived at the MDC, the equipment was cleared for my use by MDC staff, and the required passwords for the hard drives were received. As a result, when the current trial schedule was discussed in September of 2018, I had yet to receive the massive amount of material – some 8.5 terabytes (the majority being discovery from the Government) – of material, and as result, I was not in a position to comment on the appropriateness of the trial date at that time.

Between the time I received the laptop and drives in November 2018, and the beginning of March 2019, my access to the material was erratic and unpredictable at the MDC. This occurred for a number of reasons, including the 35-day government shutdown, which was followed by an almost ten-day period during which the facility was locked down as a result of issues with the MDC's physical plant. Those problems seem solved now, and since the beginning of March, 2019, daily access from 0830hrs to 1500hrs seems to be consistently possible, with the possibility to stay past 1600hrs in-room count until 1900hrs, by special arrangement, if required, allowing 6.5 to 10.5 hours a day access. That all said, to date I have been able to study approximately 3% of the discovery provided.

I now have a system to prioritize and then carefully sift through selected portions of the supplied discovery. I am aware that there is no way it is humanly possible for even a few people to collectively view and analyze all the data available. However, I am taking a highly active role in my own defense, and I believe it is my right to attempt to glean all the information I can from the discovery in a reasonable amount of time, and I believe that reasonable amount of time is reflected in the schedule I am requesting.

In the January 25, 2019 conference Your Honor noted as support for a 2019 trial date the fact that my detention has already exceeded three years, counting my time in custody in Thailand. I don't believe that is a fair metric to use

in deciding when to set the trial date. From December 3, 2015, to June 15, 2018, I was in custody in Bangkok prison in Thailand. No indictment had yet been unsealed, nor was I arraigned until after I had arrived in New York City in the custody of U.S. Marshalls on June 15, 2018. Any clock concerning my detention by any arm of the American justice system, or any calculation of when is a fair date to set the trial, must be started no earlier than my arrival on American soil. It was only after my arraignment that I had any access to discovery or legal assistance concerning the charges I am facing. While in Thailand I had no access to American legal services--in fact it would have been illegal for an American lawyer to offer his or her services in Thailand, the practice of law there is restricted to Thai nationals born in Thailand.

Only the time I have spent in detention while in the custody of the Federal Bureau of Prisons should be considered. I believe a request for additional time is reasonable in the light of the voluminous amount of discovery and the extensive amount of trial preparation that lies ahead.

The Government in this case has referred to the Ulbricht case as a touchstone for determining deadlines, as is to be expected as the vast majority of discovery in this matter stems from the Ulbricht prosecution. During the course of the Ulbricht trial, the defense posited that Ulbricht had created and run the Silk Road website initially, and then sold it, only to return to operating it shortly before it was seized by law enforcement, concurrent with his arrest. As well, a large amount of discovery material was from Ulbricht's laptop. Thus, Mr. Ulbricht could be assumed to be familiar with much of the discovery material.. Ulbricht's prior knowledge of the discovery allowed that case to proceed to trial in just under 16 months after Mr. Ulbricht's arraignment; far less time was required for discovery than would have been the case if he was not already familiar with a large amount of the discovery.

The same cannot be assumed in this case regarding the material found on Mr. Ulbricht's laptop or the Silk Road servers. Any assumption that I have prior knowledge of any of the discovery would be inconsistent with the presumption of innocence. "Since [a] defendant is presumed innocent because of his plea of not guilty, it cannot be assumed that he knows the particulars . . . and he can only be considered 'ignorant of the facts on which the pleader founds his charges'." United States v. Tucker, 262 F. Supp. 305, 307; 1966 U.S. Dist. LEXIS 7501 (S.D.N.Y. Dec. 7, 1966) (quoting Fontana V. United States, 262 F. 283, 286 1919 U.S. App. LEXIS 1928 (8th Cir. 1919)); accord United States v. King, No. 94 Cr. 455 (LMM); 1995 U.S. Dist. LEXIS 4222, 1995 WL 146252, at *1 (S.D.N.Y. Apr. 4, 1995) ("[A] defendant being presumed to be innocent, it must be assumed that he is ignorant of the facts on which the pleader founds his charges." (alteration and citation omitted)); United States v. J M Huber Corp., 179 F. Supp. 570, 573; 1959 U.S. Dist. LEXIS 2419 (S.D.N.Y. Dec. 30, 1959) (characterizing the same argument as "one which long ago ought to have been laid at rest").

5

In my review of the discovery and other case-related material my trial counsel had provided me so far, I have discovered no fewer than eight *major* factual errors that went completely un-noticed during the Ulbricht trial by any party, as well as in the years since in either the appellate court or any public venue. All eight errors were serious, and cumulatively likely would have dramatically changed the course of the Ulbricht trial

Extraordinary claims require extraordinary proof, so as an example I offer up the least serious and most easily explained of the errors promulgated by the Government during the Ulbricht trial, in support of my need to have the time to prepare for my case properly. The error came out in the testimony of Michael Duth, and was exploited and reinforced in the closing statements of Assistant United States Attorney Serrin Turner, both of whom were referring to a spreadsheet (Government Exhibit 703A - TR at 1530) that had been entered into evidence.

