UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

            v.                              :        Indictment No.
                                          15-cr-866 (WHP)
                                    :

ROGER THOMAS CLARK,                          :

               Defendant.                   :

-------------------------------------------------------------x

## SENTENCING MEMORANDUM

Stephanie M. Carvlin
Counsel for Roger Thomas Clark
140 Broadway, Suite 4610
New York, New York   10006
212-748-1636

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**………………………………………………………...1

I.   **MR. CLARK'S CONDITIONS OF CONFINEMENT IN THAILAND PRIOR TO HIS EXTRADITION TO THE UNITED STATES**…………..2

II.  **MR. CLARK'S CONDITIONS OF CONFINEMENT AT THE MDC**…………………………………………………………………...12

    **The Government Shutdown**…………………………………………13

    **The Blackout**………………………………………………………15

    **COVID-19**…………………………………………………………20

III. **OBJECTIONS TO THE PSR**…………………………………23

IV.  **THE STATUTORY SENTENCING FACTORS**…………………………24

    **The Sentencing Guidelines Range**………………………………24

    **The Nature of the Offense**………………………………………25

    **The History and Characteristics of the Defendant**………………26

    **The Kinds of Sentences Available**………………………………26

V.  **WHAT SENTENCE IS APPROPRIATE TO IMPOSE IN THIS CASE**…………………………………………………26

    **Individual Deterrence, Likelihood of Recidivism and The Need to Protect the Public**………………………………27

    **The Need to Promote Respect for the Law, Reflect the Seriousness of the Offense and Provide Just Punishment**……………………………………………29

**CONCLUSION**………………………………………………………30

i

## **TABLE OF AUTHORITIES**

**United States Sentencing Guidelines Provisions**

U.S.S.G. §3C1.1…...…………………………………………………………24, n11

U.S.S.G. §2D1.1, Application Note 7……………………………………….24, n11

U.S.S.G. §2D1.1(b)(16)(D)…………………………………………………..24, n11

U.S.S.G. § 5G1.1(a)……………………………………………….…24, n11

**Cases**

*DeShaney v. Winnebago County Dept. of Social Services*,
    489 U.S 189 (1989)………………….…………………………………….12

*Koon v. United States*,
    518 U.S. 81 (1996)…………………………………………….....22

*Lareau v. Manson*,
    651 F.2d 96 (2d Cir. 1981)…………………………...……………12

*Simon v. United States*,
    361 F. Supp. 2d 35 (E.D.N.Y. 2005)………………………………..……28

*United States V. Alexander*,
    860 F.2d 508 (2d Cir. 1988)………………………………………..29

*United States v. Booker*,
    543 U.S. 220 (2005)……………………….………………………23, n10

*United States v. Carty*,
    264 F.3d 191 (2d Cir. 2001)………………………………………29

*United States v. Carmona-Rodriguez*,
    2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)………………………………28

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005)………………………………………23

*United States v. D.W.*,
    198 F.Supp.3d 18 (E.D.N.Y. 2016)………………………………………22

*United States v. Hamilton*,
    323 F. App'x. 27 (2d Cir. 2009)…………………………………………...27

*United States v. Ministro-Tapia*,
    470 F.3d 137 (2d Cir. 2006)…………………………………………23, n10

*United States v. Nellum*,
    2005 WL 300073 *3 (N.D. Ind. Feb. 3, 2005)………………………………27

*United States v. Nkanga*,
    2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)……………………...20

*United States v. Ozols*,
    2020 WL 2849893 at *4 (S.D.N.Y. June 2, 2020)…………………………22

*United States v. Scparta*,
    2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)………………………...21

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2019)………………………………………………...23

*United States v. Zukerman*,
    451 F.Supp. 3d 329 (S.D.N.Y. 2020)………………………………………22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

              v.                    :          Indictment No.
                                             15-cr-866 (WHP)
                                   :

ROGER THOMAS CLARK,                          :

              Defendant.              :

-------------------------------------------------------------x

## **PRELIMINARY STATEMENT**

During the almost five years Roger Thomas Clark will have spent in custody prior to his sentence, he endured conditions of confinement both in Thailand prior to his extradition to the United States and in the Metropolitan Detention Center ("MDC") that fail to meet the minimum standards a civilized society imposes on those charged with the care of others. While incarcerated in Thailand, Mr. Clark was given inadequate food, inadequate clothing, inadequate space and insufficient protection from other inmates and guards who constantly preyed on those they perceived to be vulnerable.[1] In a letter he is submitted to the Court in relation to his sentencing, Mr. Clark describes life in the Bangkok Remand Prison ("BRP") in chilling terms. See Exhibit A hereto. Reports by several international human rights groups and non-government organizations ("NGOs") support his claims. Indeed, when he arrived in the United States, Mr.

---

[1] The factual assertions in this submission are based on information provided by Mr. Clark in Exhibit A, a letter he is submitting to this Court and, where noted, external sources such as reports by government agencies or NGOs or affidavits filed in other cases.

Clark had a treatment-resistant fungal infection and a recurring rash that ravaged his body. He weighed only 93 pounds. When he was taken into custody in Thailand he had weighed 180. *See* Exhibit A at 12.

While incarcerated at the MDC, Mr. Clark has also endured unreasonably harsh conditions of confinement as a result of the 35-day shutdown of the government from December 22, 2018, to January 25, 2019, the power outage ("blackout") at the MDC from January 27, 2019, through February 2, 2019, and the COVID-19 pandemic that since March 3, 2019, has led to constant lockdowns and the attendant limitations on inmates' activities. Mr. Clark respectfully submits that this Court should impose a sentence that takes his conditions of confinement into consideration.

### I.       MR. CLARK'S CONDITIONS OF CONFINEMENT IN THAILAND PRIOR TO HIS EXTRADITION TO THE UNITED STATES

Mr. Clark was arrested in Thailand on December 3, 2015, and was extradited to the United States 31 months later on June 15, 2018. Presentence Investigation Report ("PSR") at 1. Between his arrest and his extradition, Mr. Clark was incarcerated in a country that is renowned for the brutality of its prisons.

