

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 16, 2020

**BY ECF**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
500 Pearl Street
Daniel Patrick Moynihan U.S. Courthouse
New York, New York 10007

> Re:  *United States v. Roger Thomas Clark*, S2 15 Cr. 866 (WHP)

Dear Judge Pauley:

  The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for December 10, 2020, at 2:00 p.m.  In January 2020, defendant Roger Thomas Clark (the "defendant" or "Clark") pleaded guilty, pursuant to a plea agreement with the Government (the "Plea Agreement"), to conspiracy to distribute narcotics, stemming from his role in helping administer the Silk Road website.  Pursuant to the Plea Agreement, the applicable range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") would be life imprisonment; however, by operation of the statutory maximum punishment (20 years), the applicable Guidelines range becomes 240 months' imprisonment (*i.e.*, the "Stipulated Guidelines Sentence").  For the reasons below, the Government respectfully submits that such a sentence—240 months' imprisonment—would be fair and appropriate in this case, given the severity of the defendant's conduct and the need for deterrence.

## I.   OFFENSE CONDUCT

> *"I believe that we can break drug prohibition"*

> *"I want that whole ball of wax in my hands, so I can say I did that, I took down the DEA"*

> *"Ha, dude, we're criminal drug dealers – what line shouldn't we cross?"*

> *"folks who risk the security of clients have to be dealt with swiftly and ruthlessly"*

> *"You would have surprised me if you had balked at taking the step, of bluntly, killing Curtis for [stealing Bitcoin] . . . We're playing for keeps . . . . I'm perfectly comfortable with the decision, and I'll sleep like a lamb tonight, and every night hereafter."*

> *"I cannot think of a time in my life when I was happier, busier, or more content"*

>  -  Roger Thomas Clark, during online chats with Ross Ulbricht (2011–13)

### A.   Overview

From January 2011 until October 2, 2013, the "Silk Road" website hosted a sprawling black-market bazaar on the Internet, where illegal drugs and other illicit goods and services were regularly bought and sold by the site's users.  Silk Road emerged as the most sophisticated and extensive criminal marketplace on the Internet at the time.  During its more than two-and-a-half years in operation, Silk Road was used by several thousand drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other illicit goods and services to well over 100,000 buyers, and to launder hundreds of millions of dollars derived from these unlawful transactions.  In total, approximately $183 million dollars of illegal drugs were sold on Silk Road, as well as a variety of other goods and services.  Silk Road enabled its users to buy and sell drugs and other illegal goods and services anonymously and outside the reach of law enforcement.  The creator, owner, and operator of Silk Road was Ross William Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road."  Ulbricht's right-hand man and senior adviser was the defendant, Roger Thomas Clark, who went by the online nicknames "Variety Jones," "VJ," "Cimon," "Plural of Mongoose," and "CaptainSargeant."  (U.S. Probation Office's final Presentence Investigation Report dated July 8, 2020 (Dkt. 56 ("PSR")), ¶¶ 16-17).

Ulbricht described Clark as a "real mentor" who advised Ulbricht about, among other things, security vulnerabilities in the Silk Road site, technical infrastructure, the rules that governed Silk Road's users and vendors, and the promotion of sales on Silk Road, including the sales of narcotics.  Clark also provided advice to Ulbricht on developing a "cover story" to make it appear as though Ulbricht had sold Silk Road.  Clark also assisted with hiring a programmer to help improve the infrastructure of, and maintain, Silk Road.  Clark also was responsible for gathering information on law enforcement's efforts to investigate Silk Road.  And Clark advised Ulbricht on how to protect the Silk Road empire.  For instance, when a Silk Road staff member was suspected of stealing approximately $350,000 in Bitcoin from the site, Clark suggested to Ulbricht that Ulbricht commission a murder-for-hire.  Ulbricht took that suggestion.  Clark also tried to facilitate the murder-for-hire by offering the services of someone who could carry it out.  (Ultimately, unbeknownst to both men, the attempted murder-for-hire did not result in the target's death, because, as explained in detail below, Ulbricht solicited an undercover agent to carry out the murder.)  Clark was paid at least hundreds of thousands of dollars for his assistance in operating Silk Road.  (*Id.* ¶ 18).

### B.   Overview of the Silk Road Website

Silk Road was an extensive and sophisticated online criminal marketplace that sought to make conducting illegal transactions on the Internet as easy and frictionless as shopping online at mainstream e-commerce websites.  The website offered a sales platform that allowed users to conduct transactions online, and the basic user interface resembled those of well-known online marketplaces.  (*Id.* ¶ 19).

#### 1.   The Tor Network

Unlike mainstream commerce websites, Silk Road was only accessible on the Tor network. The Tor network is a special network of computers on the Internet, distributed around the world,

that is designed to conceal the true Internet Protocol (or "IP") addresses of the computers on the network and, thereby, the identities of the network's users.  Although Tor has legitimate uses, it is also used by cybercriminals seeking to anonymize their computer.  Every communication sent through Tor is bounced through relays within the network, and wrapped in layers of encryption, such that it is practically impossible to trace the communication back to its true originating IP address.[1]  (*Id.* ¶ 20).

Tor also allows websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, referred to as "hidden services."  Such "hidden services" operating on Tor have complex web addresses ending in ".onion."  Such addresses can only be accessed using special Tor web browser software, which can be downloaded for free on the Internet.  (*Id.* ¶ 21).

### 2. Silk Road User Interface

Upon arriving at the Silk Road website, a user was presented with a blank screen containing a prompt for a username and password.  Users could create a new account simply by creating a unique username and password.  No other information was required, such as information about the identity or age of the user.  (*Id.* ¶ 22).

After a user entered a username and password, the user was directed to Silk Road's homepage, which, in the upper left hand corner, contained the logo for the website, labeled "Silk Road anonymous market."  *See* Ex. A.  On the left side of the screen, there was a list labeled "Shop by Category," containing links to various categories of illegal items for sale on the site, including most prominently, "Drugs," and various subcategories of types of illegal narcotics.  (*Id.*).  The center of the homepage contained photographs of a sample of current listings on the website.  (*Id.*).  The homepage also included links that permitted users to access: (1) a private message system, which allowed users to send messages to each other through the website, similar to emails; (2) online forums where users could post messages to "discussion threads" concerning various topics related to the website; (3) a "wiki," which contained a collection of frequently asked questions, and other forms of guidance for users; and (4) a "customer service" section, where users could get support from the Silk Road administrative staff.  (*Id.*; *see also* PSR ¶ 23).

When a user clicked on any of the links to items for sale, the website would bring up a page containing the details of the listing, including a description of the item, the price of the item, the username of the vendor selling it, and reviews of the product posted by previous customers.  *See* Ex. B.  To purchase an item, the user would simply click on a link to add the item to an electronic "shopping cart."  (*Id.*).  The user would later be prompted to supply a shipping address and to confirm the placement of the order.  Once the order was placed, it was processed through Silk Road's Bitcoin-based payment system, described in detail below.  (PSR ¶ 24).

---

[1] An IP address is a unique series of numbers, separated by periods, that identifies each device using the Internet Protocol to communicate over a network.  An IP address is functionally similar to a street address or a phone number—it is how devices communicate with each other over a network and, in the absence of Tor, it can be used to identify the user and location of the device.

### 3.   Illegal Goods and Services Sold on the Silk Road Website

The illegal nature of the items sold on Silk Road was readily apparent to any user browsing through its offerings.  (*Id.* ¶ 25).  The illegal goods and services, included, among other things:

#### a.   *Illegal Narcotics*

The vast majority of the goods for sale consisted of illegal drugs of nearly every variety, which were openly advertised on the site as such and were immediately and prominently visible on the site's home page.  As of the takedown of the Silk Road website on October 2, 2013, there were about 13,802 listings for controlled substances on the website, listed under the categories "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants," among others.  As of the same date, among other illegal narcotics, there were at least approximately 643 listings for cocaine products, which included listings for cocaine base (commonly known as "crack" cocaine), 205 listings for heroin products, 305 listings for LSD products, and 261 listings for methamphetamine products.  (*Id.* ¶ 26).

