

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 29, 2022

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

  Re: <u>United States v. Roger Thomas Clark</u>, S2 15 Cr. 866 (SHS)

Dear Judge Stein:

  The Government respectfully submits this letter in further response to the Court's Order dated July 12, 2022. (Dkt. 148). That Order directed the Government to investigate defendant Roger Clark's ("Clark" or the "defendant") allegations about the conditions of his confinement.

## I. Background

  *Clark's Case*: Clark was arrested in late 2015 in Thailand, contested extradition, and was ultimately extradited to the United States in June 2018. (Dkt. 13, p. 2). In January 2020, Clark pleaded guilty to conspiring to distribute massive quantities of narcotics—a charge arising out of his role as the senior adviser to the owner and operator of the "Silk Road" online illicit black market. In his plea agreement, Clark admitted to, among other things, (1) his leadership role in Silk Road; (2) his urging and facilitating an attempted murder-for-hire in order to protect Silk Road; and (3) his obstruction of justice by lying, under oath, during his extradition proceedings in Thailand in connection with this case. (Dkts. 47, 56). As set forth in the PSR and in the Government's sentencing letters, Clark also threatened to hurt his co-conspirator's wife if she reported Clark's involvement in Silk Road to the police. (*See, e.g.*, Dkt. 56 (PSR), ¶ 73; Dkt. 64 (Govt. Sent.), p. 16).

  Clark is currently pending sentence, and the parties' primary sentencing letters have been filed. (Dkts. 63, 64, 74, 75). Sentencing is scheduled for September 22, 2022. (Dkts. 145, 148).

  *Clark's 2021 Injury*: From approximately June 2018 until October 2021, Clark was detained at the Metropolitan Detention Center ("MDC"), where he was in the custody of the Bureau of Prisons ("BOP"). Then, in October 2021, Clark fell at the MDC, sustained serious injuries, underwent surgery, and was transferred to a hospital/rehabilitation facility (the "Medical Center"). At the Medical Center, Clark was in the principal day-to-day custody of the United States Marshals Service ("USMS"), and he was guarded by employees of United Security, Inc. ("USI"). USI contracts with both USMS and BOP to provide security at medical facilities for in-custody defendants who are receiving short- or long-term medical care.

Hon. Sidney H. Stein  Page 2
United States District Judge  July 29, 2022

While recovering from his injuries, Clark was housed at the Medical Center from approximately late October 2021 until June 13, 2022, and then at a nursing home (the "Nursing Home") from approximately June 13, 2022 until July 27, 2022.  On or about July 27, 2022, Clark was medically cleared to return, and did return, to the MDC.

*USMS Approved Various Accommodations for Clark*:  From approximately October 2021 until May 2022, the Government worked very closely with defense counsel and the USMS to accommodate a number of Clark's requests.  Specifically, the Government worked closely with a USMS supervisor and with Clark's then-counsel, Stephanie Carvlin, Esq., to provide various accommodations for Clark, including those outlined below.  A number of these accommodations go well beyond what other inmates generally receive.  Moreover, during this period, Clark and Ms. Carvlin typically had scheduled biweekly phone calls; Ms. Carvlin (or her colleague) could also visit Clark in person as often as they wished (with advance notice to the USMS), and did visit him on a number of occasions.  This frequency of communication enabled the parties to address Clark's evolving list of requests as well as occasional alleged misunderstandings.

Ultimately, USMS approved the following core package of accommodations for Clark—and USMS specifically directed USI as follows:

1. **Confidential Phone Calls with Defense Counsel**: Roger Clark is permitted, on a daily basis, to make phone calls to his attorney.  These phone calls shall be confidential, as explained below.

2. **Confidential Phone Calls with the Canadian Consulate**: Roger Clark is permitted, on a daily basis, to place phone calls to his consular representative at the Canadian Consulate.  These phone calls shall be confidential, as explained below.

3. **Social/Personal Phone Calls**: Roger Clark is permitted three social/personal calls per week, for 30 minutes each.  These calls are permitted to individuals who have been pre-approved by USMS.  These phone calls are not deemed confidential.
    a. The following individuals have been approved by USMS to date:
        i. [redacted for privacy reasons]

4. **Pens**: Roger Clark will be given access to standard pens—each day, between 10:00 a.m. and 4:00 p.m.—for the purpose of conducting legal research and writing.  These pens will be provided by defense counsel and shall first be cleared by the USMS.  Clark shall have access to one pen at a time.  When Clark is not using a standard pen to conduct legal research or writing, it will be returned to the USI employees who are guarding him.

