UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
UNITED STATES OF AMERICA,


   – against –                                        No. 15-cr-866 (SHS)

ROGER THOMAS CLARK,

                      Defendant.

-----------------------------------------------------------------------x


---

## SUPPLEMENTAL SENTENCING MEMORANDUM OF DEFENDANT ROGER THOMAS CLARK

---


**LAW OFFICE OF EVAN L. LIPTON, P.C.**
*Counsel for Roger Thomas Clark*
250 West 55th Street, Floor 30
New York, New York 10019
Phone: (917) 924-9800
ell@evanliptonlaw.com

I.   **Roger Clark has endured a brutal pre-trial incarceration, first in Thailand and then at the Metropolitan Detention Center in Brooklyn, where he was the victim of extreme medical negligence. He should be given a sentence of time-served.**

This supplemental sentencing memorandum is submitted on behalf of Roger Thomas Clark to address events that have developed since his initial memorandum was filed on November 6, 2020 (ECF No. 63), and to provide the Court with additional information about his personal background and characteristics, as well as his role in the offense conduct, for consideration pursuant to 18 USC § 3553(a).

Clark has endured extraordinary punishment since his arrest in Thailand in 2015 and subsequent incarceration at the MDC. His brutal treatment in the Bangkok Remand Prison in Thailand was thoroughly addressed in the personal statement attached to his 2020 submission. When he arrived in the United States he was mentally and physically destroyed. He weighed 90 pounds; his skin was riddled with rashes from ringworm and other infestations; the circulation in his leg was disordered from being forced to sleep on the floor of packed rooms on his side, unable to move for fear of angering a cellmate; and he was suffering from post-traumatic stress disorder from the experience of being exposed to the constant threat of violence, including sexual violence. These conditions were made worse by medical negligence at the MDC.

Clark has endured some of the worst conditions in the history of the MDC. He was there during the 2019 blackout, where the facility was left without heat, electricity or plumbing during a weeklong cold wave, and he was there at the height of the Covid pandemic and for the perpetual semi-lockdown that followed. He contracted Covid multiple times and began to experience dizzy spells, including while trying to reach his top bunk. Still, he was denied a "bottom bunk pass."

For Clark, the most traumatizing experience of his confinement occurred on October 18, 2021, when he fell as he tried to climb the ladder to his bed, landing on his side and fracturing several bones around the pelvis. Despite repeated pleas to corrections officers, he was folded over on the floor of his locked cell, immobile, without any medical assistance whatsoever, for over nineteen hours. During the eleven days he spent at NYU Langone to repair his broken bones, he was inexplicably prevented from communicating with anyone by agents who guarded him. He could not call his wife, sisters, his attorney or his embassy.

This manner of arbitrary mistreatment by contracted security staff continued through the duration of Clark's medical treatment, first at an acute care facility in Brooklyn, then in a rehabilitation facility in Queens, where both his leg and arm were shackled to a bed. His accumulated legal work, including thousand of pages of research notes and expensive legal texts were lost several times, in apparent retaliation for complaining about guards listening in on attorney-client meetings.

After nine months in these specialized medical facilities, and in the midst of a prescribed course of physical and occupational rehabilitation, Clark was brought back to the MDC without warning to the MDC medical staff. There was no plan for continuity of care and he was abruptly discontinued from a series of medications he had been taking, some at very high dosages, for months. His health plummeted again as he experienced the effect of withdrawal from these medications and of the lack of any type of physical therapy, or even the ability to walk around the common areas of the jail.

The totality of these circumstances, including the severe trauma Clark endured in Thailand, the fragile mental state in which he arrived in this country and his mistreatment at the

MDC,  have made the time Clark has served thus far exponentially more harsh that it is supposed to be. This should be reflected in his sentence.

For these reasons a sentence of  eight years time-served (three years in Thailand and five years at the MDC), followed by deportation and permanent bar from entering the United States, is "sufficient but not greater than necessary" to fulfill the purposes of federal criminal sentencing.  18 U.S.C § 3553(a).

## II.  Clark's involvement in Silk Road was a product of his political philosophies about privacy and drug legalization.

