



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 26, 2023

**BY ECF AND EMAIL**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
Daniel Patrick Moynihan U.S. Courthouse
New York, New York 10007

    Re:    *United States v. Roger Thomas Clark*, S2 15 Cr. 866 (SHS)

Dear Judge Stein:

    The Government respectfully submits this supplemental letter in advance of sentencing in the above-captioned case, which is scheduled for June 26, 2023, at 10:00 a.m. In January 2020, defendant Roger Thomas Clark ("Clark" or the "defendant") pleaded guilty, pursuant to a plea agreement with the Government (the "Plea Agreement"), to conspiracy to distribute narcotics, stemming from his role in helping administer the Silk Road website. Pursuant to the Plea Agreement, the applicable range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") would be life imprisonment; however, by operation of the statutory maximum punishment (20 years), the applicable Guidelines range becomes 240 months' imprisonment (*i.e.*, the "Stipulated Guidelines Sentence"). For the array of reasons set forth in the Government's prior sentencing letters (Dkts. 64, 74) and below—including Clark's leadership role in operating Silk Road, Clark's orchestration of a murder-for-hire plot, Clark's obstruction of justice, and the staggering quantities of devastating drugs sold on Silk Road—the Government respectfully submits that a sentence of **240 months' imprisonment** is warranted for Clark's far-ranging and extremely serious conduct.

    Part I of this letter highlights especially important aspects of Clark's offense, and Part II of this letter responds to the defense's arguments in its recent supplemental sentencing submission.

**I.    SUMMARY OF CERTAIN ASPECTS OF CLARK'S OFFENSE**

    This Part highlights the following features of Clark's offense: Silk Road's purpose, sophistication, and scope; Clark's roles; Clark's use of violence to protect the Silk Road empire; Clark's obstruction of justice; and Clark's own words.

    *Silk Road's Purpose*: Clark and his co-conspirators operated a massive dark web marketplace that was specifically designed to facilitate the sale of contraband—such as drugs, guns, and computer hacking equipment—in a way that protected buyers and sellers. Silk Road offered the sale of nearly every illegal drug, including heroin, fentanyl, cocaine, crack, ecstasy, LSD, methamphetamine, prescription pills (*e.g.*, oxycodone), and GHB (*i.e.*, a date-rape drug).

Silk Road also offered various other illegal goods and services, such as: (1) guns and ammunition (for a period of time); (2) counterfeit and fraudulent identity documents, including U.S. and foreign passports, drivers' licenses, and social security cards; (3) money laundering services; and (4) computer hacking tools, such as tools that compromised the usernames and passwords to victims' email and social media accounts, as well as tools that gave intruders remote access to a victim's computer, including their webcam activity. The sale of such contraband was openly advertised on Silk Road. (*See* U.S. Probation Office's Revised Presentence Investigation Report dated November 2, 2022 (Dkt. 159 ("PSR")), ¶¶ 17, 24, 26-33).

*Silk Road's Sophistication*: Silk Road was the first site of its kind to combine various anonymizing features (*e.g.*, Tor, Tor hidden services, Bitcoin, a Tumbler, etc., *see id.* ¶¶ 21, 22, 34, 40). Silk Road was therefore unprecedented and paradigm-shifting. Predictably, Silk Road has spawned various copycat darkweb marketplaces that have caused, and continue to cause, significant societal harm.

*Silk Road's Staggering Scope*: Silk Road was staggering in scope; there were more than 1.5 million transactions, involving more than 115,000 buyer accounts and 3,000 seller accounts. These transactions had a total value of approximately $213 million, including more than $183 million in drug sales. The drugs sold on Silk Road included more than 82 kilograms of cocaine and 26 kilograms of heroin—approximately $17.3 million in cocaine sales, and $8.9 million in heroin sales. In terms of total sales volume, there were more than approximately: 82,000 sales of cocaine; 53,000 sales of heroin; 34,000 sales of methamphetamine; 169,000 sales of ecstasy; 122,000 sales of psychedelic drugs; 298,000 sales of cannabis (or cannabis-related products); 24,000 sales of opioids; and 5,000 sales of GHB, a date-rape drug. Furthermore, there were more than approximately 7,000 sales of counterfeit or fraudulent identity documents, and more than 32,000 sales of money laundering services. Simply put, Clark's offense was breathtaking in scope. (*Id.* ¶¶ 43-47; *see also* Ex. A (*United States v. Ross Ulbricht*, 14 Cr. 68 (LGS), Govt. Exhibit 940 (Silk Road Sales Data, Feb. 6, 2011 – Oct. 2, 2013)).