<u>United States v. Ulbricht</u>, 1:14:-cr-00068-KBF; PACER #214

Trial transcript at 1530

(WEDNESDAY, JANUARY 28, 2015, AFTERNOON SESSION) Document 214, pp. 214, 245.

<u>Excerpt from direct examination of MR. MICHAEL DUCH by MR. SERRIN TURNER</u>:

Q. OK. So how many orders did you do in total?

A. 2,414.

Q. And how many bags of heroin did you sell?

A. 31,827.

Q. It is about 10 milligrams per bag?

A. That is correct.

Q. Was it ever more than that?

A. Sometimes. Sometimes more. Sometimes a little less. That is about an average.

Q. OK. And total estimated weight, you just multiplied the paper bag times the bags you sold and it is 3.18 kilograms of

6

    heroin?

A.   That's correct.

===============================================================

United States v. Ulbricht, 1:14-cr-00068-KBF; PACER #218

Trial Transcript at 2176

(TUESDAY, FEBRUARY 3, 2015, AFTERNOON SESSION) Document 218, pp. 113, 187

    Excerpt from closing arguments by MR. SERRIN TURNER:

    MR. TURNER: Before I go into Count Four, let me touch briefly on drug quantities. Assuming you find the defendant guilty on Count One, Two or Three, you will be asked to make a further finding, whether certain quantities of drugs were involved in the offenses, how much of these substances did the defendant help others distribute, or agree with others to distribute. More than a kilogram of heroin. More than five kilograms of cocaine. At least ten grams of LSD, or at least 500 grams of methamphetamine.

    So for heroin it's easy. Michael Duch told you he alone distributed over three kilograms of heroin as a dealer on the site, which by itself puts the amount over the threshold and that's just one vendor.

===============================================================

    Now, the chain of events above seems pretty straightforward. Mr. Duch confirmed the prosecutor's statement that he, Mr. Duch, sold 3.18 kilograms of heroin. Then the prosecutor reiterated that fact in his closing arguments. Finally, Judge Forrest charged the jury with instructions concerning the threshold amount for heroin being 1 kilogram. (Ulbricht TR. at 2283.)

    It all does seem pretty straightforward.

    But the testimony was factually – mathematically – incorrect.

    Mr. Duch testified that he sold 31,827 bags of heroin containing 10 milligrams per bag. A milligram is 1/1,000th (One Thousandth) of a gram, or 0.001 grams. Ten milligrams, the size of each bag of heroin Mr. Duch sold, is 1/100th (One Hundredth) of a gram, or 0.01 grams. To get 1/100th of 31,827 you

7

multiply by 0.01 grams. In other words, you move the decimal place in 31,827 two places to the left, and you get an answer of 318.27 grams, or 0.318 kilograms, 1/10th, or only 10% of the amount that the prosecution incorrectly calculated.

The prosecutor, Mr. Turner, over-stated the amount of heroin Mr. Duch sold by an order of magnitude! Mr. Duch then confirmed this figure of 3.18 kilograms that he was prompted with. So the jury was left with the highly mistaken impression that Mr. Duch sold 10 times more heroin than he actually did, and that such an amount was over 3 times the threshold limit they were instructed they had to find, when in fact it was less than 1/3rd of the threshold limited they were required to determine as per the Judge's instructions. The sentencing guidelines are significantly different for 3.18 kilograms and 318 grams, to put it mildly.

This one example highlights that the importance of my review of the voluminous amount of discovery cannot be overstated. As noted supra, the Government appears to be prepared to, for the most part, re-prosecute the Ulbricht trial here based upon the same set of evidence and discovery offered so far. My uncovering of eight significant errors thus far stands as proof that I need to put additional, time-consuming effort into perusing discovery, and that being forced into 'skimming' the contents of various discovery files due to lack of time is equivalent to denying discovery completely.

If a trial date were set for mid-September 2020, I will have been detained in the custody of the American legal system for approximately 27 months. This length of time falls within the range of delays that the Second Circuit has upheld against defendants' claims that the delays violated their right to due process. See United States v. Infanti, 474 F.2d 522, 527; 1973 U.S. App. LEXIS 11423 (2d Cir. 1973) (28 months); United States v. McGrath, 622 F.2d 36,41; 1980 U.S. App. LEXIS 17423 (2d Cir. 1980)(24 months); United States v. Vazquez, 918 F.2d 329, 337; 1990 U.S. App. LEXIS 19474 (2d Cir. 1990)(26 months); United States v. Jones, No. 12-CR-125W, 2015 U.S. Dist. LEXIS 101773 (W.D.N.Y. Nov. 10, 2015) (holding that a pretrial incarceration period of 32 months, with the potential to last more than 60 months, did not violate defendant's due process rights because the delay was largely attributable to the defense); United States v. Rounds, 619 F. Appx. 40, 41; 2015 U.S. App. LEXIS 18893 (2d Cir. 2015) (summary order) (holding that defendant's 65 month pretrial detention period did not violate his due process rights because the delay was largely attributable to the defense).

In light of the above, I ask that Your Honor set a date of mid-March of 2020 for submission of motions and mid-September of 2020 for the trial date. I appreciate your consideration of my request.

I remain,

Yours sincerely,

_____/rc/_____
Roger Thomas Clark