Indisputably the conditions in prisons in Thailand fall far below those in federal prisons in the United States. What is perhaps less obvious is just how barbaric conditions are at some Thai prisons, including BRP, where Mr. Clark was detained pending his extradition. While Thailand signed to the United Nations Convention Against Torture and Cruel, Inhuman or Degrading Treatment

or Punishment ("UNCAT") in 2007, Amnesty International,[2] human rights groups[3] and the United States Department of State[4] all have written about the shocking treatment that prisoners are subject to in Thailand.

Mr. Clark's description of what BRP was like for the 31 months he was there, while consistent with these reports, is far more vivid. Exhibit A. The overcrowding of the prison is the most easily quantified of the brutality that he experienced while at BRP. Mr. Clark shared a cell of approximately 258 square feet with seventy-five to eighty-five men. Exhibit A at 2. A wooden platform was constructed along one wall of his cell – cell ten in sub-prison 8. The shelf was approximately six feet wide and was raised 2 feet above the floor of the cell. Men slept on the platform and below it. *Id*. No mattresses or blankets were provided. Mr. Clark describes his "bedding" as follows:

---

[2] *See Concluding Observations on the initial report of Thailand*, United Nations Committee against Torture, June 20, 2014. http://docstore.ohchr.org/SelfServices/FilesHandler.ashx?enc=6QkG1d%2FPPRi CAqhKb7yhsk2oy72JIefPnicA9mLXtq%2B9%2F5hbXwg%2B5JWNDr0RdTusMR gzu6yegqVTu8QgwbPcc9dIir1Tfe5g9kMOTJykFvZmYIG7TVsYdYCm2OgOMRJ K. (Expressing "serious concern" about conditions of confinement in detention centers, including "insufficient ventilation and lighting, poor sanitation and hygiene facilities and inadequate access to health care" as well as "violence in detention, including sexual violence by prison guards or other prisoners with the acquiescence of the authorities.")

[3] *See Thailand Submission to the United Nations Committee Against Torture, 52nd Session, 28 April – 23 May, 2014*, AMNESTY INTERNATIONAL, 2014 ("Amnesty International has received credible reports of the practice of torture and other ill-treatment in prisons."). https://www.amnesty.org /download /Documents/8000/asa390032014en.pdf

[4] *See 2018 Country Reports on Human Rights Practices: Thailand*, United States Department of State, 2019. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/thailand.

> When I first arrived at sub-prison 8, I was issued 2 sackcloth blankets, which were really more like the thickness of sheets, and measured about 3 ft x 6 ft. In mid-2016 the military toured the prison, and declared that we didn't need the blankets. The officers seized them all and burned them. After that, we slept on the concrete floor wearing shorts and a t-shirt, and nothing more.

Exhibit A at 4. Because of the absence of space, men slept on their sides, knees to the next man's back. See photograph of conditions at Thai prison, attached hereto as Exhibit B[5]. Mr. Clark reports that as a result of sleeping on his side for the two and a half years he was at BRP, he has an ongoing impairment:

> It is either a nerve or circulation problem, or possibly both. Medical staff here [at the MDC] is stymied. Now I cannot lay on my left side, back or stomach without my left thigh going numb, with a feeling of excruciating fire in my left leg.

Exhibit A at 4. In his letter to the Court, Mr. Clark also notes that while at BRP, he was "inflicted with numerous intestinal parasites, scabies, pinworm, ringworm and several other types of fungal infections, and countless insect bites." Exhibit A at 6.

The inmates at BRP were locked in their cells from 2:00 p.m. when they completed their work assignments until 6:30 a.m., a period of sixteen and a half hours per day. *Id*. They were not allowed to have food or water during this period. *Id*.

The most repulsive conditions at the prison concerned the lack of sanitation. There was one toilet – a hole in the ground – in Mr. Clark's cell, which

---

[5]This is not a photograph of BRP, the prison where Mr. Clark was held. However, the photograph depicts conditions that mirror those Mr. Clark experienced. See Exhibit A.

was routinely shared by eighty men for the sixteen hours a day they were locked

inside. Mr. Clark describes the filth this situation created:

> There was no privacy whatsoever, and prisoners were in full view of each other throughout the cell. There was a hose pipe that had about an 8" hose dangling from it, that was for rinse water to wash excrement down the drain and for personal cleaning. There was no toilet paper, nor bowl to hold water. After defecating, one had to scoop water from the pipe with the left hand to clean oneself. We were not allowed to bring any bottled water into the cells. Shorts (no underwear allowed) and a t-shirt were the only two items that were permitted, enforced by strip searches every day before entering the cells.
>
> Because of the ongoing drought in Thailand, and in fact in large swaths of SE Asia, the water was shut off at 6:00 p.m. every night, so there was no water for cleaning or flushing waste away. One does not truly know the meaning of despondent until they are crouched over a 4" hole in the floor suffering explosive diarrhea from dysentery, with no water to clean oneself or the floor. Many people became nauseous at the mess which stank indescribably in the heat, and would get sick, causing others to also vomit as a result. Dysentery was common due to poor water sanitation facilities, and everyone suffered from it at least several times a month. The area around the toilet became a cesspool of urine, excrement, and vomit on most nights. Prisoners who were unable to clean themselves had to stand against an outside wall for the rest of the night, so as not to spread the mess throughout the rest of the cell.

Exhibit A at 8. When it rained the hole overflowed, spilling human waste onto the

floor of the cell:

> Prisoners would take off their clothes to try and dam the area around the drain if the rain wasn't too heavy. In heavier rains prisoners were force to choose between standing or sitting down in foul sewage water remnants until we were released at 6:30 a.m., and rushed to the shower area to clean up before breakfast.

*Id*. at 8.