The narcotics on the site tended to be sold in individual-use quantities, although some vendors sold in bulk.  At almost any given time, the offerings for sale on the site amounted to multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances, such as LSD.  (*Id.* ¶ 27).

During the course of the investigation, law enforcement seized a wide variety of controlled substances obtained through undercover purchases made on the Silk Road website, including cocaine, crack, heroin, MDMA (commonly known as "ecstasy"), LSD, and oxycodone.  (*Id.* ¶ 28).

#### b.   *Counterfeit Identity Documents*

Silk Road also offered for sale counterfeit and fraudulent identity documents, which included, among other things, counterfeit United States and foreign passports, U.S. and foreign drivers' licenses, and social security cards.  As of October 2, 2013, there were approximately 156 different listings for forged identity documents in the "Forgeries" section of the Silk Road website. During the course of the investigation, law enforcement seized counterfeit identity documents that had been ordered through the Silk Road website.  (*Id.* ¶ 29).

#### c.   *Computer Hacking Tools and Services*

Silk Road offered a wide variety of computer hacking tools as well as services of computer hackers.  As of the takedown of the Silk Road website on October 2, 2013, the following specific computer hacking goods and services (among others) were available on the site:

- Account password hacking tools and services, which included tools for compromising the usernames and passwords of victims' electronic accounts, including, among other things, email accounts, Facebook accounts, and other social media accounts.  Silk Road also had custom listings made by hackers who offered to compromise email and other electronic accounts on behalf of purchasers.

- Remote Access Tools, commonly known as "RATs," which allow users to obtain unauthorized remote access to a compromised computer. A hacker can use such a tool to view the victim's activity, view the victim's webcam activity, and execute programs remotely, among other things.

- Keyloggers, which allow a user to monitor keystrokes inputted by a victim into his or her computer, used to steal confidential information, including usernames, passwords, or account information.

- Distributed Denial of Service ("DDoS") services, which involve disabling websites or other publicly available services on the Internet by using large networks of compromised computers to flood victim systems with malicious Internet traffic.

(*Id.* ¶ 30). During the investigation, law enforcement purchased a computer hacking pack from a Silk Road vendor which contained a variety of 50 different computer hacking tools, including RATs, keyloggers, and other computer viruses. The FBI tested a selection of these tools and verified that they operated as advertised to compromise victim computer systems. (*Id.* ¶ 31).

### d.   Money Laundering Services

Silk Road offered a variety of money laundering services to its users, many of which were directly marketed to vendors who sold illegal goods and services on the website as a means to convert their criminal proceeds (obtained in Bitcoins, the required means of payment on the Silk Road website) into other forms of currency. Vendors in this category offered, among other things, the sale of United States currency, anonymous debit cards preloaded with currency, and other prepaid payment systems, including Moneypak cards. (*Id.* ¶ 32).

### 4.   Silk Road's Bitcoin-Based Payment System

The only form of payment accepted on Silk Road was Bitcoin—an anonymous, decentralized form of electronic currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer-to-peer" network. Bitcoin transactions are processed collectively by the computers composing the network. (*Id.* ¶ 33).

To acquire Bitcoins in the first instance, a user typically must purchase them from a Bitcoin "exchanger." After doing so, the user can then use the Bitcoins to conduct financial transactions, by transferring Bitcoins from his Bitcoin "address" to the Bitcoin "address" of another user, over the Internet. (Bitcoin "addresses" are analogous to customer accounts at a bank, except that they have no identity information attached to them.) (*Id.* ¶ 34). Bitcoins are not illegal in and of themselves and have known legitimate uses. However, Bitcoins are also known to be used by cybercriminals for money-laundering purposes, given the ease with which they can be used to move money anonymously. (*Id.* ¶ 36).

Hon. William H. Pauley III                                                                    Page 6
United States District Judge

Every Silk Road user had a Silk Road Bitcoin address, or multiple addresses, associated with the user's Silk Road account, where the user could deposit funds into his account. These addresses were stored on "wallet" files maintained on computer servers controlled by Ulbricht. In order to make purchases on the site, the user had to first obtain Bitcoins (typically from a Bitcoin exchanger) and send them to a Bitcoin address associated with the user's Silk Road account. After thus funding his account, the user could make purchases from Silk Road vendors. When the user purchased an item on Silk Road, the funds needed for the purchase were debited from the user's account and held in escrow (in a wallet file maintained by Silk Road) pending completion of the transaction. Once the transaction was completed, the Silk Road account of the vendor involved in the transaction was credited with the payment—minus the commission Silk Road took on the sale. The vendor could then withdraw Bitcoins from his Silk Road account by sending them to an outside Bitcoin address, such as the address of a Bitcoin exchanger who would cash out the Bitcoins for traditional currency. Vendors could also convert Bitcoin proceeds into other forms of currency by using various money laundering services offered on the site, as noted. (*Id.* ¶¶ 37-38).

Silk Road charged a commission for every transaction on the site, generally 8 to 15 percent. The commission rate varied depending on the size of the sale, *i.e.*, the larger the sale, the lower the commission. Silk Road also used a so-called "tumbler" to process Bitcoin transactions in a manner designed to frustrate the tracking of individual transactions through the Blockchain. (The Blockchain is a public ledger that records Bitcoin transactions.) According to the Silk Road "wiki" page, Silk Road's tumbler "sen[t] all payments through a complex, semi-random series of dummy transactions . . . making it nearly impossible to link your payment with any coins leaving the site." In other words, if a buyer made a payment on Silk Road, the tumbler obscured any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the Bitcoins end up—making it fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin addresses were both known. (*Id.* ¶¶ 35, 39).

Silk Road vendors and buyers were required to use the Silk Road Bitcoin-based payment system, or risked being banned from doing business on Silk Road. Specifically, vendors were not permitted to engage with customers on the website, but then arrange for payment to occur off the website, thereby avoiding the commissions charged for sales on the site. These kinds of disallowed transactions, referred to as "out of escrow" or "OOE" transactions, were explicitly prohibited by the rules that both vendors and users had to agree to in order to engage in business on the website (explicitly listed in the "Seller's Guide" and in the agreement that vendors had to consent to when establishing accounts). (*Id.* ¶ 40). The prohibition on out of escrow transactions was actively enforced by Ulbricht and his staff. (*Id.* ¶ 41).

### 5.   Volume of Illegal Transactions on Silk Road

The FBI seized computer servers located in Iceland and the United States that were used to operate and back up the Silk Road online marketplace. Those servers included computer databases that contained records for transactions which occurred on Silk Road during the course of its operation. The transactional database included detailed information regarding each transaction, including but not limited to the category of product sold, the purchase price (both in Bitcoins and U.S. dollars), and the commission taken by the site (again, both in Bitcoins and U.S. dollars). According to that data, between February 2, 2011 and October 2, 2013:

- Approximately 1.5 million transactions occurred over Silk Road, with a total of value of approximately 9.9 million in Bitcoins, which generated commissions of approximately 640,000 in Bitcoins for Silk Road. These transactions had a total value of approximately $213.9 million in United States currency, and generated a total of approximately $13.2 million in commissions for Silk Road, based on Bitcoin exchange rates at the time that the transactions occurred.

- The vast majority of sales were for illegal narcotics; transactional data indicated that narcotics sales accounted for about $183 million of the transactions on Silk Road.