Hon. Sidney H. Stein                                                          Page 3
United States District Judge                                             July 29, 2022

> 5. **Leg Irons**: In the event that the use of leg irons is deemed necessary for any period, the leg irons will be removed to permit Roger Clark to do physical, occupational, and other therapy dictated by his medical team.
>
> 6. **Attorney of Record**: In-person visits are scheduled through the USMS.
>
> 7. **Family Visits (in-person)**:
>    - A background check must be conducted on each visitor.
>    - One visit per week for one hour between the hours of 9am-9pm.
>    - Visit must be scheduled through the USMS.
>    - No physical contact is permitted.
>    - No electronic devices are allowed in the room.
>
> **Procedures to be followed for Confidential Phone Calls**
> Clark's phone calls with his attorney and with the Canadian Consulate shall all be confidential. During such calls, USI employees who are guarding Clark shall:
> 1. Exit Clark's room for the duration of the call;
> 2. Maintain visual contact with Clark by positioning themselves outside of Clark's room, with the door ajar, and at a location that is sufficiently far away to ensure Clark's privacy; and
> 3. Place Clark's white-noise machine in his room, and turn that machine on, for the duration of such calls.

A supervisor with USI informed the Government that this package of accommodations goes well beyond what he has seen other inmates receive—and has resulted in other inmates complaining to USI that they do not receive the same suite of accommodations. Nor does the list above constitute the entirety of what was approved for Clark; USMS also approved various additional requests, such as reading glasses, permission to photograph Clark's injuries, and meetings with a civil attorney. Clark's package of accommodations is memorialized in USI's log book, which generally resided in or near Clark's hospital room with USI guards.[1]

*Clark Proceeds* Pro Se: On May 31, 2022, the Court approved Clark's request to proceed *pro se* and relieved Ms. Carvlin. Evan Lipton, Esq. was appointed as stand-by counsel.

With one modest exception noted below, Mr. Lipton did not contact the Government, at any point, to convey any questions, issues, or requests for accommodations from Clark. Rather, on July 11, 2022, Mr. Lipton filed a letter on Clark's behalf, in which Clark makes various allegations regarding the conditions of his confinement. (Dkt. 147). On July 12, 2022, the Court directed the Government to investigate the validity of Clark's allegations, and to update the Court on its findings. (Dkt. 148).

---

[1] During the time that he was guarded by USI (*i.e.*, October 2021 until July 2022), Clark was generally accompanied by two guards at a time, who typically worked eight-hour shifts. Thus, in total, it is believed that more than 100 USI employees were involved in guarding Clark.

Hon. Sidney H. Stein  
United States District Judge

Page 4  
July 29, 2022

## II. Investigation and Response

In light of the Court's Order, the Government has interviewed approximately fifteen individuals, who are employees of five entities—USMS, USI, BOP, and both medical facilities where Clark was housed during the past nine months (*i.e.*, the Medical Center and the Nursing Home). The Government has also reviewed documentary evidence. Based on that investigation, the Government's findings to date are set forth below.

### 1. Clark Has Received More Accommodations Than Inmates Typically Do

In his letter, Clark appears to allege that he is treated worse than other inmates. As set forth above, Clark in fact received more accommodations than the typical inmate. A USI supervisor stated that, in his more than eleven years with USI, he has never seen an inmate receive as many accommodations as Clark has. Indeed, Clark's package of accommodations has led other inmates to complain to USI that they are not receiving the same treatment as Clark. To the extent Clark is treated any differently than a typical inmate, it is because of the advocacy of his then-counsel Stephanie Carvlin, the sustained efforts of the Government, and the willingness of the USMS to accommodate Clark's many requests. For example, an employee of the Nursing Home said it was "shocking" to the Nursing Home staff to see a laptop computer in Clark's room, which was the result of one of the accommodations made by the USMS.