Roger Thomas Clark is a 60 year old Canadian citizen who has also resided in England and Thailand (where he lived with his common-law wife, Nikki, at the time of his arrest). As a teenager, Clark taught himself how to code on early computers and developed expertise in emerging technology, most notably the use of networks to communication and commerce. His early explorations led to the development of a political philosophy encompassing deeply held beliefs about privacy, individual autonomy, and a legalization / harm reduction model for drug policy. It was in this spirit that Clark said that his goal was to "break the DEA" and "break drug prohibition." PSR 54. These same beliefs led to his involvement with the Silk Road and its site administrator.

Clark was a computer nerd when he was 10 years old, well before there was anything that resembles desktop computers. He learned to code using rolls of paper and was an early user of internet message boards. When his father became sick with ALS, he became interested in medical cannabis which led to his belief that cannabis, and eventually, all drugs, should be legal.

He posted about these beliefs online where he had become an active participant in forums discussing privacy and technology issues, cannabis cultivation and drug legalization.

When Silk Road was launched in 2011, Clark was forty-nine years old and living a simple life in Thailand. He watched the development of the site with the same computer nerd interest he had held for decades, and became involved with running the site after offering tips to the site administrator about site security. Throughout the period of the offense conduct Clark participated in Silk Road with knowledge that he was engaging in unlawful activity. Although the majority of the site's sales were of cannabis and cannabis-related products, Clark knew that hard drugs were also being sold and, in fact took steps intended to prevent sales of mislabeled or adulterated drugs to create a safer marketplace than the street.

Clark accepts responsibility for his illegal conduct. But the Court should have a broader picture of his personal history, his motivation for becoming involved in the offense conduct, and the conditions of confinement he has endured since extradition from Thailand. When fairly viewed, separate and apart from the aura surrounding Silk Road and the extraordinarily harsh sentence levied on the site administrator, these considerations strongly support the requested sentence.

III.     **Clark is a self-taught expert in coding and computer networks. He correctly anticipated that impact that these technologies would have on data privacy.**

Roger Thomas Clark was born in the City of Edmonton in Alberta, Canada, in 1961. His father owned a carpet cleaning business and his mother was a housewife. He has three older sisters, all of whom are retired and live in Canada. When he was sixteen years old his father

became sick with ALS and Roger dropped out of school to run the family business. He never returned and does not have a high school diploma or its equivalent.

Roger began to experiment with computing when he was ten years old. His attention to and study of computers, coding, and emerging technology traces the development of modern computing and the impact on personal privacy created by the introduction of massive networks used to communicate and store personal information. When he was eleven he asked the dean of nearby University of Alberta for a library card. He began to spend hours in the library reading about computer technology. At 12 he talked his way into the university computer lab where graduate students, impressed by his precociousness and willingness to assist with with any task, taught him the basics of FOCAL, a programming language written on paper tape using teletype machines to encode programs for pre-PC Programmed Data Processor ("PDP") machines. The first program Roger wrote used a PDP to print an image of a damped sine wave. Soon the graduate students were letting him experiment with other machines.

Roger began to see real world applications of this emerging technology. He was fascinated, but also alarmed. When he was thirteen the local utility instituted punch card water bills, which Roger recognized from his work in the computer lab. He recalls being struck by the idea that data generated from his family water bill could conceivably be used to to discern inferences as to what the family was doing at a given date and time, even decades in the future. He believed, correctly, that the amount and type of personal data that would eventually be stored on computer networks would be huge and that the impact on privacy would be significant. He closed the bank account his grandmother had opened for him and never opened a personal bank

account again. When the library changed to electronic library cards, he stopped checking out

books. Data privacy remains one of his primary interests.

IV.    **Clark's father's diagnosis with ALS led to his involvement with medical cannabis and contributed to his belief in the legalization / harm reduction model of drug policy.**

When Roger was in tenth grade, around 1977, his father was diagnosed with ALS and

became too sick to work. Roger dropped out of school to run the carpet cleaning business. He

primarily worked in the office managing a small staff and fleet of truck and occasionally cleaned

carpets in customer homes. Roger's father was eventually placed in a long term care facility for

respiratory issues resulting from ALS, where he remained for several years. He underwent a

tracheotomy. He was malnourished and in constant pain. Roger learned from physicians and

nurses at the facility about emerging data about the use of cannabis to alleviate pain and

stimulate appetite. Roger made contacts in the local cannabis industry and worked to obtain

cannabis that was grown in a way that it would be safe for medical use. (His primary concern

was that the product be free of mold and pesticides.) Although he was working with the blessing

of the staff of the long term care facility, he still needed to figure out a mechanism to administer

the cannabis without lighting a flame. His research led him to source a product from Germany

that uses heat to extract vapor from the dried plant, which was then captured in plastic bags,

which could be delivered to his father.