Silk Road also reached nearly every corner of the globe, and it is easy to see why: Silk Road dramatically lowered the entry barriers into the underground economy for buyers and sellers alike. For sellers, Silk Road provided immediate access to a massive pool of customers across the globe, whom they never could have found on the street. For buyers, Silk Road (1) connected them to a large volume of drug dealers throughout the world; (2) provided immediate access to drugs of virtually every variety; and (3) enabled them to purchase drugs with the click of a mouse. Thus, for buyers and sellers alike, Silk Road accomplished a double-feat: It greatly expanded the pool of potential transaction partners, while greatly reducing their risk, as buyers and sellers could circumvent the physical obstacles that might otherwise prevent or deter them from buying or selling drugs locally. It was no longer necessary to meet a drug dealer in person, because Silk Road transformed the U.S. mail into a *de facto* delivery service for narcotics and other contraband.

*Clark's Central, Varied Roles*: In a chat with Ulbricht in 2011, Clark explained that he and a co-conspirator ("~s") had hacked Silk Road three times before Clark got involved in Silk Road.[1]

---

[1] "~s" was subsequently identified as Michael Weigand, an Ohio-based hacker and close confidante of Clark's. In 2019, Weigand lied during proffers with the Government in order to

Clark explained, "we didn't know whether or not we could trust you way back then. . . . by trust, I mean we wanted to know wheter or not you were doing what we'd call bad things / saving info you shouldn't." Clark elaborated, "were addresses really deleted, or did you save them away for a rainy day"? By hacking Silk Road, Clark and "~s" promptly proved their value to Ulbricht; in so doing, they revealed that, in its early iteration, Silk Road was vulnerable and therefore, that Ulbricht needed assistance. During this conversation, Clark recommended several security practices, including requiring that vendors use encryption when sending delivery addresses, so that if law enforcement were able to image the Silk Road servers, law enforcement would not have usable information with which to target Silk Road users for buying and selling contraband. During this conversation, Clark also told Ulbricht, "you MUST stop adding new features to the live site - one of these days you'll leave an opening, and if a db dump, including many unencrypted addy's [*i.e.*, customer addresses] and info got dumped on pastebin, you're done. period. no more chances." (PSR ¶¶ 60-61). This is just one example of the many, varied, pivotal roles that Clark fulfilled.

In total, for nearly two years, Clark partnered with Ulbricht to operate Silk Road, culminating in Clark's part-ownership of Silk Road (according to Clark). During this time, Clark was involved in virtually every aspect of Silk Road, including that:

- Clark assisted with the technical development of the Silk Road website.

- Clark hired a computer programmer to maintain and improve the technical infrastructure and computer code underlying the Silk Road website.

- Clark was involved in promoting sales of contraband on Silk Road, including narcotics.

- Clark advised Ulbricht on the rules and policies for Silk Road, including what should be sold on the site (*e.g.*, firearms).

- Clark regularly advised Ulbricht regarding security.

- Clark devised Ulbricht's "cover story" to make it appear as though Ulbricht had sold Silk Road.

- Clark urged Ulbricht to arrange for the murder of a Silk Road staff member whom they believed had stolen approximately $350,000 from Silk Road.

- Clark conducted research on law enforcement's efforts to investigate Silk Road.

- Clark advised Ulbricht as to what to do if Ulbricht were ever arrested (*e.g.*, do not speak with law enforcement; do not leave information lying about; and if imprisoned, "*just sit quietly and remember that time is on your side, always*").

(*Id.* ¶ 52).

---

protect Clark. Weigand subsequently pleaded guilty to making several false statements and was sentenced principally to eight months' imprisonment. *See* 20 Cr. 510 (WHP).