There were 16 squat toilets in the "yard," that the inmates had access to during the daytime hours they were not locked in their cells. Those toilets were used by 1200 men. While there were wooden barriers on the sides between the "stalls", there was   "no door on the front, and [they] offered absolutely no privacy." Exhibit A at 7. The "open wall of the 16,000 square foot paper factory on the main floor of the building faced the toilets." *Id.*

The prison served only breakfast and lunch. The food often was not edible:

> The food provisions were nutritionally inadequate, and the water was not always potable. Breakfast usually consisted of a "soup" with one fish-ball per prisoner. The soup was served in bowls that were shared between four prisoners, who would all dip their spoons into the same bowl while eating. Each prisoner would have his own plate of rice, which was often unpalatable. The food was placed on the tables starting long before the prisoners were let in to eat, so cockroaches, flies, mice and rats got their fill first. Lunch usually consisted of fish-head soup--which is exactly what it sounds like-- and more rice. That was the extent of the food available daily from the prison.

Exhibit A at 11. As noted above, Mr. Clark lost almost 90 pounds while incarcerated in Thailand.

Vermin were rampant at the facility. Even the feral cats could not control them:

> The eight sub-prisons went through literally tons of rice a day. The ground floor of the main building was used to store the rice, and it always had several dozen stacks or rice, stacked in 50-kilogram burlap type bags 3 x 6 x 20 high (the main floor was about 18' high) leaving a mice, rat and insect "highway" between the bags. Cats would camp out and toilet on the top of the stacks--there was no ground that wasn't concreted over for them to bury their spoor. As bags were removed from the top of the stacks for use to feed the prisoners, the bags would be covered in excrement and stained yellow from the urine that leaked inside. Repeated requests for tarps to cover the stacks were denied. The staff seemed to find it

6

> humorous that "Cats shit and piss all over your food." Undoubtedly boiling the rice for 30 minutes killed any microbes, but that didn't change the fact that the food was too unappetizing to eat as a result.

Exhibit A at 10. Seeing how the food was stored and prepared, Mr. Clark often found it difficult to eat even the minimal rations that were provided.

The absence of water was oppressive and dangerous. The temperature in Bangkok while Mr. Clark was at BRP reached a daily high average of 91 degrees and 86% humidity. *See* Exhibit C attached hereto. The country was experiencing a drought in 2016 to 2018, and water was scarce at BRP. *See* Exhibits D and E attached hereto. There was no air conditioning in the facility. Showering was a necessary means for reducing body temperature. The inmates were permitted to shower only twice a day from 6:30 to 8:00 a.m. and from 1:30 p.m. until the count at 2:00 p.m. Exhibit A at 9. During that time, 1200 men vied to wash themselves. The two water tanks that fed the showers were exhausted well before the designated shower time ended. Inmates had to fight to insure that they would get their share of the scarce commodity. *Id*.

Inmates with money or influence essentially controlled the prison. The guards, who were indifferent to the needs of inmates who were not bribing them, would bring virtually anything into the prison for a fee: food, drugs or weapons. Gangs participated in controlling this trade, particularly the distribution of food and water, with the full knowledge and encouragement of the guards. In his letter to the Court, Mr. Clark explains how the system worked. The so-called Food Mafia, inmates designated by the guards, "pretty much ran sub-prison 8." Exhibit A at 14. One of the gang's most profitable activities was reselling good from the

commissary at a significant mark up. Inmates could make purchases only through agents of the Food Mafia:

> Payment was made by giving the gang the required amount in milk - 250 ml boxes that were 10 baht (about US $0.30) each and were sold 30 to a case. The Food Mafia would give the cases of milk to the guards, who would then "sell" them back to the store, keeping a percentage, and using the proceeds to credit the Food Mafia purchases.

*Id*. at 15. The Food Mafia also sold access to water when the cisterns in front of the toilets were empty. Since dysentery was a frequent issue, and the prison provided no toilet paper, the gang did a brisk business in selling this vital product. Inmates who got behind in paying their debts were severely beaten. *Id*.

While the physical conditions in the facility were brutal, the omnipresent violence, particularly sexual violence directed at the vulnerable, was the most difficult aspect of life at BRP for Mr. Clark. It is this component of his life in prison in Thailand that most haunts Mr. Clark now. He believes this aspect of his incarceration in Thailand caused him post-traumatic stress disorder. It is not difficult to understand why:

> Sexual assaults, rapes, and violence were a continuing problem at sub-prison 8 of the BRP, particularly in the cells. Locked in from line up to cells at 2:00 p.m., until 6:30 a.m., sadistic alpha males in the cell took constant advantage of the zeta males.

> Weaker prisoners were stripped naked and beaten, sometimes for hours. Sometimes the aggressors would play soccer with their victims, splitting into two teams, and kicking their victim towards the wall at the opponents end of the room, up a narrow aisle up the middle of the cell. The people who would normally lay there stood to the side and cheered them on. If the victim was kicked towards the sides, the prisoners lying there would kick him back towards the center of the room. It was positively brutal.

> Sexual assaults were pervasive, with the victims being raped or
> forced to perform fellatio, or often both at the same time by two
> attackers. There were numerous attacks every night, up to five or
> six over a period of several hours. I witnessed literally several
> thousand attacks of sexual violence during my time at the BRP.

*Id*. at 5

This is a brief summary of the unimaginably inhumane treatment that Mr. Clark

received while incarcerated at BRP. Only his letter to this Court, Exhibit A, can

adequately communicate what his life was like for more than 31 months.

This Court need not rely solely on Mr. Clarks' reports about the conditions

he experienced in BRP during his incarceration there. In its 2014 submission to

the U.N. Committee on Torture, Amnesty International reported so-called "trusty-

beatings" (beating of inmates by other inmates who had been given responsibility

by prison officials to control and discipline prisoners) at BRP. *Thailand

Submission to the United Nations Committee Against Torture, 52nd Session, 28

April – 23 May, 2014*, AMNESTY INTERNATIONAL, 2014 ("Amnesty International has

received credible reports of the practice of torture and other ill-treatment in

prisons.") at 9, 10  https://www.amnesty.org/download/Documents_/8000/_ asa

390032014 en.pdf.