- Further, transactional data from the database indicates the following regarding total sales of heroin, cocaine, methamphetamine, and LSD on Silk Road:

|  | Number of Sales | Quantity (kg) | Total Sales Revenue |
|---|---|---|---|
| Heroin | 53,649 | 26.8 | $8,930,657 |
| Cocaine | 82,582 | 82.6 | $17,386,917 |
| Methamphetamine | 34,689 | 8.7 | $8,110,453 |
| LSD | 54,567 |  | $7,073,838 |

Transactional data from the database indicates the following regarding total sales of counterfeit identity documents:

|  | Number of Sales | Total Sales Revenue |
|---|---|---|
| Fake IDs | 3,642 | $699,053 |
| Forgeries | 3,487 | $197,291 |
| Passports | 103 | $105,292 |

Finally, transactional data from the database indicates the following regarding total sales of money laundering-related services:

|  | Number of Sales | Total Sales Revenue |
|---|---|---|
| Money | 14,345 | $2,846,025 |
| Digital Currencies | 18,134 | $177,167 |
| Gold | 81 | $159,944 |
| Bullion | 122 | $80,952 |
| Silver | 138 | $9,746 |

(*Id.* ¶¶ 42-45). The database also included information regarding the number of vendors and users on the Silk Road website. According to the information in the database, between approximately January 2011 and October 2013, there were approximately 3,748 different registered vendor accounts, and approximately 115,391 registered buyer accounts who engaged in at least one transaction on the website. Further, the data indicated a worldwide geographic scope of countries where vendors and buyers indicated they were located. (*Id.* ¶ 46).

### C.   Ulbricht's Arrest

On October 1, 2013, Ulbricht was arrested at a public library in San Francisco, while he was logged in to the Silk Road website under the username "Dread Pirate Roberts." Agents seized Ulbricht's laptop computer, while it was open. (*Id.* ¶ 47). Subsequent examination of Ulbricht's computer revealed a significant volume of evidence tying him to the creation, ownership, and operation of Silk Road for the entire period of its existence. This included, among other things:

-   Thousands of pages of chat logs with his co-conspirators, including with Clark;
-   Journal entries describing his ownership and operation of the Silk Road website;
-   A weekly "to do" list regarding Silk Road–related tasks;
-   A copy of the Silk Road website;
-   A copy of a Silk Road–related database, including information regarding Silk Road users and transactions;
-   A spreadsheet with information regarding the servers used to operate Silk Road;
-   The encryption key for the "Dread Pirate Roberts";
-   An expense report spreadsheet, listing expenses and profits related to Silk Road;
-   A spreadsheet listing Ulbricht's assets, which included Silk Road as an asset valued at approximately $104 million as of June 2012; and
-   Scanned copies of identification documents belonging to members of Ulbricht's very small Silk Road staff, including Roger Thomas Clark's Canadian Passport.

(*Id.* ¶ 48). From a Bitcoin wallet file recovered from Ulbricht's computer, FBI agents seized approximately 144,341 Bitcoins, which had an approximate value of $18 million in United States currency at the time that Ulbricht was arrested. Shortly following Ulbricht's arrest, law enforcement placed a "banner" on the Silk Road homepage, informing those who visited the website that it had been taken down by the FBI. (*Id.* ¶ 50).

### D.   Roger Thomas Clark's Roles and Responsibilities for the Silk Road

This section has three subsections: (1) Clark's roles in administering Silk Road, which make clear that Clark was Ulbricht's confidante, adviser, and partner in crime; (2) Clark's advocating violence in connection with the Silk Road enterprise; and (3) Clark's chats with Ulbricht about Clark's goals and legacy.

#### 1.   Clark's Many Roles in Helping Run Silk Road

In a journal entry on his laptop, Ulbricht wrote about Silk Road's successful first year in operation, and in the following excerpt, he described how "Variety Jones"—*i.e.*, Clark—provided him with significant advice and assistance with operating and managing Silk Road[2]:

> Around this time, Variety Jones showed up. This was the biggest and
> strongest willed character I had met through the site thus far. He quickly

---

[2] All quoted journal entries and chat logs are provided verbatim herein, including any errors in spelling, grammar and punctuation.

> proved to me that he had value by pointing out a major security hole in the
> site I was unaware of. It was an attack on bitcoin. We quickly began
> discussing every aspect of the site as well as future ideas. He convinced me
> of a server configuration paradigm that gave me the confidence to be the
> sole server administrator and not work with someone else at all. He has
> advised me on many technical aspect of what we are doing, helped me speed
> up the site and squeeze more out of my current servers. He also has helped
> me better interact with the community around Silk Road, delivering
> proclamations, handling troublesome characters, running a sale, changing
> my name, devising rules, and on and on. He also helped me get my head
> straight regarding legal protection, cover stories, devising a will, finding a
> successor, and so on. He's been a real mentor.

(*Id.* ¶ 52).

Among these chat logs were over 1,000 pages of chats between Ulbricht and Clark (as "Variety Jones"/"cimon"), which ranged from approximately December 2011 until April 2013; in June 2012, during the course of these chats, Clark indicated that he was no longer using the online pseudonym "Variety Jones," and agreed to use the pseudonym "cimon" going forward. (The chats run until only April 2013, because at that time, Ulbricht switched to a different "chat" application, which did not log these conversations on his laptop.) (*Id.* ¶ 53 & n.2). Examples of Clark's many central roles follow, from his chats with Ulbricht about security, technology, and the rules that governed Silk Road users; to Clark's devising a "cover story" to make it appear as though Ulbricht had sold Silk Road; to Clark's hiring a programmer to help improve the infrastructure of, and maintain, Silk Road; to Clark's gathering information on law enforcement's efforts to investigate Silk Road; to Clark's investigating a Silk Road staff member's disappearance; etc. (*Id.* ¶ 51).

*Cover Story*: Clark provided advice to Ulbricht in developing a "cover story" to make it appear as though Ulbricht had sold Silk Road, consistent with the reference in the journal entry above. During a chat dated December 9, 2011, Clark advised Ulbricht to be discreet and limit the number of people who knew about his connection to owning and operating Silk Road, stating, "remember - someday it would be very valuable information who started SR, and the person who knows the guy who sold it on could sell that info - if senators are bitching and DEA is itching, they'd pay 7 figures for info leading to the site - and you will be interviewed someday - from my lips to your ears - be ready for it . . . one of them will someday realize there is lottery winning amounts of cash in giving you up as the creator of the site." During the same chat, Clark asked Ulbricht, in sum and substance, whether Ulbricht had disclosed to anyone in real life that he was involved in Silk Road: "IRL – is there anyone with a clue at all? Girlfriend, boyfriend, bunny you talk to, online buddy's who you've know for years? Gramma, priest, rabbi, stripper?" Ulbricht responded, "unfortunately yes. They are two, but they think I sold the site and got out. . . and they are quite convinced of it." Clark replied, "good for that – when do they think you've sold?" Ulbricht responded, "about a month ago."[3] (*Id.* ¶¶ 54-55).

---

[3] During Ulbricht's trial, Richard Bates testified, in sum and substance, that Ulbricht had previously bragged to him during 2011 that Ulbricht was involved in creating and running Silk Road. Further, Bates testified that on November 11, 2011 (approximately one month prior to the

In a chat dated January 15, 2012, Clark asked Ulbricht whether he had seen the movie *The Princess Bride*, and whether he knew the "history of the Dread Pirate Roberts."[4]  Clark explained the legend of the character "Dread Pirate Roberts"—how "over the years, a new one would take the name, and the old one would retire."  Clark insisted that Ulbricht should change his name on the Silk Road website "from Admin, to Dread Pirate Roberts" to "clear your old trail – to be honest, as tight as you play things, you are the weak link from those two prev contacts."  (*Id.* ¶ 56).

Ulbricht took Clark's advice to heart.  Less than a month later, in a post on the Silk Road Forum dated February 5, 2012, the "Admin" account—known to be the chief administrator account for Silk Road—announced that "my new name is: Dread Pirate Roberts."  At the time of Ulbricht's arrest, Ulbricht was actively logged into the Silk Road website as the "Dread Pirate Roberts" administrator account from his laptop computer.  (*Id.* ¶ 57).

*Hiring a Programmer*: In addition, Clark assisted with hiring a computer programmer to help improve the infrastructure of, and maintain, Silk Road.  For example, in January 2012, Clark suggested to Ulbricht that he (Clark) hire a team of developers to help test, improve, and maintain the computer code for the Silk Road website.  Clark suggested that the team be overseen by a programmer whom he referred to in the chats as "Tex."  In mid-January 2012, Clark indicated that the programmer was already working on testing the code underlying the Silk Road website.  On January 17, 2012, Clark confirmed to Ulbricht, in sum and substance, that the programmer was aware that the programming work was for Silk Road, and noted that the programmer shared Clark's "dream of breaking the DEA" (*i.e.*, the Drug Enforcement Administration).  (*Id.* ¶ 58).