### 2. Clark Has Verbally Abused USI Guards and Medical Staff, Has Become Physical With USI Guards, Has Disobeyed Directives, and May Have Attempted to Escape

Multiple witnesses have indicated that Clark has been a difficult inmate. *First*, Clark is verbally abusive. Clark (1) cursed at USI employees; (2) used racial epithets repeatedly, such as calling black USI employees the N-word and referring to a Hispanic employee as a "spic"; (3) has referred to female employees as "bitch"; and (4) verbally threatened USI employees, such as threatening to get them fired if they did not do what Clark said. Clark also threatened USI employees in another respect—he highlighted his computer skills and the fact that it would be easy for him to use the Internet to find out who they are and where they live, and to uncover information about their children and their bank accounts. Clark's abusiveness is not limited to his treatment of USI employees; Clark has also mistreated medical staff. Representatives of the Medical Center and the Nursing Home have stated that, at times, Clark was cooperative, but at other times, Clark was verbally abusive and rude to medical staff, including his use of the N-word at the Nursing Home.

*Second*, in one instance in April 2022, Clark threatened to punch a particular USI guard in the face. Specifically, right after he fell, Clark was adamant that shackles not be re-applied. As guards were in the process of tending to Clark and shackling his *non*-injured leg, Clark closed his fist, cocked his arm, and said he would punch the guard in the face if the guard tried to use shackles. Clark later apologized for his actions.

*Third*, in another recent instance, on or about July 23, 2022, Clark demanded that the window in his room—which has no security feature to thwart an escape—be opened. His request was denied. Several hours later, Clark requested to use the bathroom between 3:00 and 4:00 a.m.

After leaving the bathroom, Clark rushed to the window and tried to open it with both hands. The USI guard reacted quickly and stopped Clark before Clark could open the window. Clark made physical contact with the guard and pushed the guard's hands away. The USI guard directed Clark to return to his bed and informed him that, if he did not do so, the guard would use the necessary force to subdue him; Clark then complied and called the guard a "dick." This was not the first time that this guard has ordered Clark not to advance to the window.

*Fourth*, Clark disobeyed USI directives in other respects. For instance, USI told Clark that, when he was done using his standard pen, he should put the pen on the desk, so that USI could take possession of it again. On certain occasions, however, Clark said he would not return the pen; on several others, he threw the pen on the floor; and on one occasion, he hid the pen under his mattress, which required several USI employees to search for the pen. *I.e.*, Clark abused an unusual accommodation he had been afforded. (For safety reasons, inmates typically are granted access only to a flexible, floppy pen—not a standard pen.)

*Finally*, a representative of one medical facility (which housed Clark) noted, in part, that in their view, Clark was very smart, manipulative, and entitled. This representative noted that Clark was afforded the opportunity to do physical and occupational therapy five days per week, but refused therapy "quite often." This representative added that, at a certain point, Clark claimed he could not walk, yet staff observed him walking without an assistive device.

### 3. Specific Allegations Made by Clark in His *Pro Se* Letter

**Shackles/Handcuffs**: Clark alleges that, immediately after the May 31, 2022 court conference, the "security procedures" employed by USMS became "more severe," resulting in his being handcuffed to the bed, whereas previously his hands had been free. (Dkt. 147, p. 2). Clark appears to claim that this change was in retaliation for his complaints. *Id.* The Government's investigation has revealed that, far from being retaliatory, the change in Clark's restraints was prompted by his own counsel's request.

By way of context, the Medical Center is not a BOP hospital, nor a secure correctional facility. In such an environment, USMS policy typically requires that inmates be restrained at two points (*e.g.*, both legs, one leg and one hand, etc.).

In the leadup to the May 31, 2022 court conference, Clark's legs were both restrained and his hands were free, consistent with USMS policy. On or about May 26, 2022, Clark's then-counsel emailed the Government to request the removal of his leg irons. After some discussion between the parties, Clark's then-counsel requested the removal of his leg iron from his injured leg specifically. Moments before the court conference before Your Honor, Clark's then-counsel informed the Government that Clark's right leg was his injured leg, and the Government promptly informed USMS accordingly via email: "Clark's right leg is the injured one. Thank you again for directing USI not to use a restraint on that particular leg." USMS directed USI accordingly, and USI promptly changed the restraints to one leg and one arm, in keeping with USMS policy regarding restraint at two points. Specifically, one of Clark's arms was handcuffed to the bed rail, but the handcuff was removed for eating, showering, legal research/writing, and therapy. USI also took steps to ensure Clark's comfort, even as he was restrained. For instance, USI asked Clark

which arm he would prefer to be handcuffed. Furthermore, when USI applied the handcuff, they put four fingers (of their own) through the cuff to ensure that Clark had room, and they also employed a safety lock to ensure that the cuff did not tighten. In sum, what Clark describes as retaliatory was, instead, the product of the Government's, USMS's, and USI's efforts to respond to defense counsel's requests in a way consistent with the USMS policy regarding restraint.