Soon Roger began to introduce other patients to his sources for medical grade cannabis.

This experience led him to research the history of cannabis prohibition and eventually led him to

conclude that all efforts to regulate drug use through criminal law were misguided and that all

drugs should be legalized. Ever since this time Clark has been a strong and vocal proponent of

legalization, believing that individuals have an inherent human right to use substances and that efforts should be focused on harm reduction.

V.      **Clark was entrepreneurial from a young age. After designing and selling computer programs, he started a cannabis seed company and promoted it on early internet message boards.**

When Clark was 14 years old he overheard a neighbor who worked in the oil industry describe a need to analyze and control the flow of oil through pipelines. Thinking that the task seemed "easy" he wrote out a program by hand, which he sold to the oil company for a few thousand dollars. He continued to run the family carpet cleaning business while he tried to develop new applications for his computer programming. When Roger was about 22 years old, he started a business called Automotive Retail Solutions which designed and sold marketing software to car dealerships. He also developed and sold an internet load balancing system, which was one of the first systems to automate directing internet traffic.

At the same time that Clark was developing systems to help run and manage the internet, he continued to post on early internet message boards. He was particularly focused on forums discussing two subjects: privacy and cannabis cultivation. He developed a reputation as a prolific poster on these subjects, which he would write about in an acerbic style, using the internet handle "Plural of Mongoose." As Clark studied cannabis cultivation and the industry that was forming around it he observed that there were no reputable sellers of cannabis seeds, which were unregulated in Canada. He started a cannabis seed company, advertising in the classified sections of magazines like High Times and Rolling Stone and sending seeds to customers through the mail. Eventually, anticipating the passage of new laws targeting cannabis seeds in Canada, Clark decided to move to the United Kingdom which permitted both retail and mail order sales.

Clark joined an existing seed business that operated out of a South London storefront and also fulfilled orders placed on the internet. Clark used the persona he had developed through his internet posts to promote the company, increasing sales through innovations like packaging that resembled popular non-cannabis high-end seed brands, and the development of specialized strains, some of which bore his "Plural of Mongoose" moniker. While in London, Clark met Nikki, who would become his common law wife. They began to travel together to Thailand and became enamored with the culture and pace of life, eventually deciding to move there, planning for a life of perpetual semi-retirement.

**VI.     Clark was an early user of Silk Road. He became involved in running the site when he offered advice to the site administrator.**

In Thailand Clark operated bars and restaurants. With ample amounts of free time and widely available internet service he continued to study developments in computer technology and privacy and to post prolifically on internet forums. He was among among first to develop an understanding of block chain technology and its use in Bitcoin and other crypto currencies. He worked with others he met through these forums to develop the Tor browser, which anonymizes web browsing.

Clark learned about Silk Road through this same internet community. Silk Road was a real world application of technologies and political theories that had fascinated Clark for decades. At first Clark used the site to sell cannabis seeds. He soon reached out to the site administrator to provide his ideas on how to improve site operations - the same types of conversations he'd been having in internet forums since they first began in the 90s. He looked at

the site and saw all sorts of inefficiencies and problems in its code. Through these exchanges

Clark developed a relationship with the site administrator.

**VII.    Clark provided a detailed, sworn statement admitting his involvement in the offense. He accepts full responsibility for his illegal conduct.**

Clark's primary role in the offense conduct, for which he has pleaded guilty, was to

provide advice and direction about the technical operation of the Silk Road site. He did so with

full knowledge that the site was violating United States law by selling cannabis, which made up

the majority of the site's sales, and that hard drugs like cocaine and heroin were also being sold.[1]

With regard to the latter category Clark implemented mechanisms derived from the harm

reduction model of drug policy, which aimed at reducing the negative consequences associated

with drug use, rather than trying to stop it. Most notably, when a new seller would appear on the

platform, Clark would arrange samples to be anonymously purchased and sent to a lab in the

Netherlands where they would be tested for content and purity; this process would be repeated

regularly. Sellers who misrepresented a product would be banned. Of course, no such testing

occurs in street marketplaces, leaving users more vulnerable to overdose.