    Ulbricht confirmed the various, critical ways in which Clark was a partner and mentor. In a journal entry on his laptop, Ulbricht wrote about Silk Road's successful first year in operation, and in the following excerpt, he described how "Variety Jones"—*i.e.*, Clark—had provided him with significant advice and assistance in operating and managing Silk Road[2]:

> Around this time, Variety Jones showed up. This was the biggest and strongest willed character I had met through the site thus far. He quickly proved to me that he had value by pointing out a major security hole in the site I was unaware of. It was an attack on bitcoin. We quickly began discussing every aspect of the site as well as future ideas. He convinced me of a server configuration paradigm that gave me the confidence to be the sole server administrator and not work with someone else at all. He has advised me on many technical aspect of what we are doing, helped me speed up the site and squeeze more out of my current servers. He also has helped me better interact with the community around Silk Road, delivering proclamations, handling troublesome characters, running a sale, changing my name, devising rules, and on and on. He also helped me get my head straight regarding legal protection, cover stories, devising a will, finding a successor, and so on. He's been a real mentor.

(*Id.* ¶ 53).

    <u>Clark Urged Murder</u>: As the parties stipulated in the Plea Agreement, Clark advocated for and facilitated an attempted murder-for-hire of a Silk Road employee suspected of stealing $350,000 in Bitcoin from Silk Road.

    The murder-for-hire occurred in early 2013, but to better understand Clark's and Ulbricht's mentalities towards violence and murder, it is necessary to briefly discuss one prior conversation between the two men, which occurred in October 2012. In that 2012 conversation, Clark wrote to Ulbricht, "Ha, dude, we're criminal drug dealers - what line shouldn't we cross?" Ulbricht replied, "murder, theft, cheating, lying" and added, "hurting people".

    Three months later, these views were put to the test. Specifically, in January 2013, Ulbricht learned from a Silk Road staff member about the suspected theft of $350,000 worth of Bitcoin, and Ulbricht's initial reaction was consistent with the philosophy he had previously articulated to Clark in October 2012. Specifically, Ulbricht told this Silk Road staff member, "this makes me sick to my stomach . . . This will be the first time I have had to call on my muscle. fucking sucks." Ulbricht then considered how to respond to this theft. Ulbricht told a purported high-volume drug trafficker on the site, "Nob," that he wanted someone to sit the thief down at his computer and send the stolen bitcoins back; "beat up [the thief] only if he doesn't comply i guess," Ulbricht said, adding, "not sure how these things usually go." (*Id.* ¶ 71). Ulbricht also drafted a possible note to be delivered to the thief, directing him to "Send the bitcoins you stole to the following address immediately." Ulbricht's initial reaction was clear; he was focused on money, not murder.

---

[2] All quoted journal entries and chat logs are provided verbatim herein, including any errors in spelling, grammar, and punctuation.

Then Ulbricht discussed the theft with Clark. As Ulbricht speculated about how the theft might have occurred, Clark interjected. "Enough about the theft," Clark said; "tell me about the organ donor." Shortly thereafter, Clark asked, "at what point in time do we decide we've had enough of someones shit and terminate them?" Ulbricht asked, "terminate? execute?" Clark explained, "We're playing with big money with serious people, and that's the world they live in." Shortly thereafter, Clark added, "he came at us from inside, put many folks at risk, and facing a serious felony he's def the kind of guy that would seel what little he knows for a break with the Feebs."[3] Clark also said, "Dude, he was a CSR [*i.e.*, customer support representative] that could read PMs [*i.e.*, private messages], reset passwords, mebbe harvest addys [*i.e.*, addresses] while emptying accounts, etc., etc." (*Id.*).

Clark persisted in advocating for the murder. Approximately one minute later, he pressed Ulbricht, "So, you've had your time to think. You're sitting in the big chair, and you need to make a decision." Ulbricht replied, "I would have no problem wasting this guy." Clark then said, "Well ok then, I'll take care of it." Not long after, Clark added:

> You would have surprised me if you had balked at taking the step, of bluntly, killing [the suspected Bitcoin thief] for fucking up just a wee bit too badly. Also, if you had balked, I would have seriously re-considered our relationship. We're playing for keeps, this just drives it home. I'm perfectly comfortable with the decision, and I'll sleep like a lamb tonight, and every night hereafter.