The U.S. Department of State reported no improvement in these

conditions in its 2016 report on human rights in Thailand. The publication noted

with extreme understatement that conditions in prisons and detention centers

remained "poor and most were overcrowded." *2016 Country Report on Human

Rights Practices – Thailand,* UNITED STATES DEPARTMENT OF STATE, 3 March,

2017. https://www.refworld.org/docid/58ec89bb4.html. As of September 1, 2016,

Thai authorities held 306,000 persons in detention facilities with a maximum capacity of 210,000 to 220,000. *Id*. Lack of sleeping accommodations and lack of medical care were cited as "serious problems" at some facilities. *Id*. Solitary confinement was used to punish male prisoners. From October 2015 to September 1, 2016, 728 people in the custody of the Department of Corrections died.

The International Federation for Human Rights ("FIDH") released a report, based on interviews with former prisoners, that extensively documented the conditions in the BRP and the Central Women's Correctional Institution (CWCI) while Mr. Clark was incarcerated. *FIDH Report - BEHIND THE WALLS - A look at conditions in Thailand's prisons after the coup*, February, 2017. https://www.refworld.org/pdfid /58b593dd4.pdf. ("FIDH Report"). It its Executive Summary to the report, FIDH states its overall conclusion succinctly: "Thailand's ongoing failure to enact a comprehensive prison reform has created conditions for human rights violations to be rife in its prison system in breach of the country's obligations under international instruments to which it is a state party." FIDH Report at 4. The conditions are those described by Mr. Clark: a high level of crowding and inadequate living conditions, limited access to medical treatment, insufficient food and potable water, and poor sanitation facilities. *Id*. The group also found that "punishment contravenes international standards and, in some cases, may amount to torture and ill-treatment." *Id*. *See also See* UN Committee Against Torture (CAT) - *Concluding observations on the initial report on Thailand*, 20 June 2014. http://docstore.Ohchr.org/SelfServices/Files

10

[Handler.ashx?enc](Handler.ashx?enc)=6QkG1d%2FPPRiCAqhKb7yhsk2oy72JlefPnicA9mLXtq%2B

9%2F5hbXwg%2B5JWNDr0RdTusMRgzu6yegqVTu8QgwbPcc9dIir1Tfe5g9kMO

TJykFvZmYIG7TVsYdYCm2OgOMRJK.

In its 2018 report on Thailand, which also documented conditions that existed in 2017 while Mr. Clark was incarcerated there, the States Department, an agency not known for exaggeration, noted that the sub-standard conditions it had documented in the 2016 report were still prevalent:

> Physical Conditions: Prison and detention facility populations were approximately 60 percent more than designed capacity. As of August 1, authorities held approximately 359,500 persons in prisons and detention facilities with a maximum designed capacity of 210,000 to 220,000 persons.
>
> In some prisons and detention centers, sleeping accommodations were insufficient, there were persistent reports of overcrowding and poor facility ventilation, and a lack of medical care was a serious problem. Authorities at times transferred seriously ill prisoners and detainees to provincial or state hospitals.
>
> Pretrial detainees comprised approximately 18 percent of the prison population. Prison officers did not segregate these detainees from the general prison population. The government often held pretrial detainees under the emergency decree in the southernmost provinces in military camps or police stations rather than in prisons.
>
> ***
>
> Prison authorities sometimes used solitary confinement, as permitted by law, to punish male prisoners who consistently violated prison regulations or were a danger to others. Authorities also used heavy leg irons on prisoners deemed escape risks or potentially dangerous to other prisoners.
>
> According to the Ministry of Interior's Investigation and Legal Affairs Bureau, 536 persons died in official custody from October 2017 to August, including 21 deaths while in police custody and 515 in the custody of the Department of Corrections. Authorities attributed most of the deaths to natural causes. According to media reports, an inmate died in custody on April 18 after an apparent beating.

*Thailand 2018 Human Rights Report*, U.S. Department of State, 2018. https://www.state.gov/wp-content/uploads/2019/03/THAILAND-2018.pdf

In short, there can be no dispute that Mr. Clark was subjected to brutal treatment at BRP. The word torture would be more accurate.

While the requirements of the Eighth Amendment likely would not apply to a foreign government, it is significant that many of the conditions of Mr. Clark's confinement in Thailand would violate the Eighth Amendment if they were imposed by a government official in the United States. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S 189, 199-200 (1989)(citation omitted)("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. … The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment … [and the] Due Process Clause."); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981)(prisoners are entitled to, *inter alia*, sanitation).

## II.   MR. CLARK'S CONDITIONS OF CONFINEMENT AT THE MDC

Mr. Clark could reasonably have believed that his conditions of confinement would improve following his June, 2018 extradition to the United

States. They have. However, the conditions he has experienced at the MDC also deserve condemnation.

### The Government Shutdown

Six months after Mr. Clark arrived at the MDC, Congress was unable to reach an agreement on an appropriations bill to fund the continuing operation of the federal government. As a result, for the 35-day period from December 22, 2018, through January 25, 2019, the MDC was "operating under a lapse of funding." February 15, 2019 Affidavit of Warden Herman Quay, 19-cv-01075-MKB-SMG, Eastern District of New York, docket entry 65-1, at ¶12. ("Quay Affidavit"), attached hereto as Exhibit F. Staff at the MDC were required to report to work during the shutdown. Many did not. *Id*. This had a direct impact on Mr. Clark's ability to participate in his defense.

Because the discovery in this case is far larger than is usual – almost nine terabytes – Mr. Clark was permitted to use a laptop that was provided to him to review the material. The MDC was concerned that having a computer circulating in the facility would create a security risk and, as a result, designated a "discovery room" in the East Building visiting area. Mr. Clark was required to keep the laptop, discovery materials and the bulk of his notes on what he had reviewed and ideas for how to plan his defense there. Mr. Clark is housed in the West Building. The two structures are connected by a tunnel. To access his material, Mr. Clark had to be escorted to the East Building by an officer. During the shutdown, the officers who worked refused to take Mr. Clark over. For a

month, Mr. Clark was not able to continue his review of the government's evidence against him.