*Security*: Clark also repeatedly discussed security with Ulbricht and recommended security improvements to the Silk Road website.  For example, in a chat dated December 7, 2011, Clark told Ulbricht that he and "~s"[5] had successfully hacked Silk Road three times, as they wanted to see what Ulbricht was doing with user information before they became involved: "we didn't know whether or not we could trust you way back then. . . . by trust, I mean we wanted to know wheter or not you were doing what we'd call bad things / saving info you shouldn't."  Clark elaborated, "were addresses really deleted, or did you save them away for a rainy day"?  By hacking Silk Road, Clark and "~s" promptly proved their value to Ulbricht; in so doing, they revealed that, in its early iteration, Silk Road was vulnerable and therefore, that Ulbricht needed assistance.  (*Id.* ¶¶ 77-78).  During the same conversation, Clark wrote that he and "~s" were "working with you first to harden your systems . . . [w]hen we're done, even getting the server will give them nothing

---

quoted chat between Clark and Ulbricht), Ulbricht told Bates that he was worried that Ulbricht's girlfriend had been careless with Ulbricht's secret that he ran Silk Road, and that he had sold Silk Road to someone else.

[4] *The Princess Bride* was a motion picture released in 1984.  It portrays the legend of the "Dread Pirate Roberts" character as bearing a name not belonging a single individual, but belonging to a series of individuals, each of whom passes his name and reputation to a chosen successor.

[5] As the Court is aware, co-conspirator Michael R. Weigand, a/k/a "Shabang," a/k/a "~Shabang~," a/k/a "~s," a/k/a "s," recently pleaded guilty and is pending sentence before Your Honor.  *See* 20 Cr. 510 (WHP).

. . . enforce encryption on all order info – automatically if not done by the customer/vendor – ditto with PM's – both sender and recip need to have public keys posted – so only they can read them even if the server is taken." During this conversation, Clark recommended to Ulbricht additional security practices, including requiring that vendors use encryption when sending delivery addresses, so that if law enforcement were able to seize and image the Silk Road servers, law enforcement would not have usable information with which to target Silk Road users for buying and selling contraband. During this conversation, Clark also told Ulbricht, "you MUST stop adding new features to the live site - one of these days you'll leave an opening, and if a db dump, including many unencrypted addy's [*i.e.*, customer addresses] and info got dumped on pastebin, you're done. period. no more chances." (*Id.* ¶¶ 59-60).

*Silk Road's Rules*: Clark also communicated with Ulbricht regarding the rules that governed Silk Road's users. As noted above, one such rule prohibited Silk Road vendors and buyers from engaging on the website, but then arranging for payment to occur off the website, thereby avoiding the commissions charged for sales on Silk Road. These kinds of disallowed transactions, referred to as "out of escrow" or "OOE" transactions, were explicitly prohibited by the rules that both vendors and users had to agree to in order to engage in business on the site. In a chat dated December 28, 2011, Ulbricht and Clark discussed the rule against "out of escrow" payments on Silk Road. During the conversation, Clark recommended that a "bounty" or payment be offered to the Silk Road community to report vendors who sought to perform out of escrow transactions, and Ulbricht confirmed that he liked the idea. (*Id.* ¶ 61).

*Silk Road Web Design and Speed*: Clark also provided assistance and advice with respect to the design of the Silk Road marketplace and related projects. For example, during a chat dated December 8, 2011, Clark provided advice to Ulbricht regarding how to reduce the time it took for the Silk Road home page to load onto a Tor browser, and Clark said he was going to undertake a comprehensive review of Silk Road's design. Clark wrote, "on a browser restart, signed in, got a 9.3 second main page load . . . we'll have to look at every page template you have, but it will make a huge different." (*Id.* ¶ 62).

*Investigating a Staff Member's Disappearance*: Further, Clark provided assistance with investigating the disappearance of a Silk Road customer support staff employee, who used the online pseudonym "Digital Alchemy," or "DA." On October 29, 2012, Ulbricht and Clark discussed DA's disappearance. Clark discussed trying to track down DA's whereabouts, stating, "Bluntly - I need to know if he's gone off the rails, or is simply fucked up. Off the rails scares me. Point is, I think in 10 days or less I can find him. Don't want to do a thing, just watch, learn, and be careful. This is a whole nother level -- are you all right with this, or do you want me to pull in my horns?" Ulbricht gave the go-ahead, responding, "go for it. it's a loose end." Later in the conversation, Clark opined, "I think someone got to him – not the cops – the competition." (*Id.* ¶ 63). Later in that conversation, Clark and Ulbricht talked about their pursuit of profit, and Ulbricht said, "I think as long as we don't cross the line in our pursuit, then we are only doing good." Clark replied, "Ha, dude, we're criminal drug dealers – what line shouldn't we cross?" Ulbricht responded, "murder, theft, cheating, lying"—and elaborated, "hurting people." (*Id.*).

*What Should Be Sold on Silk Road, Including Guns*: Clark and Ulbricht also discussed which items should be sold on Silk Road, including firearms and ammunition. By way of context,

Hon. William H. Pauley III                                                                                   Page 12
United States District Judge

for a time, vendors also sold guns and bullets on Silk Road.  On several occasions, Ulbricht and
Clark discussed whether firearms should continue to be sold on the same Silk Road marketplace
as other contraband, or whether there should be a separate underground website devoted to
firearms.  For instance, on January 28, 2012, Clark sent Ulbricht the link to a new *Gawker* article
entitled, "Now You Can Buy Guns on the Online Underground Marketplace"[6]; this article listed
the 13 firearms for sale on Silk Road at that time, such as a "9mm Machine Pistol with Silencer."
Clark told Ulbricht, "We'll call this the official Day One of the big-assed ATF task force that's
now on our list of Advanced Persistent Threats."  Later that day, Clark messaged Ulbricht:

> (2012-01-28 18:21) vj: [delayed] And don't you D.A.R.E. say a thing about
> guns, one way or the other, period. It's a devisive issue. If you are thinking of
> moving guns - and mebbe digital goods for company - to a diff site, great -
> keep it a secret until you do it. Say nothing publicly, because that will open a
> debate, and there ain't no winning that debate, just which losing side you
> support. Don't defend the sale of guns. Don't knock the sale of guns. Just go
> all status quo and fucking publicly ignore any discussions of Guns. Fucking
> Gawker, made it look like the gun selections is larger than my seed collection.

The following day, Clark messaged Ulbricht about this topic:

> (2012-01-29 18:55) vj: I wanna talk about guns, but not today, I want us both
> to read the forums and think on it. I'm pro-gun, as are ~s and smedley, btw –
> wouldn't want to walk up their 1/2 mile driveways uninvited. I was all for
> moving guns offa SR. But now, I dont' wanna move guns off of SR because
> we have to, know what I mean. It#s gonna be a touchy subject on the forums,
> and one that's gonna have to be dealt with  carefully this week.
>
> (2012-01-29 18:56) vj: Mebbe tomorrow you can tell me, in your dream
> world, how all this gun stuff would play out. Then lets make it happen.
>
> *   *   *
>
> (2012-01-29 19:09) vj: guns will scare off a lot of mainstream clients, rather
> have a split target for the TLA's to go after.
> (2012-01-29 19:09) vj: how did that go?
> (2012-01-29 19:10) vj: guns are never gonna make a significant impact on the
> bottom line, it's all about the freedoms

(*Id.* ¶¶ 79-80).

   *Counter-Intelligence and Protecting Silk Road*: One file recovered from Ulbricht's
computer was a text file labeled "log," reflecting various actions he took on various dates in
connection with operating Silk Road.  Several of the log entries refer to Clark as "cimon" and the
work VJ/cimon did for Ulbricht.  For example, an entry dated June 3, 2013 states, "put cimon in

---

[6]     *See*     https://gawker.com/5879924/now-you-can-buy-guns-on-the-online-underground-marketplace (last visited November 16, 2020).