Clark next claims that, when he returned from Court on May 31, 2022, some of his legal papers were "spread about" his hospital room, while others were "removed"; he also asserts that he was told that the Court had given guards "'carte blanche' to violate any and all of [Clark's] rights as they desired." (Dkt. 147, p. 2). There is zero evidence, whatsoever, to support these allegations. Rather, as is routine, this inmate's room was searched by USI while he was at court—*e.g.*, to ensure that he did not have any sharp objects, including small medical apparatus, such as a used needle. While Clark was at court, USI guards were also directed to remove Clark's extra side table—which belonged to the Medical Center, not to Clark—as it was needed for another patient at the Medical Center.[2] Prior to removing Clark's extra side table, USI ensured that all of Clark's possessions from this table were located; USI left these possessions in Clark's room in an organized fashion.

*Access to Counsel*: Clark alleges that one visit with Mr. Lipton was limited to one hour. In his letter, Clark acknowledges that, "This may have been remedied," as their subsequent meeting was two hours long. *Id.* at 3. Nonetheless, Clark expresses the concern—without any explanation or basis—that these lengthier visits may not continue in the future. Clark then concludes, "I cannot make use of my legal advisor if I don't have sufficient access to him." *Id.*

To reiterate what is stated above, the parties' collective efforts ensured that, while Clark was in USMS custody, he was authorized to (1) speak by phone with Mr. Lipton every day; and (2) meet in person with Mr. Lipton as frequently as they wished. (In-person visits simply required notifying USMS approximately one business day before a visit.) USI informed the Government that the "standard" meeting length is one hour; that temporal limit appears to have been imposed for Mr. Lipton's first in-person visit with Clark. Subsequently, Mr. Lipton informed the Government that he would like multi-hour visits; and at the Government's request, USMS promptly directed USI accordingly and remedied any complaint on this score.[3]

---

[2] Clark's room at the Medical Center was a "double room"—*i.e.*, it was meant for two patients—but Clark was the only patient in that room.

[3] Clark also complains about the confidentiality of his communications with counsel—and in so doing, Clark misconstrues the record. Specifically, Clark accuses USI guards of (purportedly) violating an Order of Judge Nathan's relating to the confidentiality of communications—but Clark cites an Order (Dkt. 111) that merely directed the Government to file a letter, which the Government did. (*See* Dkt. 111 (Memo Endorsement: "The Government is hereby ORDERED to confer with the Marshals Service and file a response to this letter on or before November 19, 2021."); *see also* Dkt. 112 (Govt. Letter dated Nov. 19, 2021). Contrary to Clark's assertion, Judge Nathan did not order USMS to do anything in this case; she did not need to. Clark's zealous counsel, the Government, and USMS collaborated to accommodate various requests of the defendant, including extensive arrangements relating to privacy, as noted above.

***Sending and Receiving Mail***: Clark alleges that he is not allowed to send or receive legal or consular mail. This is an unusual allegation for several reasons. *First*, and most elementally, Clark *did* receive legal mail. For instance, on February 25, 2022, Clark's then-counsel, Stephanie Carvlin, Esq., emailed the Government, in substance and part, as follows (emphasis added):

> **I need to get legal materials to Mr. Clark** that he wants to review for sentencing (sentencing memoranda that have been filed so far, cases, chat logs, etc.). **He tells me it can be mailed, and he provided a mailing address at the hospital (hospital address and his room)**. This is a box full of papers (printed and will be mailed by [*a paralegal*]). I want to be sure the material gets through without problems since time is getting short. Can you give the USMS a heads up?