Clark's involvement in the offense conduct is set forth in a sworn affidavit filed in

support of his motion to suppress. ECF No. 42. He describes learning of Silk Road in February

2011, just after it launched. He soon discovered a security vulnerability on the site and brought it

to the attention of the site administrator. He helped to configure a solution. During the next

several months Clark developed a "mentor-protege" relationship with he administrator, who had

---

[1] In 2012, Professor Nicolas Christin, a member of the Carnegie Mellon University Security and Privacy Institute, published "Traveling the Silk Road: A measurement analysis of a large anonymous online marketplace." (Attached as Exh. A) This analysis showed that cannabis related products made up a majority of the site's sales. "Heroin" and "opioids" accounted for 2.9%, and "books" 3.9%. Id.

no formal training in computer coding. Clark provided advice on how to run the site, and helped him to hire an experienced programmer. He acted as the chief of security, identifying vulnerabilities and working to resolve them. In 2012 he became the "de facto head of marketing for the site" and worked to design sales and promotions, and to expand the brand. He was not paid, but instead took an ownership interest in the site. PSR 69. Funds that were transferred to him by the site administrator were mostly used to pay salaries and other expenses.

## VIII.   Clark did not participate in or encourage any acts of violence.

For purposes of the plea agreement, Clark does not dispute the two-point enhancement applied because he allegedly "used violence, made a credible threat to use violence or directed the use of violence by urging, advising and facilitating the attempted murder-for-hire of a Silk Road staff member suspected of stealing $350,000 of Bitcoin" from the site. Without challenging this enhancement, or the guidelines offense level in the plea agreement, Clark maintains that he did not participate in this conduct, and that the chat logs relied upon by the government, which were seized from the site administrators computer, were altered by the site administrator to falsely implicate him. The government's failure to employ appropriate forensic methods to detect these alterations, or to obtain this data from a source other than the site administrators laptop, makes the chat logs unreliable. The lack of reliability of this evidence, and Clark's denial that he participated in any violence or credible threats of violence, should be considered pursuant to 18 USC 3553(a) in support if his argument for a non-Guidelines sentence.

IX.    **Clark's incarceration in Thailand, pursuant to a United States extradition request, was brutal and inhumane. Transcripts of statements allegedly made to a Thai court while in custody and without meaningful legal representation do not justify a longer sentence.**

Clark was arrested in Bangkok at the request of the United States on December 3, 2015 and sent to the Bangkok Remand Prison ("BRP") where he would remain for 925 days pending extradition proceedings. Clark's time in BRP was brutal, inhumane and deeply traumatizing. This issue is covered in depth in Clark's November 6, 2020 sentencing statement, attached to the initial sentencing memorandum. ECF No. 63-1. He describes severely overcrowded cells where he was forced to lie on his side on concrete floors for 16 hours a day, with inmates pressed on either side of him, resulting in permanent injury to his left leg, witnessing "several thousand attacks of sexual violence" and being subject to forced labor, amongst other horrific abuses.

Clark had no meaningful legal representation in Thailand. Attorney visits were monitored by English speaking guards who would strike Clark if they did not approve of what he was saying, or would simply end the meeting. The plea agreement and presentence report assess a two-point enhancement for statements that Clark is alleged to have made during a court appearance in Bangkok when he said that he "had no knowledge" regarding Silk Road and "did not have any involvement with this web site." PSR, 75. For purposes of the plea agreement, Clark does not challenge this two-point Guidelines enhancement. Pursuant to his request for a non-Guidelines sentence, however, the Court should consider the circumstances and content of this alleged statement and should accord it little weight.

First, the statement is mis-recorded and taken out of context. The proceeding was not transcribed. Rather, Clark recalls that the judge would periodically pause to speak a summary of

what had just occurred into a microphone. This recording would later be used to generate a record of the proceeding. According to Clark, he was asked specific, direct questions regarding statements they alleged he had previously confessed to. For example, he was asked if he had ever met the site administrator, which he denied. (They have never met in person). He was shown screen images of a web site called "SilkRoad.com" that had continued to operate after his arrest and asked questions about its registration. He truthfully told the Thai court that he had no involvement with this website, which was true: it was a knock off created after his arrest, and used a different domain extension (".com") than the site he operated.