(*Id.* ¶ 72). Clark offered Ulbricht the services of "Irish," who was Clark's muscle, to carry out the murder. However, "Nob" separately told Ulbricht that he could carry out the murder more quickly. ("Nob" was geographically much closer to the target than was "Irish.") Accordingly, Ulbricht agreed to pay "Nob" $80,000 to kill the Silk Road staff member whom he believed had stolen the money. In fact, "Nob" was an undercover law enforcement agent; unbeknownst to Ulbricht and Clark, no murder in fact occurred. (*Id.* ¶ 73). During a subsequent conversation about the murder-for-hire, Ulbricht told Clark, "there's definitely a part of me that's crossed a line though," and added, "like... you can't uncross that line." Clark calmly replied, "Irish was 2 days behind them, if I had info earlier, I would have acted first, I assure ya."

In summary, Clark's assessment of the entire situation was cold-hearted and nonchalant; he neither hesitated to kill nor appeared to view the matter as worthy of much conversation. This is the mentality of a cold-blooded killer—a man willing to stop at nothing to protect Silk Road. Indeed, perhaps nowhere was Clark's influence on Ulbricht more apparent than in Ulbricht's rapid transformation in how to handle this suspected Bitcoin theft.

*Clark Obstructed Justice*: During the offense, Clark threatened to hurt a co-conspirator's wife if she reported Clark's and her husband's involvement in Silk Road to the police. (*Id.* ¶ 74). And after Clark's arrest in Thailand, Clark obstructed justice by lying under oath during his extradition proceeding in Thailand. Specifically, Clark lied by claiming that (1) at the time of his arrest, he had "no knowledge" of Silk Road; (2) he did not have "any involvement" in Silk Road;

---

[3] Earlier in this conversation, Ulbricht noted that the suspected thief, "Flush," had been arrested ten days earlier for cocaine possession.

and (3) he was not associated with Ross Ulbricht. (*Id.* ¶ 75). Thus, Clark was quite determined to evade the consequences of his actions.

*Clark's Words*: Among the chat logs recovered from Ulbricht's laptop were over 1,000 pages of chats between Ulbricht and Clark, which spanned from approximately December 2011 until April 2013. Clark's words provide insight into his motivations, his character, and his risk of recidivism:

- "*been my dream, make those fuckers at the DEA pack their bags and leave in the night. I believe that we can break drug prohibition*"

- "*I want that whole ball of wax in my hands, so I can say I did that, I took down the DEA*"

- "*iwant to break the dEA's back and end cannabis prohibition - I believe i will succeed in destroying them. And they are a big target.*"

- "*I wanna break the DEA, and to do that, we need to break new ground in many directions at once.*"

- "*[A particular programmer whom Clark hired] supports my dream of breaking the DEA*"

- "*they killed 2 friends of mine, DEA did, and I took it personally and swore I'd break them or die trying*"

- "*folks who risk the security of clients have to be dealt with swiftly and ruthlessly*"

- "*I'm having the time of my fucking life. Told my honey, that today, looking back, I cannot think of a time in my life when I was happier, busier, or more content, all at the same time.*"

(*Id.* ¶¶ 54, 59). It is hard to imagine a more eager criminal, or a less repentant one, than Clark.

Indeed, even Ulbricht's arrest did not stop Clark. Rather, after Ulbricht's arrest, Clark asked a co-conspirator, "Tex," to take over Silk Road's operations. (*Id.* ¶ 68). Thus, Clark was neither chastened nor deterred. This was the response of a man who was determined to achieve his goals—his dream—of "break[ing] drug prohibition" and "t[aking] down the DEA."

Given Clark's stunning array of misconduct, it is unsurprising that his Guidelines calculation was literally off the chart, as his stipulated offense level, 45, exceeds the maximum possible offense level under the Sentencing Guidelines. (*Id.* ¶ 9). By operation of the statutory maximum punishment of the lesser-included offense to which Clark pleaded guilty, Clark's applicable Guidelines range was reduced from life imprisonment to 20 years. That sentence, 20 years, is plainly warranted here, given the following considerations, among other things:

1. The enormity of this offense;
2. The significant harms that such conduct causes;
3. The unprecedented nature of Silk Road, which unfortunately created a model that others have subsequently drawn from to wreak further havoc on our society;

4. The defendant's central, pivotal roles in the offense for nearly two years, including his leadership;
5. The defendant's role in perpetuating Silk Road by making it more secure, more professional, more ruthless;
6. The defendant's promptly advocating violence and murder to protect the Silk Road empire;
7. The defendant's entirely nonchalant reaction to murder, which evinces a complete disregard for others' lives or wellbeing;
8. The defendant's eagerness to continue Silk Road, even after Ulbricht's arrest; and
9. The defendant's obstruction of justice after his arrest.