The shutdown affected Mr. Clark in other ways. During the 35-day period, inmates' movements throughout the facility were curtailed. Educational and other types of programming was interrupted. Social visits were cancelled for several weeks. While Mr. Clark was not directly impacted by some of these interruptions in the routine of the facility – he was extradited to the United States and has never had a social visit, for example – the shutdown indirectly affected all the inmates. Tension in the facility, including in the unit in which he was housed, reached an extremely high level. Inmates who could not see their family members or write emails to them became increasingly agitated. This unrest was manifest at the MCC by some inmates refusing to eat. *See* Brendan Krisel, *Prisoners on Hunger Strike As Gov't Shutdown Bars Visits: Report*, PATCH, January 15, 2019, https://patch.com/new-york/downtown-nyc/mcc-prisoners-go-hunger-strike-government-shutdown-report. At the MDC a similar feeling of unrest prevailed. The inmates felt like they were being subject to unnecessary punitive restrictions. They were resentful.

Significantly for Mr. Clark, access to commissary, which inmates generally can avail themselves of bi-weekly, was curtailed. As stated, *supra* at 2, during his incarceration in Thailand, Mr. Clark developed a rash of undiagnosed origin. This is not the type of small, localized irritation that results from a spider bite or an ill-fitting garment. This rash has at times covered much of Mr. Clark's body.[6] It is

---

[6]I personally have observed this rash.

endlessly itchy. When the rash is out of control, it becomes a consuming preoccupation. Mr. Clark cannot get comfortable in any position. He cannot sleep. He loses his appetite. Sometimes during his two-plus years at the MDC, medical staff has provided Mr. Clark with cortisone cream. This helps quell the itching. Sometimes the medical staff has refused to see Mr. Clark, and he has had to buy the cream from the commissary.[7] During the shutdown, neither avenue was consistently available for Mr. Clark to obtain the medication.

### The Blackout

Two days after the shutdown ended, the conditions at the MDC worsened. On January 27, 2019, "a major electrical fire impacted the MDC." Exhibit F at ¶18. The fire destroyed the Priority 3 power-distribution equipment, which was essential to providing power to the West Building where Mr. Clark was housed. *Id*. at ¶19. The situation was not corrected until February 3, 2019. *Id*. at ¶30. The blackout occurred during a "polar vortex," which led to record cold temperatures in many parts of the United States.[8] The temperatures in Brooklyn were frigid

---

[7] This has been an ongoing issue throughout Mr. Clark's period of incarceration at the MDC. He has had to fight to get treatment for this condition. I have drawn this problem to the attention of the MDC Legal Department more than once. At my request, the government has also spoken to MDC Legal to ensure that Mr. Clark got his cortisone cream. On one occasion, the Court intervened and ordered the government to seek an explanation from the MDC about why Mr. Clark was being denied treatment. After the government made the MDC Legal Department aware of the Court's concern, Mr. Clark immediately receive a small supply of the medication.

[8] The National Weather Service defines a polar vortex as follows: "The polar vortex is a large area of low pressure and cold air surrounding both of the Earth's poles. It ALWAYS exists near the poles, but weakens in summer and strengthens in winter. The term 'vortex" refers to the counter-clockwise flow of air that helps keep the colder air near the Poles. Many times during winter in the

during this period: From Sunday, January 28, 2019, to Friday, February 2, 2019, the daily high temperatures were 38, 43, 35, 16, 21 and 34, respectively. The daily lows were 25, 25, 6, 2, 11 and 16. https://www.accuweather .com/en/us/brooklyn/11210/february-weather/334651?year=2019. There was no heat in the West Building, and as the days passed and the remaining heat in the facility quickly dissipated, the temperature inside began to equal the ambient air temperature outside.

Deirdre D. von Dornum, the Attorney-in-Charge of the Eastern District office of the Federal Defenders of New York, toured the MDC on February 1, 2019, pursuant to an administrative order issued by Chief Judge Dora Irizarry of the Eastern District of New York. In an  Affidavit she submitted in support of a civil suit the Federal Defenders' Office brought contesting the conditions of confinement at the MDC, Ms. D. von Dornum described the conditions she observed. The lobby was cold. Officers at the desk were wearing multiple layers of clothing, including scarves wrapped around their heads. Affidavit of Deirdre D. von Dornum, *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, 19-cv-660 (MKB-SMG), document 7, at ¶25, attached hereto as Exhibit G. In the housing units, the lights were not functioning in any individual cells. The cells were pitch black. It was too dark to read or for the inmates to see the food they were given. *Id*. at ¶31. Inmates had been unable to obtain refills of their medications. *Id*. at ¶32. Because grievances are submitted electronically, and the computers had been down since the fire, inmates were unable to raise concerns

---

northern hemisphere, the polar vortex will expand sending cold air southward with the jet stream." https://www.weather.gov/safety/cold-polar-vortex.

about the lack of medical care. *Id*. at ¶33. Inmates had not received access to legal or social visits or to the CorrLinks email system. *Id*. at ¶34. Only the telephone that had a direct dial to the Federal Defender was accessible to inmates. *Id*. Inmates had not received clean clothing or bedding since the fire. The facility provided no additional blankets or clothing, and since the commissary had been closed since January 25, 2019, even inmates who had sufficient funds were unable to purchase these items. *Id*. at ¶35. Some inmates had only short-sleeved shirts and light cotton pants. *Id*. at ¶36. Several inmates described dire medical situations for which they had received no care. *Id*. at ¶37. Inmates on one unit reported being locked into their cells since the fire with the exception of a few hours each morning and afternoon. *Id*. at ¶51. Some had no had hot food since the fire on January 27. *Id*. at ¶52. While the common rooms had some heat, the cells in some of the units did not. Inmates on the side of the building that faced the Upper Bay were wrapped head to toe in blankets and towels. Cold air blew out from the cell doors. *Id*. at ¶¶54, 56. Many inmates were wrapped in multiple layers of clothing. Other did not have enough clothing to use to try to warm themselves. *Id*. at ¶57.