Hon. William H. Pauley III                                                                    Page 13
United States District Judge

charge of LE counter intel," indicating that Ulbricht had put Clark in charge of counter intelligence ("*counter intel*") on the efforts that law enforcement ("*LE*") was making to investigate Silk Road. (*Id.* ¶ 64).

    *Marketing and Promotions*: Clark also aided Ulbricht with marketing and promotions.  For instance, in a chat from March 23, 2012, Clark and Ulbricht discussed an upcoming promotion on Silk Road, to occur for three days around April 20, 2012, called the "4/20 Sale."  (April 20th is observed as a counterculture holiday, where drug users gather to celebrate and use marijuana.) Ulbricht provided Clark with a draft announcement for the sale.  Later in that conversation, Clark and Ulbricht discussed various discounts and promotions that narcotics vendors would offer during the sale, and they discussed whether the site should not charge commissions on sales of contraband during the promotion.  During this conversation, Clark noted that they anticipated "a mil in sales" during the promotion.  (*Id.* ¶¶ 81-84).[7]

                                          *        *        *

    Ulbricht repeatedly paid Clark.  For example, the aforementioned "log" file on Ulbricht's computer—which reflected various actions Ulbricht took in connection with operating Silk Road—contained an entry dated May 31, 2013 stating, "$50k xferred to cimon."  Another file recovered from Ulbricht's computer was a spreadsheet file labeled "sr_accounting," reflecting various Silk Road–related expenses.  These included several additional references to payments to Clark (under the online pseudonym "cimon"), including payments of approximately: (1) $93,150 in United States currency on November 16, 2012; (2) $50,000 in United States currency on May 7, 2013; and (3) $57,000 in United States currency on July 3, 2013.  (*Id.* ¶¶ 64-65).

    Ulbricht's arrest did not stop Clark's desire, or efforts, to continue Silk Road.  Rather, after Ulbricht was arrested, Clark asked "Tex" (the lead programmer) to take over the operations of Silk Road.  "Tex" declined to do so.  (*Id.* ¶ 67).

    In connection with this case, Clark filed a Declaration (Dkt. 35), in which he confirmed his various leadership roles in connection with Silk Road.  In his Declaration, Clark wrote that:

-   Clark "became aware of Silk Road" in February 2011, shortly after its launch.  In September 2011, Clark "began to communicate with the administrator of the site."

-   Soon after he began to use to Silk Road, Clark "noticed a vulnerability in the method used to handle Bitcoin transactions that potentially made it possible for someone to hack into the site and steal Bitcoins.  I told DPR about the problem and helped configure the website's code to prevent others from gaining unauthorized access to the server."

-   "Over the course of the following months, we"—Clark and Ulbricht—"developed a mentor-protégé relationship.  DPR had no formal training in computer coding.  I provided advice on the technical aspects of running the site.  I helped him hire and manage an experienced programmer.  The programmer and I assisted DPR in

---

[7] Clark was also a seller on Silk Road—he sold marijuana seeds.

Hon. William H. Pauley III                                                   Page 14
United States District Judge

developing computer code and maintaining Silk Road's technical infrastructure."
Clark also "often developed ideas for changing and improving the technical structure
of the site to make it easier for users to access," including helping Ulbricht "redesign
the portion of the site the users interacted with."

- "By mid-2011, I was devoting the majority of my time to participating with DPR in
  running Silk Road."

- "In 2012 I became *de facto* head of marketing.  I dreamed up and ran promotions for
  the site."

- "Together DPR and I developed ideas on how to expand the Silk Road brand into other
  areas and how to improve the site."

- "Often I paid for equipment we needed to run the site and paid the salary of some of
  the employees."

- Instead of seeking reimbursement, Clark "agreed to take an ownership interest in the
  business."  From February 2013 until the site was taken down in October 2013, Clark
  was "a part-owner of Silk Road."  Although Ulbricht had created the site "and
  continued to hold a greater interest in it than I, we became partners."

- When the two men disagreed about a policy or practice, Clark's view "often prevailed."
  Clark and Ulbricht disagreed as to whether any transactions should be permitted to take
  place outside of Silk Road's escrow system (the system by which Silk Road received a
  commission from every transaction).  "DPR ultimately agreed to do things my way."

- Clark "also was chiefly responsible for making sure that what occurred on the website
  would remain private."

(Clark Decl. ¶¶ 6, 7, 8, 9, 13, 14; *see also* PSR ¶¶ 68, 75).

### 2.   Clark Advocated for, and Threatened, the Use of Violence

#### a.   *The Attempted Murder-for-Hire*

As the parties stipulated in the Plea Agreement, Clark urged, advised, and facilitated the
attempted murder-for-hire of a Silk Road staff member suspected of stealing approximately
$350,000 in Bitcoin from Silk Road.  (PSR ¶ 69).  Notably, murder had *not* been Ulbricht's first
impulse; after conferring with Clark, however, it promptly became Ulbricht's strategy.

By way of context, on January 26, 2013, a Silk Road staff member ("Inigo") told Ulbricht
that (1) about $350,000 in Bitcoin were missing, and (2) he believed that another Silk Road staff
member ("Flush") may have stolen these Bitcoin.  Ulbricht replied, "this makes me sick to my
stomache . . . This will be the first time I have had to call on my muscle. fucking sucks."  Ulbricht
then considered how to respond to this theft.  Ulbricht told a purported high-volume drug trafficker

on the site, "Nob," that he wanted someone to sit the thief down at his computer and send the stolen bitcoins back; "beat up [the thief] only if he doesn't comply i guess," Ulbricht said, adding, "not sure how these things usually go." (*Id.* ¶ 70). Ulbricht also drafted a possible note to be delivered to the thief, directing him to "Send the bitcoins you stole to the following address immediately."

Ulbricht and Clark then messaged about the theft. As Ulbricht speculated as to how the theft might have occurred, Clark interjected. "Enough about the theft," Clark said; "tell me about the organ donor." Shortly thereafter, Clark asked, "at what point in time do we decide we've had enough of someones shit and terminate them?" Ulbricht asked, "terminate? execute?" Clark explained, "We're playing with big money with serious people, and that's the world they live in." Shortly thereafter, Clark added, "he came at us from inside, put many folks at risk, and facing a serious felony he's def the kind of guy that would seel what little he knows for a break with the Feebs."[8] Clark also said, "Dude, he was a CSR [*i.e.*, customer support representative] that could read PMs [*i.e.*, private messages], reset passwords, mebbe harvest addys [*i.e.*, addresses] while emptying accounts, etc., etc." (*Id.*).

Clark persisted in advocating for the murder. Approximately one minute later, he pressed Ulbricht, "So, you've had your time to think. You're sitting in the big chair, and you need to make a decision." Ulbricht replied, "I would have no problem wasting this guy." Clark then said, "Well ok then, I'll take care of it." Not long after, Clark added:

> You would have surprised me if you had balked at taking the step, of bluntly, killing Curtis[9] for fucking up just a wee bit too badly. Also, if you had balked, I would have seriously re-considered our relationship. We're playing for keeps, this just drives it home. I'm perfectly comfortable with the decision, and I'll sleep like a lamb tonight, and every night hereafter.

(*Id.* ¶ 71). Clark offered Ulbricht the services of "Irish," who was Clark's muscle, to carry out the murder. However, "Nob" separately told Ulbricht that he could carry out the murder more quickly. ("Nob" was geographically much closer to the target than was "Irish.") Accordingly, Ulbricht agreed to pay "Nob" $80,000 to kill the Silk Road staff member whom he believed had stolen the money. In fact, "Nob" was an undercover law enforcement agent. No murder in fact occurred.[10] (*Id.* ¶ 72).

---

[8] Earlier in this conversation, Ulbricht noted that "Flush" had been arrested ten days earlier for cocaine possession.