The same day, the Government contacted a USMS supervisor, who in turn advised USI that this legal material was authorized. In an email yesterday, Clark's former counsel confirmed that, at her instruction, her paralegal "did mail items to Mr. Clark." Indeed, during Clark's time at the Medical Center, Clark received a significant volume of materials from his then-counsel, totaling thousands of pages. And more broadly, from fall 2021 to May 2022, Clark's then-counsel worked closely with the Government and USMS to get various items to Clark (*e.g.*, legal materials, a white noise machine, reading glasses, pens, notepads, redwelds, etc.).[4]

*Second*, Clark's July 2022 letter is believed to be the first time that Clark, or his counsel, have raised this mail-related complaint with the Government—notwithstanding the fact that, as noted, Clark had frequent access to both his counsel and his consular representatives. And both entities—counsel and consular officials—have visited Clark in person and spoken with him by phone. Had Clark raised this topic at any point with the Government, the parties could have worked together and with the USMS to promptly accommodate any request of Clark's, while also ensuring any appropriate security measures, such as USMS screening (where warranted) to prevent the transport of contraband.

***Alleged Issues Stemming from Clark's Recent Transfer to a Nursing Home***: In mid-June 2022, Clark was transferred from the Medical Center to the Nursing Home. Several of Clark's allegations relate to, or stem from, this transfer.

By way of context, from approximately late October 2021 until mid-June 2022, Clark was housed at the Medical Center. During that time, Clark accumulated a host of items in his room at the Medical Center, including an estimated 20 books; various large 3-ring metal binders, which reportedly contained legal materials; a pen; notepads; a white noise machine; a three-hole puncher; clothing; and food. Various entities were involved in providing, procuring, approving, coordinating, and/or supervising these items—including then-defense counsel, the Government,

---

[4] Nor was Clark shy about using the mail when he wished to get additional items. For instance, the medical facilities (where Clark was housed) received packages from Amazon.com addressed to Clark—which were unauthorized—including packages containing hangers; coffee, creamer, and Equal sweetener; and a power strip with an extension cord, which constituted a fire hazard.

USMS, USI, and the Medical Center. One notable exception was the BOP. As noted above, Clark was principally in USMS custody following his injury in October 2021, so the BOP was not involved in (1) the day-to-day guarding of Clark at the Medical Center, or (2) the process of determining which items Clark was authorized to possess. Accordingly, we do not believe that the BOP was advised of the ever-growing list of USMS-approved accommodations for Clark.[5]

Nonetheless, the BOP handled the transport of Clark from the Medical Center to the Nursing Home.[6] This transport occurred late in the day on June 13, 2022. When BOP employees arrived at the Medical Center to pick up Clark, they were extremely surprised to see various items in his room at the Medical Center; such items are not approved in a BOP setting. Ultimately, after some back and forth, BOP placed Clark's belongings in bags, transported Clark and his belongings to the Nursing Home, and brought his belongings into his room at the Nursing Home. Clark's room at the Nursing Home was a single room, unlike the "double" room he had had at the Medical Center. As a result, Clark's volume of possessions created a fire hazard and tripping hazard when they were all placed in his room at the Nursing Home; his possessions also included items that are not approved in a BOP setting. Accordingly, the BOP employees who transported Clark to the Nursing Home had concerns and consulted a BOP colleague ("BOP Employee-1") who happened to be at the Nursing Home that day guarding a different inmate. Ultimately, given BOP's policies and concerns, a determination was made to leave some of Clark's items in his room, but to remove other items and store them in the Nursing Home's basement, pending the receipt of more information from USMS as to whether these items were in fact authorized.

The next morning, BOP Employee-1 emailed USMS to ascertain whether USMS had approved all of Clark's possessions. Specifically, BOP Employee-1 wrote, in part, that an inmate:

> has accumulated a lot of civilian clothing, books , electric clippers for shaving and other items that poses a risk to security. However, the inmate informed Bop staff members, while being transported to the nursing center that the items was approved by your office and mailed to the hospital by his attorney. Our office is seeking conformation as to the validly of the inmate statement as we want to make the necessary preparation to inventory the property and have the inmate mail it home. Thank you for your time and consideration in the matter of great security concern.

Unfortunately, BOP Employee-1's email contained the wrong Marshals Number for Clark (and thus the wrong inmate name)—the Marshals Number was off by one digit. In response, USMS provided information about the named inmate (not Clark). As a result, the BOP was not aware

---

[5] At the parties' request, the BOP was involved on one occasion in one extremely limited respect: In May 2022, the BOP procured additional clothing for Clark, which was transported to the Medical Center (*e.g.*, a jumpsuit, socks, underwear, a t-shirt, and bus shoes). In addition, following the submission of Clark's recent letter, the BOP was also involved in retrieving Clark's laptop computer.