Most importantly, Clark's conduct with regard to the law enforcement investigation of Silk Road following the site administrator's arrest is more fairly assessed after he was extradited to the United States, represented by counsel, and felt some assurance that he would receive appropriate legal protections. His statement to U.S. authorities, made in a sworn affidavit in support of a suppression motion, was truthful, precise, and acknowledged his guilt. Given these circumstances, the alleged Thai obstruction should not be part of the Court's calculus in reaching a non-Guidelines sentence.

**X.   Clark arrived at the MDC in need of specialized medical and psychiatric care. He received neither.**

Clark arrived at the MDC on June 15, 2018. He was sick, weak, covered in painful, bleeding rashes from ringworm and other parasites, and thoroughly traumatized from exposure to sexual violence and other forms of extreme human suffering. He reports that he was unable to sleep as his mind revisited memories of the assaults he had witnessed.

Clark was not seen by a psychiatrist until six months after he arrived, on December 18, 2018, when he had a 20 minute meeting with a part-time BOP psychiatrist who prescribed medications that made him sleep, but left him groggy throughout the day. Medical records reflect a 21 minute encounter, including the time necessary to generate the report. Clark was diagnosed with bipolar disorder, borderline personality disorder, and cannabis induced psychosis. Clark, 57 years old at the time, had never been previously diagnosed with any of these disorders. Without more, there was plainly an insufficient medical basis to apply these labels.

More than two years later, on January 22, 2021, the MDC nurse practitioner diagnosed him with PTSD and depression.

Throughout his stay at the MDC Clark has been arbitrarily denied the skin cream that MDC medical staff prescribed for the painful rashes that covered his body. Clark's medical records are replete with references to "red itchy rash all over" and instructions that he be given "two tubes" or "four tubes" at a time. He regularly complained that his supply was running low, with no response. Eventually, desperate for relief, he turned to the jails underground economy, spending thousands of dollars on tubes smuggled into the facility. When he asked to be changed

to the "common fare" food program, explaining that certain foods made the rash worse, he was denied. Being denied the most basic medical care made Clark feel helpless and vulnerable.

**XI.    Clark developed dizzy spells after testing positive for Covid. MDC staff refused to provide authorization for him to use a bottom bunk. He fell while climbing the ladder to the bed, shattering his pelvis bones. He was left on the floor of his cell without medical attention for more than nineteen hours.**

On December 10, 2020, Clark tested positive for Covid. He was sick for several weeks and experienced lingering weakness and developed dizzy spells. On January 6, 2021, fearing injury, he asked MDC medical to issue a bottom bunk pass. He was not given a pass. He reports being told that he was not "old enough" to justify special treatment, and that dizzy spells are not a symptom of Covid.[2] Clark was diagnosed with Covid again during the summer of 2021.

On Monday, October 18, 2021 the MDC was under modified Covid protocols which limited movement in the facility. Detainees were allowed out in small groups to spend time in the common areas, to attend work assignments or to do legal work. During a cell shakedown the previous Friday conducted because of an anonymous phone call reporting that there was a handgun in the jail, all of the unit resident's linens and all of their clothing except a t-shirt and sweatpants and been taken away. They were told that they wouldn't receive these items back until laundry service resumed in a few weeks.

At around 5:00 p.m. Clark attempted to get into his bed. He grasped the rungs of the ladder and moved towards the top bunk, placing his foot on the top rung, which is about 18 inches lower than the mattress. As he reached across the mattress, where he had learned to grab

---

2 According to a National Institute of Health published study, Covid has been found to cause vertigo and dizziness. See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9313303/]\.

onto the tucked-in blankets for leverage, he became dizzy and began to fall backwards. He was unable to grab hold of the mattress because there were no blankets and the surface was slick.

Clark's head, right hip and right knee struck the concrete floor. He landed in a fetal position, with his hand between his legs. He couldn't left his left leg which was impacting his testicles, which felt as if they were being crushed. Clark yelled for help but couldn't be heard. The cell door is solid, except for a window towards the top, and it was closed.  At about 6:00 p.m. Clark's cell mate returned to the cell and found him in severe distress.He got the attention of the unit corrections officer, who saw Clark's condition and immediately called for medical assistance. Clark heard the someone (presumably in the medical department) tell the officer to stand by.