## II. THE DEFENSE'S ARGUMENTS ARE INACCURATE, UNPERSUASIVE, OR BOTH

On May 13, 2023, the defendant filed a supplemental sentencing submission raising various arguments and seeking a sentence of time served.[4] (Dkt. 173). These arguments are addressed in turn:

*Clark's Motivations*: Clark contends that his involvement in Silk Road was motivated by his "deeply held beliefs about privacy, individual autonomy, and a legalization/harm reduction model for drug policy." (Def. Rev. Letter, 3). This is nonsense. *First*, someone who was actually motivated by a belief in "individual autonomy"—*i.e.*, individuals' rights to make *choices about their own bodies*—would not try to commit murder. Ending another human being's life is the very antithesis of individual autonomy. And doing so without any hesitation or concern reveals an

---

[4] In this submission, the defendant falsely asserted that he "did not participate" in the murder-for-hire plot that he admitted in his Plea Agreement, and he claimed, without evidence, that the chat logs demonstrating his involvement were somehow altered by Ulbricht in order to "falsely implicate" Clark. (Dkt. 173.) In fact, the chat logs were extensively corroborated by additional evidence and also implicated Ulbricht himself in the same murder-for-hire. In this submission, the defendant also falsely denied obstructing justice by lying during his extradition proceeding, which he also had admitted in his Plea Agreement; Clark argued that the statements he "is alleged to have made during a court appearance in Bangkok when he said that he 'had no knowledge' regarding Silk Road and 'did not have any involvement with this web site'" were "misrecorded and taken out of context." *Id.* at 11. In fact, the defendant reviewed and signed a transcript of the Thai extradition proceedings that clearly set forth his false denials, and this transcript was provided to the defense during discovery.

The Government promptly informed defendant's current counsel that Clark's false denials of responsibility for the murder-for-hire and obstruction of justice plainly contradicted the terms of his Plea Agreement and his acceptance of responsibility. On May 22, 2023, defense counsel requested permission from the Court to replace his sentencing memorandum with one that withdraws these two arguments (Dkt. 174 ("Def. Rev. Letter")), which permission was granted on the same day (Dkt. 175). In light of this withdrawal, the Government is not seeking any legal relief from the Court at this time, but reserves all of its rights to the extent that, before or during sentencing, the defendant makes arguments, whether in writing or orally, that breach his Plea Agreement or otherwise demonstrate a failure to accept responsibility.

astonishing lack of regard for anyone other than himself and anything other than his hoped-for legacy.  *Second*, anyone who wanted to reduce the harm associated with illegal drugs would find no shortage of opportunities to help individuals or communities in need, including through potential legislative changes, community initiatives, etc.  What Clark did, by contrast, was to greatly expand the marketplace for extremely powerful drugs by making it much easier, and much less risky, to buy and sell narcotics.  *Third*, Clark's "deeply held" beliefs are, if anything, cause for concern.  While Clark is certainly entitled to his beliefs—and to take any lawful action based on those beliefs—his widespread, long-running, destructive conduct in this case gives rise to concerns about future dangerousness and potential recidivism.[5]  In sum, Clark's own words provide a more accurate description of his apparent motivations: *"I want that whole ball of wax in my hands, so I can say I did that, I took down the DEA."*  His actions therefore seem more motivated by his contempt for the Government and for law and order than anything else.

*Clark's Talents*: Clark next highlights his entrepreneurial spirit, his status as a self-taught computer coder, and his interest in data privacy.  (Def. Rev. Letter, 5, 7).  There is no question that Clark is extremely intelligent, perceptive, and persuasive—and that he could have made a living, and an impact, in a lawful manner.  He chose, however, to use his considerable skills for illicit, destructive ends.  And he further chose to use his intellect to try to avoid the consequences of his actions.

*Clark's Claims about Cannabis*: Clark next contends that cannabis "made up the majority of the site's sales." (Def. Rev. Letter, 9).  This is wrong.  There were approximately $183 million in drug sales on Silk Road, *see* PSR ¶ 43, and cannabis accounted for less than approximately $50 million of that total amount, *see* Ex. A.  Viewed in totality, there were far more sales of "hard" drugs on Silk Road (*e.g.*, heroin, fentanyl, cocaine, LSD, psychedelics, ecstasy, methamphetamine, etc.)—both in terms of the number of sales and the amounts paid—than there were of cannabis.  Ex. A.  Even the article that the defense attached to its recent submission—purportedly to support this argument—makes clear that "Weed," "Cannabis," "Hash," and "Seeds" comprised only approximately 22.2% of items offered for sale on Silk Road.  In sum, this argument is another transparent, self-serving attempt to minimize the severity of Clark's misconduct.