In many ways those conditions are less onerous than those that Mr. Clark experienced. The first day of blackout, the men in his unit were permitted to go into the common areas, which had emergency light, for three hours. Inexplicably, a decision was made the following day to lock the inmates on Mr. Clark's unit in their cells. The food cart brought breakfast at the usual time, but the food was not delivered to the inmates' cells until 3:00 p.m. It was inedible. The men in Mr.

Clark's unit decided to go on a "food strike." They had no food again, other than snacks they had accumulated in their cells from commissary purchases, until February 3. Mr. Clark had no role in making the decision to strike, and could not safely go against it.

In addition to having no food during the blackout, Mr. Clark was never permitted to shower or wash his clothing. The facility provided no changes of clothing. The men could not buy additional clothing or blankets since the commissary was closed. The tap water was brown throughout the eight-day period. Mr. Clark had no access to email or telephones. He could not communicate with counsel.

Perhaps most disturbing to Mr. Clark was to be so cut off from the outside world. Inmates were not given information about how long the situation would last – maybe because the officials at the MDC did not know. Inmates were left to wonder: Would this go on forever? Some of the inmates Ms. D. von Dornum interviewed described this to her. They reported having a panicky feeling. They felt frustrated that they were being "treated like they were in SHU," even though they had no disciplinary issues. They were upset they were not allowed to go to the common area, which had functioning emergency lighting. *Id*. at ¶¶59-60. The tap water in one unit was not potable. *Id*. at ¶60.

Of course these conditions did not meet the minimum standards required for federal prisons set by the Bureau of Prisons or aspirational standards of care established by the International Committee of the Red Cross. Sufficient heat, lighting, hot food and access to showers must be provided to prisoners. See

18

*Water, Sanitation, Hygiene and Habitat in Prison, Supplementary Guidance*, International Committee of the Red Cross, April 2012.https://www.icrc.org/en /doc/assets/files/publications/icrc-002-4083.pdf.

The *Inmate Admission & Orientation Handbook* that is given to new admittees to the MDC demonstrates that even some of the less egregious treatment Mr. Clark received during the shutdown and blackout violated BOP policy. The institution is required to issue clothing to inmates "which is properly fitted, climatically suitable and presentable." *Inmate Admission & Orientation Handbook*, Bureau of Prisons, Updated October 19, 2017, at 6. https://www.bop.gov/locations_/institutions/bro/BRO_aohandbook.pdf. Each unit is to be permitted to "shop" at the commissary every two weeks. *Id*. at 7. Phones are supposed to be available for the inmates' use. Inmates are entitled to three meals a day are served at designated times. *Id*. at 13. The facilities must provide legal research materials and the ability to review discovery. This is done at the MDC through the Electronic Law Library. Inmates are supposed to be able to access these materials through computers in each library and on each unit. *Id*. at 16. Absent disciplinary infractions, inmates are entitled to participate in leisure activities, such as sports, board and card games and crafts. *Id*. at 17. Finally, procedures require that inmates be given with basic mental health care and the ability to attend religious services. *Id*. at 17-18. All of these requirements were violated during the shutdown and blackout.

## COVID-19

Starting in March of this year, the BOP instituted what it characterized as a "modified operation plan" to deal with the novel Coronavirus that causes COVID-19. The key component of the plan was to limit inmate movement, and thereby minimize the spread of the illness by keeping inmates locked in their cells. For the past eight months, Mr. Clark has been locked in his cell for weeks at a time without access to regular showers, telephone calls, emails, legal materials, social visits and, until September, counsel visits. Commissary, which usually is available bi-weekly, has been severely curtailed during this period. Items, including the cortisone cream Mr. Clark depends on, are frequently unavailable. Programming has been non-existent. Whatever the merits of this approach from a public-health perspective it has imposed dramatically harsher conditions of incarceration on inmates, including Mr. Clark.

Being locked in with 1600 other inmates in a situation that poses a higher risk of contracting an illness that may lead to death it not a normal condition of confinement. It is beyond reasonable debate at this point that the virus that causes COVID-19 is highly contagious, highly deadly and present in federal prisons. [9] Courts across the country have recognized that the COVID-19 pandemic poses a particular danger for inmates. *United States v. Nkanga*, No. 18-Cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)("The country

---

[9] As of November 2, 2020, 231,181 individuals have died in the United States from COVID-19. https://coronavirus.jhu.edu. The BOP reports that as of November 2, 2020, there are currently 1,796 inmates and 911 BOP staff who have confirmed positive test results. An additional 16,185 inmates and 1,383 staff had COVID-19 and have recovered, while 130 inmates and 2 staff members have died from the illness. https://www.bop.gov/coronavirus.

faces unprecedented challenges from the novel Coronavirus pandemic. Those detained in jails and prisons face particularly grave danger.); *United States v. Scparta*, No. 18-Cr-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)("the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals.") *See also* letter of Senator Dick Durban (Mar. 23, 2020), *available at:* https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%_20and%_20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf. ("Conditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease.").

Government policy makers, including the Attorney General of the United States, have also acknowledged that the virus has entered the federal prison system and killed inmates. On March 26, 2020, General Barr issued a memorandum to the Director of the Bureau of to express the view that "at-risk inmates who are non-violent and pose minimal likelihood of recidivism" might be "safer serving their sentences in home confinement rather than in BOP facilities." The Attorney General stated that the BOP should "ensure that home confinement" is utilized, "where appropriate, to protect the health and safety of BOP personnel and the people in [their] custody." https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

In a further directive on April 3, 2020, the Attorney General stated that "upon [his] finding that emergency conditions are materially affecting the

functioning of the Bureau of Prisons," he was authorized by the "CARES Act to expand the cohort of inmates who can be considered for home release" and that the "review should include all at-risk inmates—not only those who were previously eligible for transfer." The Attorney General also acknowledged that "[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting [its] inmates, those precautions, like any precautions, have not been perfectly successful at all institutions." https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf .

The increased risk of contracting COVID-19 and becoming seriously ill that Mr. Clark has been subjected to is a factor this Court should consider in determining what period of incarceration to impose. Many courts have done so. *See United States v. Ozols*, No. 16-CR-692 (JMF), 2020 WL 2849893 at *4 (S.D.N.Y. June 2, 2020)(considering vulnerability of 42-year-old man suffering from anxiety and depression with family history of heart and lung disease in determining what sentence was appropriate); *United States v. Zukerman*, 451 F.Supp. 3d 329, 335-36 (S.D.N.Y. 2020)(granting compassion release to 75-year-old man with diabetes, hypertension and obesity). *See also*, *Koon v. United States*; 518 U.S. 81, 111 (1996)(District Court did not abuse its discretion by considering particular vulnerability of inmate to abuse in prison in determining sentence; *see also*, *United States v. D.W.*, 198 F.Supp.3d 18, 23 (E.D.N.Y. 2016)("The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison.... the prison environment must be considered by the sentencing judge in estimating total harm

and benefits to prisoner and society—a utilitarian as well as a compassionate exercise.").

III.     **OBJECTIONS TO THE PSR**

Under the Offense Section of the PSR, Probation has included a subheading entitled, "Overdose Deaths Linked to the Original Silk Road." PSR at ¶¶89-106. These paragraphs describe the deaths, purportedly by drug overdose, of six individuals who the report asserts had purchased drugs from sellers through the Silk Road website. This information should be stricken from the PSR. The Second Circuit's decision in *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017), resolves this issue.

Ross Ulbricht's PSR, as Mr .Clark's, included references to these deaths. Mr. Ulbricht's counsel argued that there was insufficient evidence connecting the deaths with drugs purchased from Silk Road for the District Court to consider them in sentencing. The District Court disagreed, finding that the government had demonstrated by a preponderance of the evidence that the deaths bore a sufficient connection to be considered relevant conduct. Ulbricht challenged that ruling on appeal. The Second Circuit held that the District Court's factual findings on this issue were not clearly erroneous. However, the Circuit Court also stated that the overdoses would not have been an appropriate basis for determining Ulbricht's sentence:

> No federal judge needs to be reminded of the tragic consequences of the traffic in dangerous substances on the  lives of users and addicts, or the risk of overdose and other ramifications of the most dangerous of illegal drugs. Those consequences are among the reasons why illegal drugs are prohibited and constitute a principle justification advance for the extremely lengthy sentence provided

> by federal statutes and sentencing guidelines for trafficking in illicit substances. Absent reason to believe that a drug dealer's methods were unusually reckless, in that they enhanced the risk of death from drugs he sold beyond those inherent in the trade, we do not think that the fact that the ever present risk of tragedy came to fruition in a particular instance should enhance those sentences, or that the inability of the government to link a particular dealer's product to a specific death should mitigate them. The government's insistent on proceeding with this evidence generated an appellate issue that has taken on disproportionate focus in relation to the reasons actually advanced by the district court in its lengthy and careful statement of the reasons for the sentence it impose.

Id. at 126. The information about the overdoses should be removed from the PSR.

## IV.     THE STATUTORY SENTENCING FACTORS[10]

### The Sentencing Guidelines Range

While this Court is no longer bound to impose a Guidelines sentence, and the Guidelines do not provide the presumptive sentence, 18 U.S.C. §3553 requires a District Court to "consider" the Guidelines, and in "order to fulfill this statutory duty to 'consider' the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range." *United States v. Crosby,* 397 F.3d

---

[10]As the Court knows well, following the United States Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), and subsequent cases*, a sentencing decision must be governed by the factors listed in 18 U.S.C. §3553(a). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the Guidelines range and any applicable Guidelines Policy Statements, the need to avoid sentencing disparities and the need to provide restitution to the victim. This Court must consider all of the 18 U.S.C. §3553(a) factors to derive a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. *See United States v. Ministro-Tapia*, 470 F.3d 137, 141-43 (2d Cir. 2006) (analyzing the "parsimony clause" of 18 U.S.C. §3553(a)).

103, 111 (2d Cir. 2005). Thus, one step in deciding what sentence is appropriate for Mr. Clark is to calculate the Guidelines range for his offenses.

Pursuant to a written plea agreement with the government, Mr. Clark pled guilty to conspiracy to distribute controlled substances, including heroin, cocaine, LSD and methamphetamine. The parties stipulated that his total offense level was 45.[11] Mr. Clark falls within Criminal History Category I. *See* Presentence Investigation Report ("PSR") at ¶9. By operation of United States Sentencing Guidelines Section ("U.S.S.G.") 5G1.1(a), Mr. Clark's sentencing guideline range is 240 months.[12] PSR at ¶163.

## The Nature of the Offense

The nature of the offense is serious. The government alleges that Mr. Clark was a key advisor and mentor to Ross Ulbricht, the creator of the Silk Road website. The PSR calculates that the website sold sufficient quantities of heroin, cocaine, methamphetamine and LSD to trigger an offense level of 36. PSR at ¶112. Probation (and the plea agreement) add an additional four levels to the base because Mr. Clark was a leader or organizer of the offense, two levels

---

[11] United States Probation found that one of the adjustments the plea agreement had incorporated – a two level increase for obstruction of justice pursuant to U.S.S.G. §3C1.1 – was not applicable. Probation based this determination on Application Note 7 to U.S.S.G. §2D1.1. That Note directs that the obstruction adjustment may not be applied when a defendant receives an enhancement under §2D1.1(b)(16)(D).  Mr. Clark did receive that enhancement, and, as a result, Probation did not apply the §3C1.1 adjustment. PSR at ¶165. Even without the two-level increase, Mr. Clark's guideline range remains the same. *Id*.