[9] "Flush"'s first name is Curtis; his true identity was known to Ulbricht, who shared it with Clark.

[10] "Nob" was an undercover DEA agent, Carl Mark Force IV, who was part of a separate investigation into Silk Road, led by law enforcement in Baltimore; the Baltimore investigation was not coordinated with the SDNY investigation. Force ultimately pleaded guilty to money laundering, obstruction of justice, and extortion under color of official right, related to (among other things) his involvement in the Baltimore Silk Road investigation. However, "Nob"'s misconduct has no bearing on the fact that *Clark* suggested the murder-for-hire and counseled Ulbricht to take that vicious step; Ulbricht then paid "Nob" to carry it out.

### b. Clark Threatened "Tex"'s Wife

In or around February 2013, Clark threatened "Tex"'s wife.  In sum and substance, Clark said that if "Tex"'s wife went to the police to talk about Clark's and "Tex"'s involvement with Silk Road, Clark would hurt her.  (*Id.* ¶ 73).

### 3.   Clark's Goals and Legacy

During chats with Ulbricht, Clark repeatedly expressed his goals of breaking the DEA and ending drug prohibition.  (*Id.* ¶ 87).  Clark also made clear that he hoped his legacy would be taking down the DEA.  Here is a sampling of those chats—Clark is "vj", and Ulbricht is "myself":

> (2011-12-07 11:54) vj: finally -- personally i want to make enough money to mail out 22 million letters, each with 50 cannabis seeds in there, to very house with a yard in north america, and **break the backs of the DEA** and cannabis prohibition.
> (2011-12-07 11:55) myself: cool idea
> (2011-12-07 11:55) vj: I've already got over 150 million seeds - about 700 pounds
> (2011-12-07 11:55) myself: wow
> (2011-12-07 11:55) vj: **been my dream, make those fuckers at the DEA pack their bags and leave in the night. I believe that we can break drug prohibition**
>
> \* \* \*
>
> (2011-12-09 09:46) vj: **iwant to break the dEA's back** and end cannabis prohibition - I believe i will succeed in destroying them. And they are a big target.
>
> \* \* \*
>
> (2011-12-19 18:46) vj: so we're gonna be number one on a few posters dude - fbi and dea at the least
> (2011-12-19 18:47) vj: which is why **folks who risk the security of clients have to be dealt with swiftly and ruthlessly** - we can't let a bunch of them get rounded up while we're still putting our shoes on
> (2011-12-19 18:48) vj: they killed 2 friends of mine, DEA did, and I took it personally and swore I'd break them or die trying
> (2011-12-19 18:48) vj: innocent, unarmed med patients
> (2011-12-19 18:48) myself: you have alot motivating you then
> (2011-12-19 18:48) vj: yeah, it's more than doable
>
> \* \* \*
>
> (2011-12-19 18:50) vj: and before I go - just for a minute - I want that whole ball of wax in my hands, so I can say **I did that, I took down the DEA**

* * *

(2011-12-19 21:57) vj: . . . **I wanna break the DEA, and to do that, we need to break new ground in many directions at once.**

* * *

(2011-12-19 22:13) vj: One way or the other, long after we're both dead, **our actions will shape the future**
(2011-12-19 22:13) myself: cheers to that
(2011-12-19 22:13) vj: **There aren't a hundred men in history that have the opportunity we have here**
(2011-12-19 22:13) vj: let's not fuck it up!

* * *

(2012-01-17 13:01) vj: **I'm having the time of my fucking life. Told my honey, that today, looking back, I cannot think of a time in my life when I was happier, busier, or more content, all at the same time.**

(Emphasis added).

### E.   Clark's Obstruction of Justice

As the parties stipulated in the Plea Agreement, Clark willfully obstructed justice by lying, under oath, during his extradition proceeding in Thailand in connection with this case. Specifically, during the course of Thai extradition proceedings, Clark testified under oath, in court, in his attempt to avoid being extradited to the United States.  In sum and substance, Clark testified falsely that, at the time he was arrested (*i.e.*, before he received the allegations against him), he "had no knowledge" regarding Silk Road and "did not have any involvement with this website." (*Id.* ¶ 74).  As noted above, after he was extradited to the United States, Clark filed a Declaration in connection with his motions to suppress evidence, asserting—contrary to his claims in Thailand—that he was a part-owner of Silk Road.  (*See* Clark Decl. ¶¶ 13-14; *see also* PSR ¶ 75).

## II.   PROCEDURAL HISTORY, THE PSR, AND THE GUIDELINES CALCULATION

*Procedural History*: Clark was charged by Complaint in 2015.  (Dkt. 1, 5).  On December 3, 2015, Clark was arrested in Thailand; he has been in custody since then.  (PSR p. 1).  He contested extradition, lied in connection with his extradition proceeding, and was ultimately ordered extradited to the United States.  On June 15, 2018, Clark arrived in this District.  (Dkt. 9). He was charged in Indictment S2 15 Cr. 866 (WHP) with six crimes: conspiracy to distribute narcotics, distribution of narcotics, distribution of narcotics by means of the Internet, conspiracy to commit computer hacking, conspiracy to traffic in fraudulent identification documents, and conspiracy to commit money laundering.  (Dkt. 7).

*Guilty Plea*:   On January 30, 2020, Clark pleaded guilty to conspiracy to distribute narcotics.  (Dkt. 47).  In the Plea Agreement, the parties stipulated that his offense level was 45 and his criminal history category was I; the offense level is based on the following calculation:

1. Pursuant to U.S.S.G. § 2D1.1(a)(5) and Application Note 8(B), because the offense involved different controlled substances, these quantities are converted to their converted drug weight equivalents and added.

2. Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(2), the base offense level is 36 because the offense involved the equivalent of at least between 30,000 and 90,000 kilograms of converted drug weight. Specifically, the offense involved at least (a) 82.6 kilograms of cocaine, which is the equivalent of 16,520 kilograms of converted drug weight; (b) 26.8 kilograms of heroin, which is the equivalent of 26,800 kilograms of converted drug weight; and (c) 8.7 kilograms of methamphetamine, which is the equivalent of 17,400 kilograms of converted drug weight. Thus, in total, the offense involved the equivalent of 60,720 kilograms of converted drug weight.

3. Pursuant to U.S.S.G. § 2D1.1(b)(2), two levels are added because the defendant—who used the pseudonyms "Variety Jones," "VJ," "cimon," and "CaptainSargeant" on the Silk Road website—used violence, made a credible threat to use violence, or directed the use of violence by urging, advising, and facilitating the attempted murder-for-hire of a Silk Road staff member suspected of stealing approximately $350,000 in Bitcoin from Silk Road.

4. Pursuant to U.S.S.G. § 2D1.1(b)(7), two levels are added because the defendant, or persons for whose conduct the defendant was accountable, distributed a controlled substance through mass-marketing by means of an interactive computer service.

5. Pursuant to U.S.S.G. § 2D1.1(b)(16)(D) & (E), two levels are added because the defendant receives an adjustment under U.S.S.G. § 3B1.1(a) (aggravating role) and the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the instant offense, or committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.

6. Pursuant to U.S.S.G. § 3B1.1(a), four levels are added because the defendant was a leader or organizer and the criminal activity involved five or more participants or was otherwise extensive.

7. Pursuant to U.S.S.G. § 3C1.1, two levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction, to wit, the defendant lied, under oath, during his extradition proceeding in Thailand in connection with this case.

(Plea Agreement, pp. 2–3). The parties also stipulated to a three-point reduction for the defendant's timely acceptance of responsibility, yielding a total offense level of 45.

Hon. William H. Pauley III                                                    Page 19
United States District Judge

 *Final PSR and Applicable Guidelines Range*: On July 8, 2020, the Probation Office issued the final PSR (Dkt. 56), which recommended the statutory maximum punishment of 240 months' imprisonment in light of, among other things, Clark's "integral" roles in Silk road, his efforts to protect and improve Silk Road, his "callous[ness]" in advocating a murder-for-hire, his "threatening" a co-conspirator's family member, his "loathing" of law enforcement, and the conclusion that "the community is safer with Clark incarcerated." (PSR p. 44). Probation identified no information about the offense or the offender that would warrant a non-Guidelines sentence. (*Id.* ¶ 179).