[6] Clark was cleared to be transferred after the Medical Center's medical staff conferred with the BOP's medical staff.

that USMS had, in fact, authorized Clark's belongings. Later that week, another BOP employee pointed out that the email contained "the wrong inmates number" and provided BOP Employee-1 with "the correct name and [Marshals] number," but this information appears not to have been followed up on. Subsequently, USI told a USMS supervisor that BOP had separated Clark from some of his belongings; this USMS supervisor appears not to have followed up, as he viewed it as BOP's responsibility. Thus, it appears that certain items—which were approved by USMS while Clark was housed at the Medical Center—became separated from Clark at the Nursing Home due to a convergence of circumstances, including: (1) Clark's transfer from the Medical Center to the Nursing Home; (2) the unusual volume and nature of the items Clark accumulated at the Medical Center; (3) the considerably smaller size of Clark's room at the Nursing Home; (4) the involvement of another law enforcement agency (the BOP), which had different procedures than the USMS; and (5) an unfortunate typographical or clerical error regarding Clark's Marshals Number.

The Government was not advised of any of the issues related to the removal of the items from Clark's room until Clark filed his letter on ECF four weeks later on July 11, 2022. (*See* Dkt. 147). In his letter, Clark appears to allege that, following his transfer to the Nursing Home, he did not have access to a standard pen (as opposed to a floppy jail pen), paper, his legal materials, or his white noise machine. In his letter, Clark also requested his previously supplied laptop computer (containing discovery), which is believed to be the first time such a request was made to the Government relating to his laptop since he left the MDC in October 2021.

Since receiving Clark's letter, the Government has worked with USMS, USI, BOP, and the Nursing Home to remedy any unintended issues occasioned by his transport to the Nursing Home. In light of these efforts, Clark obtained access at the Nursing Home, 24 hours per day, to: notepads, a standard pen (subject to the qualifications set forth in our prior letter (*see* Dkt. 150)), his previously supplied laptop computer, and those legal materials that have been located to date. As to the final point, thus far, USI and the Nursing Home have unfortunately been unable to locate the bags with Clark's possessions that were stored in the basement of the Nursing Home; these bags are believed to contain certain materials that Clark has described as legal materials, as well as his white noise machine. USI's efforts to locate these materials have been extensive. The task of locating these materials may have been somewhat complicated by the facts that: (1) when *non-*defendant patients at the Nursing Home store possessions in the basement, they typically store *luggage*, such as a suitcase or duffel bag; (2) when Clark's items were moved to the basement, by contrast, they were stored in large black trash bags—and thus did not look like typical patient property; (3) there was a leak in the basement of the Nursing Home at some point after Clark arrived, which required cleanup; (4) construction is ongoing in the Nursing Home, which has led to the presence of several contractors, and associated trash, in the basement, where Clark's items were being stored; and (5) Ms. Carvlin's departure from the case has dramatically changed the flow of communication between the parties—and thus the Government's ability to learn about, and address, any potential complaints in (or near) real time. In sum, at present, despite substantial efforts to locate these materials, certain of Clark's materials, including some of what he has described as legal materials, may have been accidentally discarded or otherwise misplaced by a construction contractor or a Nursing Home employee.

The Government is fully committed to helping reunite the defendant with the remainder of his possessions—and/or to helping recreate the legal materials he had in his possession previously.

Hon. Sidney H. Stein  
United States District Judge

Page 10  
July 29, 2022

In that regard, Clark informed USI that his legal materials (*i.e.*, the large, 3-ring metal binders) came from his former counsel, so the Government contacted Clark's counsel—both former and current. Clark's former counsel confirmed that she retained a full electronic copy of all such materials, and she will work with stand-by counsel to promptly provide a copy for Clark of any materials he still desires. In addition, in consultation with USMS, the Government informed Clark's stand-by counsel that he could bring a new white noise machine to Clark at the Nursing Home at any time.

Please let us know if any further information would be useful at this time.

Respectfully submitted,

DAMIAN WILLIAMS  
United States Attorney for the  
Southern District of New York

By: *Michael D. Neff*  
Michael D. Neff  
Assistant United States Attorney  
(212) 637-2107

cc:   Evan Lipton, Esq. (via ECF)