At 9:30 p.m. the officer returned for nightly lockdown. He again saw Clark on the floor. By this point Clark was shivering, and recalls experiencing the feeling and sound of his broken bones grinding and clicking. Again the officer called for medical assistance on his radio. Clark heard him say "there's a guy on the floor, badly hurt." Again, medical replied "we're on it, stand by." Clark and his cell mate were locked in. They waited for medical assistance. When that didn't arrive, they waited for the midnight count, expecting to at least be able to speak with a corrections officer doing rounds. Clark heard "count time" come over the PA system, and then "count's cleared." But there was never any count at his cell. Clark's cell mate stood by the cell window looking for a staff member. (They were in a corner cell and had a limited view of the tier when the door was closed.) At about 1 a.m. an officer walked by and Clark's cell mate banged on the door to get his attention. He told him that his cellmate was hurt and needed medical attention. The officer replied, "Is he breathing?" and continued walking.

At 6:30 a.m. a different corrections officer opened Clark's cell door to let his cell mate go to his work assignment. The officer found Clark on the floor and again called medical, with no apparent response. The officer did not seem to have been informed of Clark's injury by the prior shift. At about 7:30 a.m. the unit counselor arrived and was informed of the ongoing medical emergency.

At about 12:30 p.m., a team of guards and medical workers arrived at the cell. To Clark, they seemed to be acting as if the accident had just happened. There was no acknowledgement of the nineteen-plus hours Clark spent on the floor without treatment. PSR, 144. Clark protested their plan to place him in a chair, telling them that he believed he had internal fractures. They returned with a backboard, awkwardly folding his body on top of itself in a manner that Clark believes contributed to the destruction of nerves in his right leg. Clark was carried off of the tier and brought to the medical unit where he was attended to by a nurse practitioner. There was a substantial delay before an ambulance was called as MDC staff tried to find two corrections officer to volunteer to accompany Clark to the hospital. Medical records reflect that emergency medical technicians arrived at the MDC at about 3:00 p.m. and that Clark was was admitted to NYU Langone about 3:30 p.m. It took more than 20 hours for MDC staff to finally call an ambulance. Once it arrived, it took only a half hour before Clark was being treated in a reputable hospital. This underscores the extent to which MDC staff cruelly and arbitrarily withheld medical treatment from Clark, an individual under their custody and control with obvious and severe injuries.

**XII.    Clark was held in private medical facilities for nine months. Throughout this time, his conditions of confinement were arbitrarily made more restrictive and his legal materials were seized and lost.**

Once at NYU Langone, Clark recalls being told that his condition was grave. His kidney function had ceased, and liver function was severely compromised. It would take several days to stabilize him before they could operate on his broken bones. A doctor told him that he should "make peace with his god." But the officials who were guarding him would not permit Clark to call his family, to speak with a hospital chaplain, to call the Canadian embassy, or even to call his lawyer. He was denied a pen and paper to write notes to his family, or to write out a will. Clark recalls being barred from contacting anyone through his eleven day stay at NYU Langone. This contributed to a feeling of panic and helplessness, and to the sense that his mistreatment at the MDC had been deliberate.

Two days after his arrival at the hospital, Clark underwent surgery to repair a hip fracture with involvement of right superior pubic ramus and pelvic retroperitoneal hemorrhage. PSR, 145. Surgeons employed an Open Reduction Internal Fixation  (ORIF) procedure, which involved opening Clark's pelvis and using 57 clips, plates, and screws to reconstruct the broken bones.

On October 29, 2021, Clark was transferred to Kingsbrook Jewish Rehabilitation Center, an acute care facility in Brooklyn. At Kingsbrook he was treated for the pelvic fractures and began a course of physical and occupational therapy. He was prescribed medications for pain from the fractures, and for nerve pain. At first, he was chained to the bed by a shackle attached to his left leg, with about six feet of chain that allowed him to stand up and move around the bed, so that he could stretch, perform some exercises, and reach his legal work.