*Clark's Obstruction*: Clark next asks the Court to essentially disregard the fact that he lied, under oath, during his extradition proceeding in Thailand, arguing that his obstructive lies "should not be part of the Court's [sentencing] calculus." (Def. Rev. Letter, 11).  This is an unpersuasive,

---

[5] As the Second Circuit has explained, "a defendant's beliefs or associational activity" may properly be considered at sentencing so long as they are "relevant to the issues involved" in the sentencing proceeding, such as to "rebut mitigating evidence that the defendant proffers" or to demonstrate future dangerousness or potential recidivism. *United States v. Kane*, 452 F.3d 140, 142–43 (2d Cir. 2006) (quoting *Dawson v. Delaware*, 503 U.S. 159, 164 (1992), and citing, *inter alia*, *United States v. Brown*, 479 F.2d 1170, 1174–75 (2d Cir. 1973) (holding that court properly considered defendant's "expressed sympathy with the political and social views of the Black Panther Party" as relevant to whether defendant posed a future threat)).  The Government may not, however, "offer proof of a defendant's 'abstract beliefs' merely for the purpose of demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'" *Id.* (quoting *Dawson*, 503 U.S. at 166–67).

and potentially dangerous, argument. Clark's lies were calculated and obstructive. Clark presumably considered the anticipated costs and benefits of this course of action and likely reasoned that the cost of lying under oath—an increase in punishment, should he face justice in the United States—was worth the potential benefit to him: not having to face justice at all. Of course, the legal system relies on accurate information to ensure justice for all, including defendants. The consequences can be enormously significant (*e.g.*, for defendants, victims, and others) when an individual deliberately injects false information into the justice system's equation. The consequences for such an individual must also be significant. That general observation is even more important here, because Clark's lies under oath are part of a broader pattern of behavior in which he displayed no respect whatsoever for the law, legal proceedings, or other individuals' wellbeing.

*Clark's Arguments regarding Health and the Conditions of Confinement*: Finally, Clark raises a series of arguments relating to his health and to the conditions of confinement in Thailand, at the MDC, and at two rehabilitation facilities where Clark was housed while recovering from hip surgery. Having previously urged the Court to impose a sentence of 15 years' imprisonment (in his 2020 sentencing submission), Clark now contends that he should receive no further incarceration at all (amounting to a sentence of about 7.5 years), based on his medical conditions and his confinement conditions. Clark emphasizes his mental health, prior COVID-19 infection, fractured pelvis, skin rashes, and transfer from a rehabilitation center to the MDC. The Government recognizes that Clark has experienced health struggles and challenges in confinement. However, for several reasons, Clark's arguments do not come close to meriting a sentence below the Stipulated Guidelines Sentence.

*First*, it bears noting that Clark's recitation of his pre-existing health conditions has changed dramatically between his commission of the offense and during his time in custody. In a chat on or about June 22, 2012, Clark told Ulbricht that he suffers from "MS", *i.e.*, multiple sclerosis, and stated that he only had a "couple more years to live." At that time, Clark wrote to Ulbricht, "I want you to know I've learned a lot from you, and you've inspired me. I say that because I don't want to sound condescending when I say I have a lot to teach you in a short time. My health won't give me more than a couple more years, and there's decades ahead." Upon his arrest on December 4, 2015, Clark similarly informed officers from the Department of Homeland Security that he was suffering from MS and ALS, as reflected on his signed *Miranda* waiver form. *See* Ex. B. But afterwards, following numerous medical examinations in custody, Clark appears to have entirely dropped that health claim. Indeed, none of his sentencing submissions or the PSR mentions in any way that Clark has ever been afflicted by ALS or MS, serious diseases as to which there is no cure. Without minimizing any of the health issues reported in his BOP medical records, it is clear that, at a minimum, Clark has made inconsistent statements about core health concerns that raise serious questions about his veracity in interpreting or reporting his health conditions.