[12] Section 5G1.1(a) provides as follows: "Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."

because the offense involved the distribution of controlled substances through mass marketing by means of an interactive computer and two levels because Mr. Clark made a credible threat to use violence in relation to the offense. PSR at ¶113. Mr. Clark admitted his role in the offense in an affidavit he submitted in connection with his motion to suppress and has not objected to the PSR.

## The History and Characteristics of the Defendant

Mr. Clark has no prior convictions. Members of his family, Tannis Wing and Elizabeth Clark, remain supportive. They have been in contact with me throughout Mr. Clark's case to express concern about his well-being and interest in assisting with this sentencing.

## The Kinds of Sentence Available

Section 3553(a) requires the Court to consider the kinds of sentences that are available. Mr. Clark faces no mandatory minimum term of incarceration and a maximum term of twenty years. See 21 U.S.C. §841(b)(1)(C).

## V.    WHAT SENTENCE IS APPROPRIATE TO IMPOSE IN THIS CASE

Ultimately, this Court must consider the factors discussed above and craft a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, protect the public, promote respect for the law, serve as an adequate deterrent and provide the defendant with needed educational or vocational training, medical care or other correctional treatment. These factors weigh in favor of imposing a sentence below the 240-month Guideline range.

**Individual Deterrence, the Likelihood of Recidivism and the Need to Protect the Public**

This Court can conclude that it is likely that Mr. Clark will not offend in the future based on extensive research that has been undertaken by the United States Sentencing Commission. The United States Sentencing Guidelines Commission has released seven reports on recidivism, which analyze, *inter alia,* the likelihood of recidivism. correlation between age and likelihood of reoffending. *See Length of Incarceration and Recidivism,* United States Sentencing Guidelines Commission, April 29, 2020. https://www.ussc.gov/research/research-reports/length-incarceration-and-recidivism (describing past reports). This and other studies establish beyond dispute that older "offenders were substantially less likely than younger offenders to recidivate following release." *The Effects of Aging On Recidivism Among Federal Offenders*, United States Sentencing Guidelines Commission, December 7, 2017, at Report Highlights. https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders. Offenders who were 65 or older at the time of release had only a 13.4 percent rearrest rate during the eight-year period following release. *Id*.

The comparatively low probability that an individual will commit an offense after the age of 60 is a factor that this Court may appropriately consider when determining the length of the sentence that is necessary to deter Mr. Clark. *See United States v. Hamilton*, 323 F. App'x. 27, 31 (2d Cir. 2009)(finding that the District Court had the authority to consider the inverse correlation between age and recidivism in determining the appropriate sentence in spite of the Guidelines rejection of that factor as a relevant consideration in sentencing); *See also,*

*United States v. Nellum*, 04-cr-30 (PS), 2005 WL 300073 *3 (N.D. Ind. Feb. 3, 2005)("Under the guidelines, the age of the offender is not ordinary relevant in determining the sentence. *See* § 5H1.1. But under §3553(a)(2)(C), age of the offender is plainly relevant to the issue of 'protect[ing] the public from further crimes of the defendant.'"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005)(non-Guideline sentence appropriate for 43-year-old defendant in part because recidivism rates for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21); *United States v. Carmona-Rodriguez*, 04-CR-667 (RWS), 2005 WL 840464 at *4 (S.D.N.Y. Apr. 11, 2005)(relying on low probability of 55-year-old defendant recidivating as a bases for imposing a non-Guidelines sentence);

The same reasoning applies in this case. Mr. Clark is 59 years old. If this Court were to impose a sentence of 15 years, he would not be released until he is 67 years old.[13]

For the same reason, there is no basis for concluding that 67-year-old Roger Clark would pose a threat to the public. Of course, Mr. Clark will be deported to Canada, the country of his citizenship, at the conclusion of this case. Thus, it is virtually certain that he will pose no danger to individuals in the United States.

---

[13]On a sentence of 180 months, a defendant in federal custody may receive up to 706 days good-time credit, meaning he would serve 4769 days, or approximately 13 years. See Federal Sentencing Good Time Chart. https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/clemency/good-time-chart.pdf. Since Mr. Clark has already been incarcerated on these charges for approximately 5 years, he would have to serve an additional 8 years. In 8 years he will be 67 years old.

### The Need to Promote Respect for the Law, Reflect the
### Seriousness of the Offense and Provide Just Punishment

This Court also must consider what sentence is sufficient but not greater than necessary to promote respect for the law, reflect the seriousness of the offense and provide just punishment. It is respectfully submitted that a sentence of 180 months is sufficient to meet these goals.

The offense of conviction is serious, and a serious sentence is warranted. However, Mr. Clark has been subjected to punishment for his role in this case that is well beyond that inherent in being imprisoned as described in detail *supra* at 1-22. The unusually harsh conditions of confinement imposed on Mr. Clark in Thailand before he was extradited to the United States and at the MDC is a factor that this Court should consider pursuant to 18 U.S.C. §3553(a) in determining what additional term of incarceration will provide "just punishment" for Clark.

Even before the United States Supreme Court's decision in *Booker*, Courts, including the Second Circuit, had found that harsh conditions of confinement were a mitigating factor that a sentencing court could consider. In *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001), for example, the Second Circuit held "that pre-sentence confinement conditions may in appropriate cases be a permitted basis for downward departures." *See also United States V. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988)(for the "purposes of sentencing … the court is virtually unfettered with regard to the information it may consider." ).

In light of the extraordinary brutal conditions under which Mr. Clark was held in Thailand for 31 months and the sub-standard conditions he experience for a significant percentage of the time he has been incarcerated at the MDC, Mr. Clark should be sentence to a term of incarceration less than the maximum of 120 months. Indeed, the need to promote respect for the law, reflect the seriousness of the offense and provide just punishment can only be served by imposing a term of incarceration that takes his treatment while incarcerated into account.

## **CONCLUSION**

For all of the reasons stated herein, it is respectfully submitted that the Court should impose a term of incarceration of 180 months.

Respectfully submitted,

_____/s/_____
Stephanie M. Carvlin

cc:   AUSA Michael Neff
      AUSA Vladislav Vainsberg