 Probation calculated the offense level differently, in one respect, than did the Plea Agreement: Probation disagreed with the two-level enhancement pursuant to U.S.S.G. § 3C1.1, reasoning that it is precluded by an Application Note 7 (to U.S.S.G. § 3C1.1), which provides, in relevant part: "if the defendant receives an enhancement under §2D1.1(b)(16)(D), do not apply this adjustment." (PSR ¶¶ 164-65). Accordingly, Probation calculated an offense level of 43 and a criminal history category of I, which likewise would have produced a Guidelines range of life imprisonment, except that by operation of the statutory maximum punishment, the applicable range becomes 240 months' imprisonment. (In other words, Probation calculated the Guidelines slightly differently, but it does not affect the bottom-line range.)

 Although it does not affect the ultimate Guidelines range, the Government respectfully notes that Probation's Guidelines calculation is incorrect. The Application Note relied on by Probation (to preclude a two-level enhancement) does not apply in these circumstances. By way of context, the question here concerns the interplay of three Guidelines provisions:

  1. **U.S.S.G. § 3C1.1**: A two-level enhancement applies where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction."

  2. **U.S.S.G. § 2D1.1(b)(16)**: A two-level enhancement applies if "the defendant receives an adjustment under §3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors:
   . . .

    (D) the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense; [or]

    (E) the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood[.]

  3. **Application Note 7 to U.S.S.G. § 3C1.1**: "[I]f the defendant receives an enhancement under §2D1.1(b)(16)(D), do not apply this adjustment."

 As relevant here, Application Note 7 applies in only one circumstance: when the two-level enhancement under U.S.S.G. § 2D1.1(b)(16) is premised specifically on subsection (**D**). That is

not the case here, however, where the two-level enhancement under U.S.S.G. § 2D1.1(b)(16) is premised on two different subsections, (D) and (E). By its plain terms, Application Note 7 does not operate under these circumstances.

Importantly, Application Note 7 is clearly driven by concerns about double-counting; imposing a two-level enhancement for obstruction under § 3C1.1 would duplicate the enhancement in § 2D1.1(b)(16)(D), which itself specifically references obstructing justice. But such double-counting concerns plainly are not present where the enhancement is warranted (and, indeed, stipulated) under U.S.S.G. § 2D1.1(b)(16)(**E**). That is because § 2D1.1(b)(16)(E) and § 3C1.1 clearly serve distinct purposes. The former enhancement concerns the scope of the defendant's involvement in the offense itself (*e.g.*, whether the defendant committed the offense as part of a *pattern* of criminal conduct engaged in *as a livelihood*). The latter enhancement concerns obstructing justice by taking *subsequent* actions, separate and apart from the offense itself, which would frustrate the investigation or prosecution of the underlying offense. Simply put, § 2D1.1(b)(16)(E) and § 3C1.1 do not overlap in any way. Thus, as the parties stipulated in the Plea Agreement, both enhancements plainly apply.[11]

*The Defense Sentencing Submission/PSR Objection*: On November 6, 2020, the defense filed its sentencing submission, requesting a below-Guidelines sentence of 180 months. (Dkt. 63 ("Def. Mem." at 30)). The defense also objected to the PSR's inclusion of information about six overdose deaths linked to narcotics sold on Silk Road. (*Id.* at 23-24). In light of the Second Circuit's decision in *United States v. Ulbricht*, 858 F.3d 71, 125-27 (2d Cir. 2017), the Government does not intend to rely on the facts of these overdose deaths at sentencing and does not seek to enhance the defendant's sentence due to these six overdose deaths. At the same time, however, the fact of these overdoses is already part of the public record, regardless of whether it appears in this PSR. (In any event, as the PSR notes, this defendant is not personally or directly responsible for any of the six overdose deaths. (PSR ¶ 89)).

## III.   **APPLICABLE LAW**

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007),

---

[11] As the Second Circuit has noted, multiple Guidelines adjustments "may properly be imposed when they aim at different harms emanating from the same conduct." *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000). "The relevant question, then, is whether the two enhancements serve identical purposes—in which case applying both would be double counting and would demonstrate procedural irregularity—or whether they address separate sentencing considerations." *United States v. Stevenson*, 834 F.3d 80, 83-84 (2d Cir. 2016) (internal quotation marks omitted). Imposition of multiple enhancements is appropriate when "there is no necessary overlap between the conduct underlying the two adjustments." *Volpe*, 224 F.3d at 76. Here, as noted, the enhancements at issue *neither* involve "the same conduct" (*Volpe*, 224 F.3d at 76) *nor* "serve identical purposes" (*Stevenson*, 834 F.3d at 83-84).

district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. *Gall*, 552 U.S. at 50 & n.6. If the judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

## IV.   <u>DISCUSSION</u>

The Government respectfully submits that the Stipulated Guidelines Sentence (240 months' imprisonment) is appropriate in this case in light of the nature, duration, seriousness, harmfulness, deceptiveness, and profitability of the offense; the need for just punishment; the importance of protecting the public; the need for deterrence; and the defendant's characteristics.

*First*, as to the nature and circumstances of the offense, it is difficult to overstate the seriousness of this offense: The defendant and his co-conspirators operated a massive dark web marketplace that was specifically designed to facilitate black-market transactions. Silk Road was the first site of its kind to combine various anonymizing features. The site worked. Until it was taken down by law enforcement, there were more than 1.5 million total transactions, involving more than 115,000 buyer accounts and nearly 4,000 seller accounts. Those transactions had a total value of more than $210 million in U.S. currency, including more than $180 million worth of narcotics transactions. The quantity of drugs sold through this global criminal enterprise was staggering—*e.g.*, more than 82 kilograms of cocaine, 26 kilograms of heroin, and 8 kilograms of methamphetamine. This volume of drugs posed quite significant risks to public health.

Silk Road meaningfully lowered the entry barriers into the underground economy for buyers and sellers alike. It is easy to see why. For sellers, Silk Road provided an anonymous online sales portal, a large customer base, how-to advice from the "Seller's Guide" and Silk Road discussion forum, and an escrow system enabling sellers to collect payment from customers remotely. Silk Road thus enabled thousands of drug dealers to expand their markets from the local sidewalk to cyberspace, and thereby reach countless customers, across the globe, whom they never could have found on the street.

Similarly, for buyers, Silk Road made it easy for anyone anywhere to buy virtually any drug. They needed only a computer and a shipping address. With the click of a mouse, a Silk Road user could circumvent all of the physical obstacles that might otherwise prevent or deter one from obtaining drugs locally. Someone who might not know where to find drugs in his or her area, or feel comfortable searching them out, could find and buy drugs effortlessly on Silk Road.

Nor were the harms associated with Silk Road limited to drugs. Silk Road also facilitated:

- Computer hacking, such as the sale of tools that compromised the usernames and passwords to victims' email and social media accounts, as well as tools that gave intruders remote access to a victim's computer, including their webcam activity;

- The sale of more than $3 million worth of money laundering-related services (stemming from more than 32,000 such transactions); and

- The sale of more than $1 million worth of counterfeit identity documents (stemming from more than 7,000 such transactions).

All of this was possible because of the very carefully, comprehensively planned scheme that Ulbricht started, and which Clark eagerly joined, professionalized, and rendered more secure. The two men spent countless hours, over nearly two years, trying to ensure that they—and their Silk Road community—would avoid detection, and thereby avoid the consequences of their actions. Clark's roles in Silk Road were central and pivotal. For nearly two years (late 2011 until October 2013), Clark was Ulbricht's mentor, adviser, and partner in crime. As noted, the two men strategized about all things Silk Road, including the facts that:

- Clark assisted with the technical development of the Silk Road website.

- Clark hired a computer programmer to maintain and improve the technical infrastructure and computer code underlying the Silk Road website.