As he recovered from his injuries, Clark was very focused on participating in his legal defense. He collected scores of printed cases and discovery material that he would notate by hand, purchased expensive legal texts, and worked to develop legal theories both to defend this criminal matter, and to address the circumstances of his injury at the MDC. Soon he began to clash with the supervisors of the staff assigned to guard him, all of whom were employed by a private sector company through a contract with the United States Marshals' Service. When Clark complained to supervisors that guards were being instructed to sit in on his attorney-client meetings, and were not allowing him to have private conversations with consular officials, which he believed were privileged, the rules of his confinement were suddenly made more severe. The chain to his bed was shortened and a handcuff was affixed to one hand. His legal materials were removed from his room and he was not allowed to have a pen to write with. In an act that could only have been intended to humiliate, his sweatpants were confiscated, and he was given a gown, which exposed him whenever he rose to do physical therapy.

Clark was deeply effected by these arbitrary deprivations, which he experienced as a form of re-traumatization following his treatment in Thailand and at the MDC. Clark remained at Kingsbrook until June 12, 2022, when he was transferred to Windsor Park Nursing Home, a rehabilitation center in Queens. PSR, 147.

At Windsor Park, Clark was again shackled and handcuffed to his bed. To go to the bathroom (which was in his room) both legs were shackled together and he was detached from the bed. He did not receive any meaningful physical or occupational therapy. He was told that the gym was closed and the security supervisor (from the same company used at Kingsbrook) would not permit him to walk in the hallway with a therapist and walker as an alternative.

Although medical records indicate that he was meeting treatment goals, Clark maintains that these records are inaccurate and his condition actually worsened.

**XIII.   Clark was transferred back to the MDC without any plan for continued medical treatment and physical rehabilitation. He was denied access to over the counter hydrocortisone cream, which was prescribed for a pervasive and painful rash.**

On July 27, 2022, at about 5:00 p.m., Clark was informed that he was being transferred back to the MDC. Since his injury, Clark had been an active participant in his medical treatment, speaking with nurses and physicians and remaining informed of plans for his care. He did not believe that he had been medically cleared to return to the MDC, especially given the fact that he was being treated with a very high dose of Neurontin, as well as oxycontin, Cymbalta, and Ambien. He protested that these medications were not being brought with him, and that he was being made to leave without his legal paperwork and computer.

Clark described his return to the MDC in detail in his August 30, 2022 *pro se* submission. ECF No. 156. He writes that his medical needs were ignored, and his prescriptions abruptly cut-off, causing withdrawal symptoms. When he eventually saw a member of the jail medical staff, several days later, he was told that medical had not been prepared for his arrival. After Clark raised these issues with the Court, he was visited by a nurse practitioner who administered a COWIS assessment, a tool used to diagnose opiate withdrawal. But Clark's complaint concerned withdrawal from the multitude of drugs he had been prescribed, particularly gabapentin, which had been administered at a very high dosage. Additionally, Clark maintains that the assessment ignored or failed to report certain relevant symptoms, like goose bumps covering much of his body.

After several weeks at the MDC Clark began to regain some of his strength. In December, however, his rash began to intensify. The only way he was able to obtain relief was by applying large amounts of hydrocortisone cream to his skin. During earlier breakouts MDC medical had indicated that he should receive up to four tubes of cream at a time. Now he was luckily if he was able to obtain even a single tube to use over several days. He would dilute the cream to make it last longer. The rash began to dry out his skin, which cracked and bled. His clothes stuck to him. He described the pain as "unbearable" and reports that being left without any treatment left him depressed and despondent. Without any other option, Clark turned to the jail's black market economy. He arranged to purchase tubes of the over the counter cream for $150 each, sent to an anonymous CashApp account. He ordered a dozen. The next day the cream arrived. After about three months, the rash subsided. In total, he spent over $6,000 for 42 tubes of the over the counter medication. These purchases were by Clark's elderly retired sisters, who, hearing the desperation in his voice, felt compelled to scrape together funds to give their brother a modicum of relief.

Clark has not received any physical therapy since returning to the MDC. PSR, 151.

**XIV.    Clark should receive a sentence of time-served.**

For the reasons discussed in his initial sentencing memorandum and sentencing

statement, as supplemented by this submission, Roger Thomas Clark should receive a sentence

of time-served.

Dated:  May 12, 2023                                  Respectfully submitted,
        New York, New York

                                                     LAW OFFICE OF EVAN L. LIPTON, P.C.

                                                     By:_____
                                                     Evan L. Lipton
                                                     250 West 55th Street, Floor 30
                                                     New York, New York 10019
                                                     (917) 924-9800
                                                     ell@evanliptonlaw.com