*Second*, to the extent any of Clark's current health complaints are connected to any of his pre-existing conditions, it bears noting that those conditions did not prevent Clark from engaging in a breathtaking, sophisticated, harmful, unprecedented, violent, obstructive offense. Those conditions should not now permit him to escape punishment for his conduct.

*Third*, the Government generally took Clark's age and health into account in extending a plea offer that capped his exposure at 20 years' imprisonment, where the Guidelines range would otherwise have been life imprisonment. (Indeed, Clark's partner in crime, Ross Ulbricht—a 31-year-old first time offender—was sentenced to life imprisonment for his creation and operation of Silk Road.) In exchange for Clark's agreement to take responsibility for his full role in Silk Road, including enhancements for his participation in the murder-for-hire plot, and in consideration of his health conditions, the Government made a plea offer that significantly limited Clark's exposure. Clark, who is 61 years old, would potentially be eligible for release in less than ten years with a 240-month sentence, assuming good time credit. Any sentence below the Stipulated Guidelines Sentence, however, would fail to serve the essential sentencing goals of ensuring that the sentence reflects the nature, circumstances, and seriousness of the offense; protects the public from further crimes of the defendant; promotes respect for the law; and affords deterrence.

*Fourth*, Clark has previously raised a number of these arguments, and as to several, the Government has already addressed and refuted them. *See, e.g.*, Dkt. 153 (Gov't Letter dated July 29, 2022) (responding to Clark's allegations about the conditions of confinement at two rehabilitation facilities); Gov't Letter dated Dec. 28, 2022 (responding to Clark's allegations about his transfer from a nursing home back to the MDC). The Government's letters made clear, among other things, that Clark verbally abused guards and medical staff; became physical with guards; disobeyed directives; and may have attempted to escape. *See, e.g.*, Dkt. 153, pp. 4-5. A representative of one medical facility (which housed Clark) noted, in part, that in their view, Clark was very smart, manipulative, and entitled. This representative further noted that Clark was afforded the opportunity to do physical and occupational therapy five days per week, but refused therapy "quite often." This representative added that, at a certain point, Clark claimed he could not walk, yet staff observed him walking without an assistive device. *Id.* at 5. This representative's insights cast doubt on the veracity of Clark's assertions and complaints, and suggest that Clark continues to view the truth the same way that he did in his extradition hearing in Thailand.

But even if all of Clark's assertions and complaints were true, it would not merit a sentence below 240 months in this particular case. As a preliminary matter, Clark presents no evidence that the BOP lacks facilities that could handle his continued physical rehabilitation from his hip fracture, treatment for his skin rashes, and his other ailments. To the contrary, Clark has identified a specific Federal Medical Center in Butner, North Carolina that he requests to be designated to receive physical therapy for his hip. (PSR ¶ 156). Next, as discussed above, this was a truly remarkable offense meriting a commensurate punishment. And finally, courts routinely have rejected arguments similar to Clark's in cases, like this one, involving sustained criminal conduct that results in significant harm.[6] For instance, in *United States v. Murphy*, 11 Cr. 137 (C.D. Cal.),

---

[6] *See, e.g.*, *United States v. Lewis*, 594 F.3d 1270, 1275-78 (10th Cir. 2010) (affirming 330-year sentence for fraud offenses and upholding district court's rejection of a 72-year old defendant's request for a variance based upon age and health); *United States v. Dowd*, 451 F.3d 1244, 1256-57 (11th Cir. 2006) (rejecting the defendant's argument that his 305-month sentence was unreasonable because he was 65 years old); *United States v. Kerns*, 336 F. App'x 916, 918-19 (11th Cir. 2009) (rejecting the defendant's argument that his 240-month sentence for fraud offenses was a *de facto* life sentence and noting that "the district court weighed [the defendant's] advanced age against the seriousness of his offense and the need to protect the public from fraud");

Judge David Carter explained the vital importance of deterrence, and the perception of equal justice, when imposing a 97-month sentence on a 70-year-old white-collar defendant who had carried out a $2.9 million investment fraud scheme:

> I don't think a Court can allow you or somebody in a similar position to walk away from a sentencing, literally taking a round figure of 8, 9, 10, 11, 12 years, whatever that sentence is, and multiply that into a $3 million loss and, basically, make $300,000 a year on fraudulent activities. There, the government has a huge argument that I think the Courts need to pay attention to; and that is, not only you, but what's the deterrent value for people reading, hearing, or taking into account this kind of conduct?
>
> Is it that because we're older we can go out and commit these crimes, but somebody in the 40's gets 10 years? Somebody in their 70's get 41 months? I don't think so. I think you're just as accountable as a person who's 40 or 50.
>
> And maybe the argument could be made, with our life experiences—because I'm in the same age range as you—maybe just as accountable for our conduct after a lifetime of living and learning what's appropriate, ethical and right.