- Clark was involved in promoting sales of contraband on Silk Road, including narcotics.

- Clark advised Ulbricht on the rules and policies for Silk Road, including what should be sold on the site (*e.g.*, firearms).

- Clark regularly advised Ulbricht regarding security.

- Clark devised Ulbricht's "cover story" to make it appear as though Ulbricht had sold Silk Road.

- Clark conducted research on law enforcement's efforts to investigate Silk Road.

- Clark urged Ulbricht to arrange for the murder of a Silk Road staff member whom they believed had stolen approximately $350,000 from Silk Road.

It is for good reason that the Plea Agreement contains a four-level enhancement for Clark's role as a leader or organizer of this massive, unprecedented offense.

The (attempted) murder for hire was especially egregious. And Clark is the one who urged it. Initially, Ulbricht wanted the $350,000 worth of stolen Bitcoin returned; as Ulbricht told "Nob," Ulbricht wanted the thief to be roughed up *if* he refused to return the Bitcoins. But then Ulbricht messaged with Clark, and only a few messages into the conversation, Clark completely changed

the tone: "enough about the theft, tell me about the organ donor." Their conversation took less than 90 minutes; there was no need, evidently, to further discuss or weigh the decision to (try to) end another human being's life. They believed he had stolen from them and jeopardized their criminal empire, and that was that. In his messages, Clark emphasized the importance of protecting Silk Road from a suspected rogue insider—a person who had the ability to reset others' passwords and who had access to others' private messages and potentially customers' addresses. Clark also expressed the concern that the rogue insider would cooperate with law enforcement.

In short, ending another person's life was a small price to pay—in Clark's view—in order to protect his and Ulbricht's online empire. As noted above, Clark told Ulbricht, "You would have surprised me if you had balked at taking the step, of bluntly, killing Curtis for fucking up just a wee bit too badly." Astonishingly, Clark was entirely nonchalant about murder, as though this were a conversation about an ordinary business decision. Clark told Ulbricht, "I'm perfectly comfortable with the decision, and I'll sleep like a lamb tonight, and every night hereafter." Clark's reaction speaks—quite clearly and loudly—to Clark's character, including his penchant for violence and his stunning lack of remorse at seeking to end another's life. Whereas Ulbricht appeared to grapple with how to respond, Clark had neither hesitation nor qualms about killing. Clark's reaction is that of a cold-blooded killer—a man who simply did not care that he was causing others the ultimate harm or suffering.[12]

In sum, the nature and circumstances of this offense—including its seriousness, sophistication, deception, duration, harmfulness, and violence—call for an extremely serious sentence. Such a sentence is also needed to ensure just punishment and to protect the public from further crimes of the defendant. The defendant has no regard for others' lives or wellbeing, but he does appear to have easy access to a hitman through whom he can cause severe harm. This is a chilling combination.

*Second*, deterrence interests strongly counsel in favor of the Stipulated Guidelines Sentence. As for general deterrence, the Silk Road was unusually widespread and well-known, as it reached every corner of the globe. It was specifically designed to (1) facilitate various kinds of illegal activity on a stunning scale, and (2) make it nearly impossible to determine which individuals, in which locations, were using and operating the site. The Court should send a clear message that those who administer such sites will be met with serious punishment.

Moreover, it is highly unfortunate, but perhaps unsurprising, that Silk Road has spawned a number of similar (or copycat) dark web marketplaces, which continue to pose serious safety concerns and to convert the U.S. mail into a *de facto* delivery service for narcotics and other contraband. The profitability of such misconduct, unfortunately, appears to continue to appeal to wrongdoers. (From a Bitcoin wallet file recovered from Ulbricht's computer, FBI agents seized approximately 144,341 Bitcoins, which had an approximate value of $18 million in United States currency at the time that Ulbricht was arrested; today, those same Bitcoins would be worth more

---

[12] Clark's mentality was likewise apparent in his comments about whether guns should be sold on the main Silk Road site or on a companion site; Clark focused not on the real-world harm that the completely unregulated sale of guns could easily cause, but on whether the availability of guns for sale would "scare off a lot of mainstream clients" and thus hurt Silk Road's bottom-line.

than $2 billion.)  To the extent that would-be imitators may view the risk of being caught to be low, many are still likely to be deterred if the stakes are sufficiently high.

As for specific deterrence, the Stipulated Guidelines Sentence is warranted given, among other things, (1) Clark's leadership role and extensive involvement in Silk Road for a lengthy period; (2) Clark's advocating violence and murder-for-hire; (3) Clark's threatening to hurt "Tex"'s wife if she reported Clark's and "Tex"'s involvement in Silk Road; (4) the fact that Ulbricht's arrest did not stop Clark's efforts to continue Silk Road, but rather, after Ulbricht's arrest, Clark asked "Tex" to take over the operations of Silk Road; and (5) the fact that Clark obstructed justice by lying under oath during his extradition proceeding in Thailand in a further attempt to escape the consequences of his conduct.  Indeed, Clark poses a significant risk of recidivism, in light of his penchant for violence, the deceptiveness of his misconduct, and his determination to "t[ake] down the DEA" and "break drug prohibition."

*Third*, considerations of relative culpability also support the Stipulated Guidelines Sentence.  The most culpable defendant was Ross Ulbricht; Ulbricht created and owned Silk Road and ultimately ordered, and paid for, five (attempted) murders-for-hire.  (Fortunately, none of the intended targets was in fact killed.)  At age 31, Ulbricht, a first-time offender, was sentenced to life imprisonment.  *See* 14 Cr. 68.  The next-most culpable defendant is clearly Clark.  Although Clark did not conceptualize Silk Road (like Ulbricht), Clark was involved in virtually every facet of the site for nearly two years.  Clark co-led Silk Road; he helped professionalize it, improve it, and insulate it from law enforcement.  Clark clearly had Ulbricht's ear, as the attempted murder-for-hire demonstrates, and more generally, the two talked through virtually every aspect of Silk Road.  Of course, the two men could not do everything themselves, so there was also a small Silk Road staff—a few forum moderators and site administrators and programmers.[13]  But Ulbricht and Clark were the Silk Road brain-trust; indeed, according to Clark, he became a part-owner.  Thus, this sentencing factor, too, supports the Stipulated Guidelines Sentence.

*Finally*, the defendant's arguments in favor of leniency (*e.g.*, prison conditions in Thailand) are certainly fair arguments, and should be considered, but pale in comparison to the seriousness of his offense, his central role in the offense, his use of violence, and his obstruction of justice.  The defense unpersuasively contends that Clark will likely "pose no danger to individuals in the United States" upon his release, because he will be deported after he serves his prison term.  (Def. Mem., 28).  But a sophisticated cybercriminal can harm individuals in the United States irrespective of his location.  After all, Clark committed the instant offense from abroad, yet many kilograms' worth of Silk Road drugs reached the United States.  Indeed, Clark's prior residence in Thailand (*see* PSR ¶ 140) did not preclude his ability to send a hitman to Utah to kill the suspected Bitcoin thief.  More generally, many typical arguments for lenience simply are not present here (*e.g.*, youth, impressionability, lack of skills or opportunity, perceived financial need, lack of violence, lack of a central role, a one-time or short-term mistake, etc.).  Simply put, there is no excuse for the defendant's brazen, harmful conduct.

---

[13] Several members of the Silk Road staff—who served forum moderators, site administrators, etc.—have been sentenced to varying terms of imprisonment, such as 78 months, 66 months, and about 17 months (Gary Davis, Andrew Jones, and Peter Nash, respectively).  *See* 13 Cr. 950 (JMF). None of them served as *de facto* co-leaders of Silk Road as Clark did with Ulbricht.

Hon. William H. Pauley III                                                    Page 25
United States District Judge

## V.      **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Stipulated Guidelines Sentence is fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York

By:   _____
Michael D. Neff
Vladislav Vainberg
Assistant United States Attorneys
(212) 637-2107/1029

cc:     Stephanie M. Carvlin, Esq. (via ECF)