(*United States v. Murphy*, No. 11 Cr. 137 (C.D. Cal. Aug. 2, 2013), Dkt. 99 (Sentencing Transcript), pp. 85-86). Judge Lewis Kaplan made similar observations in *United States v. Emanuel Cohen*, 15 Cr. 396 (LAK), a case involving a 73-year-old, infirm white-collar defendant:

> With people in this age bracket, it is a very small number, really, from this social and economic bracket of society who can't make a medical case for avoiding incarceration of some level of persuasiveness or another. Sentences in cases like this, therefore, have to be cognizant of the need for people in general who, were they informed of the circumstances, to say well, this individual is going to pay a price for the crime, maybe not the same price that the individual would pay if he was a healthy 48-year old, but a serious price. There has got to be a perception that justice is done, that people get their just desserts, and that requires judges to impose sentences in some cases that if the sentences were considered only from the perspective of the defendant being sentenced might be harsher, more severe than might seem appropriate.

---

*United States v. Moses*, 337 F. App'x 443 (6th Cir. 2009) (affirming 210-month sentence for 71-year-old defendant suffering from coronary artery disease, removal of her colon, loss of feeling in her legs due to nerve damage, atrial fibrillation, frail kidneys, and an auto-immune disorder on conviction for a fraud that involved, *inter alia*, a $15 million loss, the use of false statements and documents, and the use of shell companies to conceal the fraud); *United States v. Credidio*, 19 Cr. 111 (PAE) (rejecting 72-year-old defendant's request, based in part on age and health issues, for non-custodial sentence, and instead sentencing defendant to a top-of-the-Guidelines sentence in a nonviolent fraud case involving approximately $415,000 in losses).

(*United States v. Cohen*, No. 15 Cr. 396 (LAK) (S.D.N.Y. Sept. 29, 2016), Dkt. 88 (Sentencing Transcript), p. 22).  Finally, in *United States v. Nancy Credidio*, 19 Cr. 111 (PAE), a non-violent fraud case involving a 72-year-old defendant with various health issues, Judge Paul Engelmayer explained why the defendant's age did not favor lenience:

> Second, you are today a mature adult. You are age 72. Many defendants whom I sentence committed crimes in their late teens or early twenties; and their counsel often argue to me that their client was still young and growing up and still in the process of maturing and gaining wisdom. There's often much wisdom to that, and often I'm persuaded by such arguments to impose a lower sentence than I otherwise would, had the . . . identical crime been committed by a fully grown adult.
>
> That argument, needless to say, is not available to you at all, Ms. Credidio. You were plenty old enough at the time of these crimes to know better and to control whatever impulses to fraud you may have had. You are, if anything, at an age when one might have expected you to slow down rather than intensify your criminal conduct.

(*United States v. Credidio*, No. 19 Cr. 111 (PAE) (S.D.N.Y. Feb. 7, 2020), Dkt. 59 (Sentencing Transcript), pp. 51-52).  These judges' observations ring with even stronger force here, where—unlike the non-violent fraud defendants discussed above—Clark faces sentencing at only 61 years of age for an offense that involved, among other misconduct, urging a murder-for-hire in order to protect a massive drug empire.

\* \* \*

In summary, Clark's arguments in favor of leniency pale in comparison to the severity of his offense, the duration of his offense, his pivotal roles in the offense, his use of violence, his use of threats, and his obstruction of justice.  Accordingly, for these reasons and those in our prior sentencing letters, the Government respectfully submits that the Stipulated Guidelines Sentence is fair and appropriate in this case.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney
        Southern District of New York

By:         /s/        
        Michael D. Neff / Vladislav Vainberg
        Assistant United States Attorneys
        (212) 637-2107/1029

cc:     Evan L. Lipton, Esq. (by ECF and email)