N7BZZCLAS-dh

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                         15 Cr. 866 (SHS)

5   ROGER THOMAS CLARK,
                                             Sentence
6                 Defendant.

7   ------------------------------x

8                                            New York, N.Y.
                                             July 11, 2023
9                                            10:00 a.m.

10
    Before:
11
                        HON. SIDNEY H. STEIN,
12
                                             District Judge
13

14

15                        APPEARANCES

16  DAMIAN WILLIAMS,
          United States Attorney for the
17        Southern District of New York
    BY:   MICHAEL NEFF
18        Assistant United States Attorney

19        Attorney for Defendant
    BY:   EVAN L. LIPTON
20

21  Also Present:   Gary Alford, FBI
                    Scott Stoner, FBI
22

23

24

25

N7BZZCLAS-dh

1          THE COURT:  We're here for the sentencing of

2     Mr. Clark.  Let me tell you the information that I have:

3          ECF 159, which is the revised PSR.  It states on its

4     cover, prepared March 27, 2020; date report revised, July 8,

5     2020 and; date report revised, November 2, 2022.

6          I also have ECF 174-1, which is the operative

7     submission of the defense.  It replaces 173 which the defense

8     asked to have withdrawn and it substituted 174-1.  I have that.

9          I also have ECF 176, which is the government's

10    response dated May 26, 2023.

11         I also have ECF 178, which is dated June 20, 2023, and

12    in it, Mr. Lipton returned for Mr. Clark enclosed reference

13    letters from Elizabeth Clark, Kayla Chan, Aaron Higgs, Neil

14    Hopkins and Tannis Wing and also from Wendy McDonald.

15         I also have ECF document 180, which is the submission

16    of the government dated July 5, 2023, in which they provide the

17    information from the Federal Bureau of Prisons.

18         Last night, the defense filed document ECF 181, which

19    is two additional letters of support on behalf of Mr. Clark

20    from Sunjeev Singh Paul and Carl Bretzlaff.

21         In addition to these documents, I've read and reviewed

22    all of the documents on ECF concerning the various and numerous

23    requests for adjournments and the delays in bringing this

24    sentencing on, as well as Mr. Clark's serious medical

25    conditions that he's had and various letters concerning the

N7BZZCLAS-dh

1    conditions of confinement.

2           Now, Mr. Lipton, have you and Mr. Clark had an

3    opportunity read and discuss this information, and have you, in

4    fact, read and discussed it?

5           MR. LIPTON:  The answer is yes, but I have something

6    else to say first.

7           When your Honor went through the papers that were

8    submitted for sentencing, I did not mention the earlier

9    sentencing submission made by prior counsel, Stephanie Carvlin.

10   That is also something that we are relying on for sentencing

11   today.

12          THE COURT:  All right.  Just a moment.

13          MR. LIPTON:  Thank you.

14          THE COURT:  As I said, I've read all of this

15   information.

16          MR. LIPTON:  It is ECF No. 63, submitted on November

17   6.

18          THE COURT:  Yes, exactly.

19          Just a moment.

20          Yes, sir.  I have that, and I certainly have read it.

21          MR. LIPTON:  Thank you.

22          I have gone over the papers that your Honor has just

23   listed with my client.  At this point though, I need to address

24   to the Court my client's request for another adjournment at

25   this point.

N7BZZCLAS-dh

1              The reason for that request is, as the Court is aware,

2       he has not been able to complete his written submission to the

3       Court.  I have submitted a sealed submission to the Court in

4       which I identified some of the issues that we would like to

5       discuss.

6              THE COURT:  Are you talking about the submission dated

7       July 10, 2023 with a request to be filed under seal?

8              MR. LIPTON:  Yes, your Honor.

9              THE COURT:  All right.  Go ahead.

10             MR. LIPTON:  My understanding was that addressing the

11      Court orally would be sufficient, but in speaking to Mr. Clark

12      this morning, he has strongly said that that will not be

13      sufficient, that he needs to complete his writing.

14             THE COURT:  Why would that be so?

15             MR. LIPTON:  Because of the complexity of the issue,

16      but I also want to address the reason why he couldn't complete

17      it.

18             Your Honor was gracious enough to suggest that pen and

19      paper would be sufficient for this writing.  The reason that

20      has not been an acceptable choice for --

21             (Defendant conferred with counsel)

22             MR. LIPTON:  Okay.

23             The conditions of confinement have made it so that he

24      cannot finish this.  He would like me to address the specific

25      reasons outside of the hearing public.

N7BZZCLAS-dh

1          THE COURT:  The specific reasons why?  What?

2          MR. LIPTON:  The specific reason that he was unable to

3    complete this submission.

4          THE COURT:  Okay.

5          Does it have to do with the reasons set forth in this

6    letter dated July 10?

7          MR. LIPTON:  Yes, sir.

8          THE COURT:  Okay.

9          I'm not surprised by the request.  It's been,

10   essentially, three years since the sentencing has been brought

11   on.  It's been a very difficult process.  A lot has intervened:

12   COVID, of course; Mr. Clark's very serious injury with a broken

13   pelvis; and his stay at both a medical facility and a

14   rehabilitation facility.

15         So we had COVID.  We've had his legitimate medical

16   problems.  We've had a great number of requests for

17   adjournments, and this sentencing has gone, I believe, from

18   judge Nathan who then left this court and went to the court of

19   appeals, to Judge Pauley who then passed away, to me.

20         As I say, it's been almost three years, and I have the

21   sense that Mr. Clark simply does not want this sentencing to

22   take place.  I don't understand that, because it seems to me

23   that it would be very much in his interest to be sentenced and

24   for the Bureau of Prisons to send him to a facility that's not

25   the Metropolitan Detention Center which is in an urban

N7BZZCLAS-dh

1    environment with limited opportunities for exercise, for fresh

2    air.

3            The difficult conditions at the MDC are very well

4    known.  There were whole issues with the heat and plumbing.  I

5    don't know if he was at the MDC at that time.

6            MR. LIPTON:  He was.

7            THE COURT:  So, very difficult conditions of

8    confinement.  And I'm going to take that into consideration in

9    rendering the sentence.  I think it's appropriate that I do.

10            But there have been, as I say, numerous, numerous

11   requests.  I have to put a stop to it at some point.  It's been

12   several months.  I'll say a few months.  I'm not sure when I

13   first set this date down for sentencing, but it was -- I

14   believe Mr. Clark told me at that time that he wanted to write

15   a statement.  It's fine.  He has the right to speak to me, and

16   I gave him a lot of time for that.

17            You wrote me.  It's ECF 179 on June 20 asking that the

18   sentencing be adjourned for an additional three weeks, from

19   June 26 to a date on or after July 19, to give Mr. Clark

20   additional time to compose his personal letter to the Court.

21            Given the previous adjournments of the Court's claim,

22   this will be the final such application.  The government

23   consents, so you made the final application in ECF 179.

24            You say that since the status conference on March 7,

25   Mr. Clark has consistently communicated a strong desire to

N7BZZCLAS-dh

1    supplement my submission with a personally authored submission

2    of his own in which he intends to address information that is

3    highly relevant.  He'll write about the most traumatic aspects

4    of his incarceration, including details of his victimization

5    while detained in Thailand, which he has been unable to share

6    with counsel during legal meetings that he believes he can

7    describe in a writing to the Court.

8              Then you talk about the almost continuous lockdowns,

9    the attendant lack of access to computers.  Mr. Clark has made

10   minimal progress and therefore makes this request for

11   additional time.

12             And I granted that in part.  I wrote an endorsement

13   dated June 21.  The sentencing is adjourned to July 11 at ten

14   a.m.  That's now, sir.  The defendant's submissions addressed

15   the conditions of confinement in Thailand -- because that's

16   what you wanted to tell me about -- may be handwritten if that

17   will assist defendant.  No further adjournments.  So I would

18   try to accommodate him as much as I can.  I've been doing that

19   throughout this, but the time has come for his sentencing.

20             What's the position of the government on the request

21   for an adjournment?  Either the government consents or it

22   doesn't.

23             MR. NEFF:  The government opposes the adjournment

24   request, your Honor.

25             THE COURT:  I'm going to deny the request for

N7BZZCLAS-dh

1    adjournment.

2              Now, in your letter that you requested be filed under

3    seal dated July 10, you say that he is concerned, in his

4    statement he will make, about potential recriminations in the

5    context of the MDC.

6              And so, he asks that the record be sealed and that

7    possibly the courtroom be sealed during a portion of the oral

8    statement that Mr. Clark intends to make to the Court.  I'm not

9    going to deal with that right now.  I'll deal with it when it

10   comes time for the sentencing for Mr. Clark to make his

11   statement.  But I do want him to be able to tell me whatever he

12   wants to tell me, and he's had plenty of time to write it.

13             You will remember, sir, that earlier on in this

14   proceeding, there were issues when -- it was either nursing

15   home or the rehabilitation facility -- where there were issues

16   of his access to pens and computers, and I had the government

17   investigate his allegations, and that was all worked out.  So

18   he was able to, to my recollection, he was able to do his

19   writing and so, too, he's had plenty of time to write.  He can

20   give me in writing today whatever he wants.  He can tell me

21   today whatever he wants, but the request for an adjournment is

22   denied.

23             MR. LIPTON:  Your Honor, I understand the ruling.

24             May I make a couple more points on the record for

25   that?

N7BZZCLAS-dh

1                   THE COURT:  Of course.

2                   MR. LIPTON:  Because he has not been able to submit

3      this writing to the Court, Mr. Clark believes that he has not

4      been able to share all the relevant information for sentencing.

5      And I understand the ruling --

6                   THE COURT:  But he'll be able to tell me whatever he

7      wants.

8                   Go ahead, sir.

9                   MR. LIPTON:  I understand that.  I understand the

10     ruling.  I'm noting my exception for the record.

11                  THE COURT:  I got you.

12                  MR. NEFF:  Also for the record -- I apologize to

13     interject.  May I note a point or two?

14                  THE COURT:  Yes.

15                  MR. NEFF:  Thank you.

16                  THE COURT:  But I really do want to proceed to the

17     sentencing.

18                  Go ahead, sir.

19                  MR. NEFF:  Absolutely, Judge.

20                  In conversations with defense counsel in the preceding

21     weeks, we noted -- as the Court noted -- that the defendant's

22     letter could be handwritten, that it could be dictated through

23     counsel.  We also offered to facilitate access, if we could, to

24     a computer at the MDC.  We offered, in essence, to reach out to

25     the BOP to try to assist.  And defense counsel, understandably,

N7BZZCLAS-dh

1   said he wanted to confer with his client, and we did not hear

2   back from the defense as to our offer.  I felt that was

3   pertinent to add.

4               THE COURT:  All right.  Thank you.

5               I listed the information I have.  Does the government

6   have any additional written information that the Court should

7   be aware of?

8               MR. NEFF:  Your Honor, just for the record, I'm

9   mindful that your Honor has indicated that you've read

10  everything on ECF, so I believe that includes these, but I just

11  wanted to highlight them because I don't believe I've heard

12  reference to them.  In addition to what Mr. Lipton noted, which

13  is the defendant's initial sentencing memorandum for November

14  2020, there's also the government's initial sentencing

15  memorandum, also from November 2020.  That's at ECF entry 64.

16              THE COURT:  Yes, I have that.

17              MR. NEFF:  Thank you, Judge.

18              And then in addition, each party -- while the case was

19  still before Judge Pauley in the Spring of 2021, each party

20  filed a supplemental submission.  The government's is at ECF 74

21  from April 5, 2021, and the defendant's is at ECF No. 75 from

22  April 8, 2021.

23              THE COURT:  I have them and reviewed both of those.

24              MR. NEFF:  Thank you, Judge.

25              THE COURT:  All right.

N7BZZCLAS-dh

1          Mr. Lipton, do you or your client have any objections

2     to the findings of fact in the presentence report?

3          MR. LIPTON:  We do not have objections.  I would like

4     to put on the record that we have -- There is an outstanding

5     objection that we're going to withdraw today.

6          THE COURT:  All right.  Thank you.

7          MR. LIPTON:  The prior counsel, Ms. Carvlin -- in

8     November 2020, in her sentencing memorandum -- objected to

9     paragraphs 89 through 106 titled "Overdose Deaths Linked to the

10    Original Silk Road."  We originally objected to that, but for

11    reasons that will be discussed further during this proceeding,

12    Mr. Clark has elected to withdraw that objection.

13         THE COURT:  So you're telling me that as of today, you

14    have no objections to the findings of fact in the presentence

15    report.

16         MR. LIPTON:  That is correct.

17         THE COURT:  All right.  Thank you.

18         Does the government have any objections to the

19    findings of fact?

20         MR. NEFF:  No, your Honor.

21         We do have one objection to the calculation of the

22    guidelines range, which is noted in our initial 2020 sentencing

23    letter.

24         THE COURT:  All right.

25         We'll get to that when we get to the guidelines, but

N7BZZCLAS-dh

1    preview it.

2             What is that objection?

3             MR. NEFF:  Yes, your Honor.

4             I realize this may be deemed somewhat academic in that

5    the probation department calculates an offense level of 43.

6             THE COURT:  43.  That's correct.

7             MR. NEFF:  The parties stipulated to 45.  The issue is

8    whether --

9             THE COURT:  Wait, wait.

10            Let's deal with that now.

11            Yes, the parties stipulated to 45.  The probation

12   department said 43, because there was an application that

13   indicated two points were not to be added in certain

14   conditions.

15            I've determined that the probation department is

16   correct, and the offense level is 43.

17            So what is the government telling me?

18            MR. NEFF:  Sure, your Honor.

19            Probation is incorrect, in our view.  I want to be

20   mindful that either way, the calculation comes out to life and,

21   of course, is capped at 20 years.  But I do think that it's

22   important or at least reasonable to note that there is an

23   application note, but it does not apply under these

24   circumstances.

25            THE COURT:  Okay.  We'll get to that when we do the

1    guidelines calculations.  Please remind me.

2              But anyway you slice it, the offense level is 43 in

3    the government's view.

4              MR. NEFF:  No, your Honor.

5              The offense level is 45 in the party's stipulation.

6    But I understand either way the ultimate calculation would be

7    life but then is capped at 240 months.

8              THE COURT:  You think the total offense level is 45?

9              MR. NEFF:  Yes, your Honor.

10             THE COURT:  I think it's 43, but we'll deal with that.

11             MR. NEFF:  Thank you, Judge.

12             THE COURT:  I hereby adopt the findings of fact in the

13   presentence report ECF 159.

14             Mr. Lipton, why don't you tell me your -- oh, I'm

15   sorry.

16             I have some changes to the presentence report, so let

17   me go -- They are cosmetic, but everyone wants to be correct

18   here.

19             On page five of the presentence report A(1), it says

20   the guideline provisions in effect as of November 1, 2018 apply

21   in this case.  Again, it's academic because they are the same,

22   but I think the guideline provisions in effect on November 1,

23   2021 apply in this case.

24             Guideline 1B1.11(a) states: The Court shall use the

25   guidelines manual in effect on the date that the defendant is

N7BZZCLAS-dh

1    sentenced.

2           Mr. Lipton, do you agree?

3           MR. LIPTON:  I agree.

4           THE COURT:  Does the government?

5           MR. NEFF:  Yes and no, your Honor.

6           THE COURT:  Well, try one or the other, sir.

7           MR. NEFF:  With respect to paragraph nine -- which is,

8    I think, where your Honor is -- which is a reference to the

9    party's plea agreement, I don't think that should be changed.

10          THE COURT:  Oh, all right.

11          MR. NEFF:  However --

12          THE COURT:  Let's see.  Wait.

13          I understand what you're saying.  You're going to

14   point me to 112.

15          MR. NEFF:  Exactly.

16          THE COURT:  All right.  Just wait a minute.  I think

17   the government is correct.  9(A)(1) refers to the plea

18   agreement.  I can't change that.

19          Mr. Lipton, do you agree?

20          MR. LIPTON:  Yes.

21          THE COURT:  Okay.

22          Now let's go to 112.

23          Yes.  It says the November 1, 2018 guidelines manual

24   incorporates all guidelines amendments used to determine

25   defendant's offense level.  That I will change paragraph 112 to

N7BZZCLAS-dh

1    read: the November 1, 2021 guidelines manual.

2            The government agrees?

3            MR. NEFF:  Yes, your Honor.

4            THE COURT:  Defense agrees?

5            MR. LIPTON:  Yes, Judge.

6            THE COURT:  Thank you.

7            Now, the other change I was going to make is at 178

8    where it says: The presentence report does not include

9    two-level decrease.  It's a two-level increase.

10           Mr. Lipton, do you agree?

11           MR. LIPTON:  Yes, I do.

12           THE COURT:  Government, do you agree?

13           MR. NEFF:  Yes, your Honor.

14           THE COURT:  So I'm going to make the change from

15   decrease to increase, and I think the application note seven is

16   to 3C1.1, not 2D1.1.

17           Government, do you agree?

18           MR. NEFF:  Yes, your Honor.

19           THE COURT:  Mr. Lipton.

20           MR. LIPTON:  Yes.

21           THE COURT:  I'm going to make that change.  I'll

22   change decrease to increase.  I'll change 2D1.1 to 3C1.1, and

23   I'll close the quotation mark also.  That quotation mark opens

24   at: If the defendant receives an enhancement under

25   2B1.1(16)(D), do not apply this adjustment."  I'll close the

N7BZZCLAS-dh

1     parentheses at that point.

2            Okay.

3            Last change.  I've made those changes.

4            Last change is on the cover where it says: defense

5     counsel Roger Thomas Clark, pro se advising as counsel.  I will

6     strike those words because Mr. Lipton is the counsel for Mr.

7     Clark.

8            Mr. Lipton, any objection to that change?

9            MR. LIPTON:  No objection.

10           THE COURT:  Government?

11           MR. NEFF:  No objection.

12           THE COURT:  All right.  I will make those changes.

13           With those exceptions, I adopt the findings in the

14    presentence report.

15           Mr. Lipton, you can now tell me whatever it is that

16    you would like on behalf of Mr. Clark.

17           MR. LIPTON:  May I speak from the podium?

18           THE COURT:  Of course.  Wherever you'd like, sir.

19           MR. LIPTON:  Your Honor, I'm here on behalf of Mr.

20    Clark to request a sentence of time served.

21           This sentence, I recognize, is substantially less than

22    the guidelines in this case, but for the reasons in the papers

23    we've submitted -- and I'll amplify today -- I believe that

24    such a sentence is sufficient but not greater than necessary to

25    fulfill the purposes of punishment under 3553(a).

N7BZZCLAS-dh

1           THE COURT:  Just so we're on the same wavelength, the

2     guidelines are life, and it's statutorily capped at 20 years.

3           Are we agreed on that?

4           MR. LIPTON:  We agree, but again, it might be

5     academic.  The guidelines become 240 because of the statute.

6           THE COURT:  You are correct.  I think that's the

7     correct phrasing.

8           MR. LIPTON:  Same thing, different ways of saying it.

9           What I hope to impress upon the Court is that in this

10    case, due to the specific interaction of the conditions that

11    Mr. Clark has been subject to and his personal history and

12    characteristics, that retribution and deterrence in this case

13    have largely already been accomplished.

14          This sentence is appropriate for two main reasons:

15    that his history and characteristics support it -- including

16    his age and his health -- and because the time that he has

17    spent in custody to this point has been the most harsh and

18    punitive incarceration as I have heard of any kind.

19          THE COURT:  You're talking about at the MDC or you're

20    talking about Thailand?

21          MR. LIPTON:  I'm talking about both.  I'm going to

22    address both in my comments this morning.  For these reasons, I

23    believe that the five years he has served in these situations

24    are equivalent to many, many, many more years under normal

25    prison conditions.

N7BZZCLAS-dh

1          As we do at sentencing, this is the time when we look

2     at the whole person.  We look at Roger Thomas Clark and his

3     history and characteristics and consider all of this together

4     when it's time to set a sentence.

5          I understand that Mr. Clark has been portrayed and

6     understood by many as a difficult person.  I submit that a lot

7     of that comes from the experiences that he has been through

8     these last several years while incarcerated.

9          I've spent a lot of time with him.  I've spent time

10    with him first when I was standby counsel at the Kingsbrook

11    Nursing Home in Queens and I've spent a lot of time with him

12    here in MDC both in the regular visiting room and,

13    unfortunately, up at the SHU as well.

14         Roger will agree that conversations can be difficult

15    at times.  What I've come away with is a picture of a very

16    intelligent man who is also very compassionate and committed to

17    the projects that he begins, and we see this in the letters of

18    support that he received.

19         THE COURT:  I agree.

20         MR. LIPTON:  He's motivated and once he gets into a

21    project, he is loyal to it.

22         These letters also show us that he has a network of

23    support to return to once he's done with his time.  He has

24    family in Canada.  There's family in Canada that care for him,

25    and there are people who will give him opportunities to use the

N7BZZCLAS-dh

talents that he has in a legitimate and lawful way.

Now I want to address that exactly, for a moment, because there's been a lot of talk about him lacking remorse, and I know that's not true.

Mr. Clark is not remorseful for saying that he thinks the DEA should be abolished or that the drug war is a failure. He believes that, as many other people do, but what he is remorseful for -- and what he's come to understand in a way that he did not before -- is that there is no way to run a safe market for illegal drugs.  It can't be done, and that is why he asked me to withdraw the objections to the presentence report that describe the overdose deaths.

I'll note that there's language from the Second Circuit which suggest that that objection may have been sustained, but regardless, Mr. Clark wished to communicate that he understands that he had a role in those deaths and is remorseful and accepts responsibility for that along with his actions here.

In that way, you know, like many people before him, he's a person who committed a crime, in part, because of political beliefs and later came to realize that those actions were wrong.  And that's important to us because it speaks to deterrence.  It speaks to whether he is likely to commit these crimes again, and I submit that he's not.  But there are other reasons why as well.

N7BZZCLAS-dh

1          The conditions of his confinement, which I'm going to

2     address in more detail, shouldn't have happened.  But by

3     happening, they've had a stronger deterrent effect than would

4     occur on another person.  He has seen what can happen to you

5     when you're incarcerated, and it has made an impact.

6          As your Honor referenced before, this case has been

7     ready for sentencing for some years.  In November 2020, his

8     prior counsel submitted an excellent sentencing memorandum, and

9     Mr. Clark submitted a letter detailing some of what occurred to

10    him in Thailand.  He described overcrowding, torture, and

11    sexual assault.  He described being forced to watch others

12    raped and tortured a few feet away from him.  I don't know

13    whether he discussed in that submission being victimized, but

14    he was also victimized.

15         He was kept in an extremely unhealthy environment,

16    both mentally and physically.  And when he arrived here in the

17    United States following some time in Thailand, he arrived here

18    an unwell person.  He was 93 pounds.  He was covered with

19    rashes.  He was sick, and he was suffering post-traumatic

20    stress disorder from what he had endured.

21         Instead of being brought back to health once he

22    reached the United States, Mr. Clark was pigeonholed by an

23    incompetent psychiatrist and given diagnoses that cannot be

24    made based on a ten to fifteen-minute interaction, and these

25    diagnoses have followed him and helped create this label that

N7BZZCLAS-dh

1    he is a difficult person.

2            It has also had a substantial impact on his physical

3    health.  We've already talked about that.  But on his mental

4    health, the experience that Mr. Clark has had has been the

5    experience of being trapped, unable to care for himself and

6    being denied basic care.  This is not supposed to happen in our

7    prisons.

8            He endured the blackout and the government shutdown,

9    which was covered in detail in her earlier memo.  That

10   situation, for lots of inmates, caused a good deal of anxiety

11   -- the feeling of being left alone and trapped in the MDC right

12   across this hard earth from all these beautiful buildings and

13   being deprived of things like heat and not knowing when it's

14   going to end.  I know that judges and attorneys went on a tour

15   of that facility and that the inmates made a report.  Roger

16   Clark was part of that.  He was there for that.  Then COVID

17   happened.

18           Now, the United States is not responsible for the

19   conditions in Thailand.  The United States is not responsible,

20   initially, for the blackout, for the government shutdown, for

21   COVID.  But there should have been more preparation for those

22   situations, and they should not have occurred the way they did.

23           And just to be clear, when I say that the U.S. is not

24   responsible for what happened in Thailand, I'm not suggesting

25   that it should not be taken into account.  I'm just

N7BZZCLAS-dh

1   distinguishing it from other aspects of his incarceration.

2          When it comes to the conditions at the MDC, we can

3   talk about different kinds of conditions.  Some are related to

4   acts of nature -- the blackout, COVID.  Still, you need to be

5   ready for these things, and the failure to do so is a disgrace.

6          But, what happened next to him is the most predictable

7   thing that can happen in a jail.  An older inmate falls and

8   breaks a bone, many bones, several bones.

9          But for some reason, Mr. Clark lay on that cell floor

10  overnight suffering, and to this day, there's been no

11  explanation of why that occurred.  What we know from the

12  records is: We know when he fell, and we know when an ambulance

13  came the next day.  It's as if this accident happened in the

14  middle of the wilderness, not across from the best hospitals in

15  the world.

16         We know that as soon as the EMTs were let into the

17  building, that about 30 minutes later, Mr. Clark was at NYU

18  Langone being treated.

19         I don't know why this happened.  Everything's

20  videotaped at the MDC.  Not this.  This video was requested,

21  and it's been confirmed by the Eastern District that the video

22  doesn't exist.

23         And again, this goes to Mr. Clark's personal

24  experience having been through Thailand, having come to the

25  United States and being treated the way he was at the MDC.  And

N7BZZCLAS-dh

1    again, he's now in this hospital.  For whatever reason -- I

2    don't know what it could be -- he was not allowed to speak to

3    anybody for a period of ten or eleven days.  He was not allowed

4    to speak to his sister.  And again, Mr. Clark experienced this

5    feeling of being trapped.

6            He had kind physicians and nurses there for him who

7    suggested that he should be able to make phone calls but were

8    unable to do anything for him.

9            Now, there's one other thing that I want to talk about

10   as far as the MDC conditions that you've heard a lot about --

11   and I just want to make sure that the seriousness of this is

12   understood -- and this relates to the rash that Mr. Clark

13   showed up with from Thailand.

14           This was addressed back in the November 2020

15   sentencing submissions.  Ms. Carvlin talked how about the only

16   thing that could give Roger relief was an over-the-counter

17   hydrocortisone cream that was available at the commissary.

18           THE COURT:  I believe the sister in one of the letters

19   talks about this as well.

20           MR. LIPTON:  That's correct.

21           Thank you for your attention.  That's what I was about

22   to address.

23           When Mrs. Carvlin discusses it back in 2020, there may

24   be reasons that have to do with the blackout why the commissary

25   is not operating, but that never ended, and that resulted in

1    the situation that your Honor has referred to where his sister

2    spent an inordinate amount of money to buy over-the-counter

3    cream on the black market and have it delivered to him.

4          This, in the context of everything else that was

5    happening to him, had a profound effect on his mental health.

6          You know, when you are under someone else's control,

7    unable to help yourself, and are being denied basic $2 tubes of

8    cream, it creates a feeling that anything could happen.  And I

9    think that has had a substantial impact on Mr. Clark.

10          I understand that he's been portrayed as being

11    difficult at the nursing homes that he was at.  I went to the

12    nursing homes.  These were -- there was a lack of

13    professionalism in the way that he was dealt with.

14          He did raise issues.  There were things he was upset

15    about, but I think I can kind of encapsulate it by telling you

16    a very brief conversation I had with one of the guards.  He was

17    in a back and forth with Mr. Clark, and I asked him to step out

18    into the hallway and said: Sir, he's cuffed to the bed.  How

19    about you don't get in an argument with him?  How about you

20    walk away?  And that's not what was happening there.

21          On top of that, he was seeking to represent himself at

22    this point.  He had a lot of things he wanted to say that had

23    to do with a deep dive into the materials in this case.

24          My understanding is that he did a tremendous amount of

25    work.  I never saw this because by the time I arrived on the

N7BZZCLAS-dh

1    scene, it was missing.  And we addressed that, but the fact is

2    that Mr. Clark was unable to represent himself in the way that

3    he wanted to, because when he completed the work, it would go

4    missing or get taken, and it became an impossible situation for

5    him.

6           Now, I'm not asking for a reduced sentence here just

7    because of the BOP's negligence or because of what someone else

8    did.  I've been doing this long enough that I know it doesn't

9    work that way.

10          But here there is a specific interaction between that

11   negligence or misconduct -- and whatever it may be -- and

12   3553(a) factors.  When you look at what was done to him,

13   combined with his history and characteristics, it makes out

14   that he has been punished much more harshly than others in his

15   situation.

16          Roger Clark is more than how he's portrayed in the

17   presentence report.  He is more than a person who was involved

18   with the Silk Road.  He did this not out of greed.  He did this

19   out of -- because it's something that he was interested in and

20   believed in and got wrapped up in.

21          He is a person who can lead a good and productive

22   life.  He's an older man.  He's suffering from poor health.  I

23   understand in the letter from the BOP that they can take care

24   of his medical conditions in a BOP hospital facility, and I'll

25   say two things.  I've never seen them not say that is the first

N7BZZCLAS-dh

```
1    one.  But the second is --
2              THE COURT:  You mean you've never seen them not say
3    that they can take care of the medical condition of the
4    defendant.
5              Is that what you're saying?
6              MR. LIPTON:  Yes.
7              THE COURT:  All right.
8              MR. LIPTON:  But second, how does that sound to Roger
9    Clark?
10             I mean, his medical care, which has been under the
11   responsibility of the Bureau of Prisons, has been horrendous.
12   I do believe that a medical facility run by the BOP is better
13   than the MDC medical, but nonetheless, I'm going to bring this
14   back to the experience of incarceration by Mr. Clark and the
15   reason why these five years should be treated much more like 15
16   or 20 years.
17             THE COURT:  Five years being about 31 months in
18   Thailand and two years here.
19             Is that what it is?
20             MR. LIPTON:  Correct.  Yes.  Sorry, I got --
21             (Counsel conferred with defendant)
22             THE COURT:  Five years all together.
23             MR. LIPTON:  No.  Seven and a half all together.  Five
24   years here and two years in Thailand.
25             THE COURT:  That's correct.  2018 is when he came
```

N7BZZCLAS-dh

1    here, I believe.  Okay.

2              Yes.  31 months in Thailand, five years here.

3              MR. LIPTON:  Yes.

4              And you know, I'm not going to -- I'm suggesting math.

5    I know it's not exact math, but my point is, those years that

6    he's already done are enough.  They are sufficient but not

7    greater than necessary for the purposes of punishment.  They

8    represent appropriate deterrence and appropriate retribution

9    for the offense conduct here, particularly given Mr. Clark's

10   acceptance of responsibility, understanding of what it is that

11   he did wrong, and remorse that he has expressed and will

12   express when he's able to address the Court.

13             THE COURT:  All right.  Thank you, sir.

14             I appreciate those remarks, very clear and direct.

15             Government, why don't you tell me what you want me to

16   know and we'll hear from Mr. Clark if he wishes to address the

17   Court.

18             MR. NEFF:  Yes, your Honor.

19             May I have one moment, please?

20             THE COURT:  Yes.

21             (Counsel conferred)

22             MR. NEFF:  Thank you for your patience, Judge.

23             That's the signed forfeiture order that we had

24   previously emailed to chambers.

25             THE COURT:  What was emailed to chambers was an

1    unsigned version.

2            MR. NEFF:  Exactly.

3            Does your Honor want me to address the guideline

4    calculation issue first before getting to the --

5            THE COURT:  Let's do that now.

6            MR. NEFF:  I'm mindful that we attempted to address

7    this in an earlier sentencing letter to Judge Pauley from 2020.

8            In short, your Honor, with respect to the guideline

9    issue, the issue involves the interplay of three guidelines

10   provisions.  And the application note that your Honor was

11   referencing explains that there is one circumstance under which

12   the obstruction enhancement should not be applied, and that one

13   circumstance is if the defendant receives an enhancement under

14   2D1.1(b)(16)(D).  However, in this case, as stipulated in the

15   plea agreement, that enhancement is stipulated under two

16   separate provisions.

17           THE COURT:  (D) and (E).

18           MR. NEFF:  That's exactly right.

19           And therefore, the application note does not apply and

20   the correct calculation includes the obstruction enhancement.

21           THE COURT:  Let me look at that.  Just a moment.

22           All right.

23           Application note 7 says, in part: If the defendant

24   receives an enhancement under 2D1.1(b)(16)(D), do not apply

25   this adjustment.

N7BZZCLAS-dh

1          I'm sorry.  I'm looking at what I think is

2     2B1.1(b)(16) and on my version, which is guidelines manual

3     2021, it says: If the offense involved (A) the conscious or

4     reckless risk of death or serious bodily injury; or (B)

5     possession of a dangerous weapon (including a firearm in

6     connection with the offense) increase by two levels.

7          MR. NEFF:  I believe your Honor may be in 2B instead

8     of 2D.

9          THE COURT:  Are we talking about paragraph 114 of the

10    presentence report, specific offense characteristics under

11    2D1.1(b)(2)?  Is that what you're referring to?

12         MR. NEFF:  No, your Honor.

13         I'm referring -- In terms of the guideline provision,

14    it's 2D1.1(b).

15         THE COURT:  But hold on, because now I'm going to go

16    back to the plea agreement which had the two points in it.

17         Are you arguing that the plea agreement is correct and

18    not the calculation by the probation department?

19         MR. NEFF:  Exactly.

20         THE COURT:  Let me go to the plea agreement which is,

21    as you pointed out, paragraph 9 of the presentence report.  And

22    I take it we're talking about 9A(9), correct?

23         MR. NEFF:  I can also hand up the plea agreement, the

24    original, if that is useful.

25         THE COURT:  I have mine.

N7BZZCLAS-dh

1        MR. NEFF:  I have it, your Honor, as paragraph 9 in

2   the PSR A(1)(7).  Sorry, A(7).

3        THE COURT:  A(7).  Okay.

4        Yes.  Now I'm with you.

5        Pursuant to the plea agreement which had that as the

6   two points, which would make it 45, the probation department

7   said because it was under 2D1.1(b)(16)(D) under application

8   note 7, we don't put the two points.

9        You're arguing that it's also under E, and therefore I

10  should keep the two points in the plea agreement.

11       MR. NEFF:  That's correct.

12       THE COURT:  But you're also agreeing that at the end,

13  it doesn't make any difference whatsoever, correct?

14       MR. NEFF:  Certainly, mathematically, at the end of

15  the day it does not make any difference.

16       THE COURT:  Because the guideline range, as Mr. Lipton

17  pointed out, is capped out at the statutory maximum, regardless

18  of whether it's 43 or 45.

19       Am I right so far?

20       MR. NEFF:  Yes, but in the interest of accurate

21  calculation --

22       THE COURT:  I understand that that's what we're doing,

23  but I just wanted to see what was at issue.  We're on the same

24  wavelength.

25       MR. NEFF:  Yes, your Honor.

N7BZZCLAS-dh

1          THE COURT:  And you are correct.  I should be in

2     2D1.1.

3          Talk about inside baseball.  2D1.1.

4          2D1.1(b)(16)(E).  2D1.1: unlawful manufacturing

5     importing, exporting or trafficking, including possession or

6     intent to commit these offenses; attempt or conspiracy, B.

7          (16): if the defendant receives an adjustment under

8     3B1.1, aggravating role -- which he is doing -- correct?

9          MR. NEFF:  Correct.

10         THE COURT:  And the offense involved one or more of

11    the following factors (D) and (E).

12         (D) is: The defendant engaged in witness intimidation,

13    tampered with or destroyed evidence, or otherwise obstructed

14    justice in connection with the investigation or prosecution of

15    the offense.  And we know because of application note 7, 3C1.1,

16    he doesn't get the two levels under that.

17         MR. NEFF:  That's correct.

18         THE COURT:  All right.

19         But it's also one or more of the following factors:

20         (E), the defendant committed the offense as part of a

21    pattern of criminal conduct engaged in as a livelihood

22    increased by two levels.

23         What is your argument that he engaged in this offense

24    as part of a pattern of criminal conduct engaged as a

25    livelihood?

N7BZZCLAS-dh

1          MR. NEFF:  Sure, your Honor.

2          The application notes in 2D1.1, in turn, point to the

3    commentary set forth in 4B1.3 entitled "Criminal Livelihood."

4    That's at page 400 of the 2021 manual.

5          THE COURT:  Yes, sir.

6          MR. NEFF:  And application note 1 notes a pattern of

7    criminal conduct means planned criminal acts --

8          THE COURT:  Wait.  Wait.  Wait.

9          Occurring over a substantial period of time, such acts

10   may involve a single course or independent offenses.

11         And that's what you're relying on.

12         MR. NEFF:  Correct.

13         Your Honor, we're relying on both application notes

14   and the particular -- As the Court is aware, this was a

15   sustained offense, nearly two years, during which the defendant

16   partnered with Ross Ulbricht to operate Silk Road.

17         In addition to being sustained, it was carefully

18   planned.  It was lengthy.  It was highly organized.  This was

19   clearly their focus.  They were chatting for countless hours

20   about every aspect of this site, and it was the two of them.

21   That was the Silk Road brain trust operating this massive dark

22   web marketplace that facilitated 1.5 million transactions, $183

23   million of illegal narcotics and during that time --

24         For instance, the second application note talks about

25   criminal conduct being the defendant's primary occupation

N7BZZCLAS-dh

1        during a twelve-month period.  Certainly, that is satisfied

2        here.  And furthermore, there is reference to amounts received

3        as well in that application note.  We've uncovered evidence as

4        reflected in at least part of the forfeiture order that Ross

5        Ulbricht paid the defendant in a number of different

6        transactions significant amounts, and those ultimately result

7        in our forfeiture order which exceeds 1.6 million.

8                    THE COURT:  All right.  Thank you.

9                    So you're relying on application 1 and 2 that it is a

10        pattern of criminal conduct because it's a planned criminal act

11        occurring over a substantial period of time, and it's also a

12        pattern of criminal conduct engaged in as a livelihood.  That's

13        application note 2 of 4B1.3, insofar as it derived income from

14        the pattern of criminal conduct in any twelve-month period, and

15        exceeded two thousand times the existing hourly minimum wage

16        under federal law, although I don't know what the hourly

17        minimum wage was during the period of this crime.

18                    But you're saying what was the income derived from the

19        amount of the income?  I know you don't have his precise

20        figure, but what do you say it is?

21                    MR. NEFF:  Well, the forfeiture order, your Honor, is

22        for more than $1.6 million.

23                    The defendant asserted that he took an ownership

24        interest in Silk Road.  Silk Road, as the Court is aware,

25        ultimately facilitated $183 million worth of illegal narcotics

N7BZZCLAS-dh

| | |
|---|---|
| 1 | transactions, and there are a number of Bitcoin transactions in |
| 2 | which Ross Ulbricht is sending Bitcoin to Roger Clark.  Several |
| 3 | of these are tens of thousands of dollars. |
| 4 | THE COURT:  Okay.  I understand. |
| 5 | The totality of circumstances shows that that criminal |
| 6 | conduct was the defendant's primary occupation under that |
| 7 | twelve-month period. |
| 8 | All right.  I understand the position of the |
| 9 | government. |
| 10 | Mr. Lipton, there's a lot to be said for Mr. Neff's |
| 11 | focus on (E).  I was really only focusing on (D). |
| 12 | MR. LIPTON:  Right. |
| 13 | Well, first I will say I'm constrained in arguing |
| 14 | against this enhancement because of the plea agreement, and I |
| 15 | don't wish to violate that statement. |
| 16 | My understanding was that this enhancement was based |
| 17 | on statements made to the court in Thailand.  That's how it's |
| 18 | been expressed to me in the past, but I will address some of |
| 19 | what was just said by the prosecutor.  And again, this is not |
| 20 | meant to argue against the enhancement or to breach the terms |
| 21 | of the agreement, but to respond some of the facts that were |
| 22 | just said. |
| 23 | THE COURT:  Go ahead. |
| 24 | MR. LIPTON:  1.6 million is the amount in the |
| 25 | forfeiture agreement.  I do think that it's important to |

N7BZZCLAS-dh

1    understand that there's not evidence that Mr. Clark kept these

2    proceeds for himself.  There is evidence that many of them were

3    reinvested in different parts of this, of Silk Road.

4            Mr. Clark did not lead a large life.  He was living a

5    simple life in Thailand at this time, and that's what I have to

6    say.

7            THE COURT:  Thank you.

8            I'm going to agree with the government's analysis that

9    it's also under (E) as well as (D), and therefore I am finding

10   that the guideline calculation is as set forth in the plea

11   agreement, not the probation department's calculation, which

12   would lead to a -- No, I'm sorry.

13           Yes.  That's correct.

14           I find a total offense level of 45.  Let me just set

15   it for the record so that it's clear.

16           I'm adopting the guideline calculation as set forth in

17   the plea agreement, which essentially is as follows:

18           Face offense level of 36 under sentencing guideline

19   2D1.1(a)(5) and (c)(2);

20           Two levels added under 2D1.1(b)(2) because the

21   defendant used violence, made a credible threat to use

22   violence, or directed use of violence;

23           Two levels added under 2D1.1(b)(7) because the

24   defendant or persons for whose conduct the defendant was

25   accountable distributed a controlled substance through mass

1    marketing by means of an interactive computer service;

2           Plus two levels under 2D1.1(b)(16)(E) because he

3    received an adjustment under the 3B1.1(a), aggravating role,

4    that he engaged in witness intimidation, tampered with or

5    destroyed evidence or otherwise obstructed justice.

6           MR. NEFF:  It may be appropriate.  It may be

7    documentary judgment.  Given the Court's delineating that that

8    enhancement applies under (E), it may be appropriate to

9    reference the specific language of (E) in that part of the

10   colloquy.

11          THE COURT:  All right.  Just a moment.

12          That is, I find he committed the offense as part of a

13   pattern of criminal conduct engaged in as a livelihood.

14          In addition, there are four levels for 3B1.1(a)

15   because he was a leader or organizer in a criminal activity

16   involving five or more participants.

17          And I'm adding two levels under 3C1.1 because the

18   defendant willfully obstructed or impeded or attempted to

19   obstruct or impede the administration of justice.  That is, he

20   lied under oath during his extradition proceeding in Thailand.

21          That leads to 48 points, and there are three points

22   for acceptance of responsibility under 3E1.1(a) and 3E1.1(b).

23   Therefore, the total offense level is 45.  The criminal history

24   category is I.  The guideline range is capped at 240 months,

25   pursuant to 5G1.1(a).  To simplify it, I'm adopting the

N7BZZCLAS-dh

1    calculation as set forth in the plea agreement, but I'm

2    excluding subdivision (D) and only using subdivision (E) of

3    2D1.1(b)(16)(E).

4           That's my guideline calculation.  It all remains the

5    same, and if I'm wrong on that and it's 43, not 45, my sentence

6    will be the same.

7           Anything else you wish to tell me, sir?

8           MR. NEFF:  Yes, your Honor.

9           THE COURT:  Go ahead.

10          MR. NEFF:  The government respectfully submits that

11   the Court should impose the stipulated guidelines sentence of

12   20 years imprisonment.  The defendant's crime was exceptionally

13   serious by any measure.  In evaluating the 3553(a) factors, we

14   often look to a series of considerations to help flesh out

15   those factors and guide the analysis.

16          What makes this sentencing extremely unusual is that

17   practically every sentencing consideration is aggravating: the

18   nature of his crime; the seriousness of his crime; the duration

19   of his crime; the sophistication of his crime; the harmfulness

20   of his crime; the profitability of his crime; the

21   carefully-planned nature of the crime; the unprecedentedness of

22   his crime; the ongoing harms to society from those who have

23   sought to copy this crime; defendant's role in his crime; his

24   mentality, his eagerness to commit this crime; his scorn for

25   law enforcement; his use of violence; his use of threats to

N7BZZCLAS-dh

1    prolong his crime; his efforts to continue this crime after

2    Ross Ulbricht was arrested, a very public arrest; and finally,

3    as the Court has noted, the defendant's obstruction of justice

4    after he was arrested to try to continue to evade

5    responsibility.

6         Every one of these considerations -- more than a dozen

7    in all -- cuts in the same direction here, and they strongly

8    militate in favor of a 20 year sentence.

9         It's worth noting the quantity of narcotics alone.

10   $183 million dollars in illegal drugs including more than

11   50,000 sales of heroin.  That quantity would merit an extremely

12   serious sentence.  But the narcotics -- as serious, harmful,

13   and devastating as they are -- are only one part of this

14   sentencing equation.

15        A just sentence here also accounts for various other

16   considerations, including the other types of illegal activity

17   on Silk Road, including the defendant's leadership role in Silk

18   Road, including the defendant's obstruction of justice,

19   including the defendant's eagerness to commit crime, and of

20   course, including the defendant's use of violence.

21        And it's the defendant's violence that I want to turn

22   to next.  Because perhaps nowhere else is Clark's influence on

23   Ulbricht more clearly demonstrated as in Clark's demonstration

24   of an attempted murder for hire.

25        As the Court is aware, when Ross Ulbricht first

N7BZZCLAS-dh

1    learned about a suspected Bitcoin theft, Ulbricht wanted to get

2    his money back.  He had money, not murder, in mind.  Then he

3    spoke to Clark, and Roger Clark's position was clear.  Clark

4    advocated for murder.  Clark showed absolutely no regard for

5    human life.

6          For Clark, the question of whether to end another

7    human being's life was simple and stress-free.  For Clark, the

8    calculus was clear, the decision obvious, the topic not worthy

9    of much discussion.  Another person, another criminal, even

10   another murderer might have at least felt the weight of what

11   they were discussing.  Not this defendant.

12         That tells the Court everything it needs to know about

13   Roger Clark, about his character, about his conscience, about

14   his proclivity towards violence, about his complete disregard

15   for human life, about his danger to the community, about his

16   ability to radicalize others and persuade them.

17         Attempting to commit murder is beyond egregious, but

18   doing so nonchalantly, that reveals an astonishing callousness

19   and heartlessness.

20         THE COURT:  I think, if I'm not mistaken, that Mr.

21   Clark's position is: Those words were not his.  They were put

22   there by Mr. Ulbricht's on his computer.  I think that's what

23   he said.

24         What's your response to that?

25         MR. NEFF:  Your Honor, that's from the -- a couple of

N7BZZCLAS-dh

1    things.

2              First of all, that's -- Clark's position, if that was

3    his position, is nonsense.  But second of all, that's from the

4    defense submission that was withdrawn.

5              THE COURT:  I see.

6              MR. NEFF:  When they put in their revised submission,

7    they eliminated that argument because it was clearly in breach

8    of the parties' plea agreement.  I would also note that it

9    would make no sense for Ross Ulbricht to plant chats on his own

10   computer that implicate himself just so that he could also

11   implicate someone else.

12             THE COURT:  Thank you.

13             MR. NEFF:  The story of the attempted murder for hire

14   makes clear that this is someone who has the mentality of a

15   cold-blooded killer, who is willing, seemingly, to stop at

16   nothing to achieve his goals.

17             And for those reasons and those in our submissions, we

18   respectfully submit that the Court should impose a 20-year

19   sentence in this case.

20             THE COURT:  Thank you, sir.

21             I appreciate that.

22             Mr. Clark, you have the right to address the Court,

23   sir.  You don't have to, but you certainly have the right to do

24   so.  I shall inform you that anything you say may be used

25   against you, but if you wish to address the Court, I'm here.

N7BZZCLAS-dh

1          THE DEFENDANT:  Thank you, your Honor.

2          This might take a while.  I'm not sure where to start,

3    your Honor.

4          (Inaudible)

5          THE DEFENDANT:  I lost my four front teeth recently.

6    I apologize.

7          I'm difficult.  There's no doubt about that. As he

8    said --

9          THE COURT:  Mr. Clark, what you're pointing to is

10   counsel?

11         THE DEFENDANT:  I'm sorry.  Yes.  As my counsel said,

12   I can be difficult, and he's correct.

13         There's a lot that's gone on, unfortunately, since

14   October 18 a year and a half ago when I fell.  Two and a half

15   almost three years, I was --

16         THE COURT:  I think it was October 21.

17         THE DEFENDANT:  October 18 I fell.  October 19 is when

18   I got to the hospital.  October 21 is when I saw him first.

19   It's all burned heavily in my mind, your Honor.

20         THE COURT:  Of 2021.

21         THE DEFENDANT:  Of 2021.  Okay.

22         In 2020, December of 2020, I was getting ready to go

23   to court to see Judge Pauley -- who was the first judge I had

24   -- to be sentenced.

25         THE COURT:  Slow down.

N7BZZCLAS-dh

1           THE DEFENDANT:  I'm sorry.

2           To see Judge Pauley, and they swabbed me and said: You

3      got COVID, and that's been the start of what's been a two and a

4      half year nightmare.

5           In the middle of the summer, Judge Pauley, we were

6      ready to go back to sentencing again.  And Judge Pauley passed

7      away, and I was assigned to Judge Alison Nathan.  And then a

8      week and a half before I fell, I was slated to appear before

9      Judge Alison Nathan, and I was ready to be sentenced at that

10     point in time too.  And then I fell, and that's when things

11     really, really went to hell in a handbasket in a bad way.

12          And we're going to do this in open court.  We're not

13     going to try and seal the court, so everybody take a good look.

14     This is the first and last time you see me before I get killed.

15          A week before October 11, MDC was shut down for one of

16     their annual -- we found these guns, response to a gun threat,

17     and the complete building was shut down.  And they started

18     searching unit by unit, floor by floor.

19          MR. LIPTON:  For the court reporter, slow down.

20          THE DEFENDANT:  I'm sorry.

21          Floors four, five, six, seven and eight have housing

22     units on them and there's housing units on each floor.

23          On Monday morning, there was a lock-in.  The whole

24     building was locked down.  From my window, we can see fifteen

25     white vehicles with guys pulling out a bunch of plastic bags

N7BZZCLAS-dh

1    and green suits coming in, so everybody knows there's going to

2    be a major shakedown now.

3           What happens is, the first day, they're starting on

4    the fourth floor on the Monday of the search.  So it doesn't

5    really affect us except we're locked in, and nobody's allowed

6    out.  Nobody's allowed out.  Only the guards are going around

7    serving the meals, taking the garbage out of the cells, which

8    lasts a day because they've got, like -- serving the meals for

9    everyone downstairs and taking the garbage out of cells.

10          THE COURT:  You have to slow down, sir, because the

11   reporter -- who's been here since ten o'clock -- please, help

12   her.

13          Go ahead.

14          THE DEFENDANT:  On the second or third day --

15          (Off record)

16          THE DEFENDANT:  The orderlies came out and slipped

17   notes under the door.  Each note that came under my door has

18   27-T which is 27 toss, where they work and they go in at like

19   two, and they go in and the note came back and said: We're

20   coming back for this in about an hour, an hour and a half.  Do

21   not lose the note.  Okay.  So, major.

22          And the prison is ran by gangs.  Unit 71 is the most

23   ganged-up unit at the time at MDC.  We have Bloods in there.

24   We have Crips in there.  We have Latin Kings in there.  We have

25   MS-13.  We have Los Serranos.  We have 18th Street Gang.  All

N7BZZCLAS-dh

1    those gangs are in there.  They run that place.  Again, four

2    people -- myself and three others -- not associated.

3           That said, I have a reputation.  Everybody in that

4    building knows who I am.  So I get a note -- so maybe I'm a

5    part of the white communist party, even though I don't

6    associate with people -- but the note said: Major shakedown

7    coming.  To save your stuff, it's just like last time.  And it

8    has a price list.  And it says: phones, $250, plus $100 per

9    inch.  If you have a five-inch-screen phone, it's going to cost

10   $750 to not have it seized.

11          There's a list of all the drugs that are available,

12   and there's a long list of drugs available.  K2 is the number

13   one drug produced in prisons because it doesn't show up on piss

14   tests.  If you smoke weed and you urine test it three weeks

15   later, it shows up, but you can get wrecked on K2 or synthetic

16   cannabis or rocks.  Some of them use spice, but that's the big

17   drug.

18          One sheet of paper this thin of K2 wholesales for

19   $1,000.  One square the size of an ID or driver's license goes

20   for $150.  A little piece the size of a stamp goes for $25.

21   Those are all listed because it's 25 percent of the value of

22   the actual drug.

23          The long and short story is -- here's your

24   instructions.  We're going to get searched on Friday so take

25   all our stuff.  Put it underneath the pillow in the top bunk.

N7BZZCLAS-dh

1    There's a Cash App.  It's a Zelle number, a Cash App number.

2    Calculate what your cost is, and then send it to this account.

3    Send this amount to this.

4           Basically, how it boils down, you've got $8,000 worth

5    of drugs and phones in your room; $2,000 you can guarantee that

6    they won't be picked up on a search.

7           This information comes through there.  We all know

8    about it.  I wasn't there for the previous time it happened,

9    but it's not the first time it's happened.  I mean, a shakedown

10   at MDC, it's how they make their money there.

11          There's 15 COs, two lieutenants, and a captain.  And I

12   can guarantee you that they're involved in this, because I

13   watched them do it.  Okay.

14          So then what happens is: We get to Friday, and it's

15   our turn to get searched.  They search the bottom level first.

16   We're watching that, and then after lunch, they come get us.

17   What they do is strip us down to shorts and t-shirt.  You get

18   searched.  They back us up out of the room and then they take

19   everything out of the room.  They take our bedding out.  They

20   take our beds out.  They take everything out of the lockers.

21   They unbolt the lockers from the wall and they tilt them

22   forward, so there's zero left in the room.

23          The COs that are working in the room, they take it

24   all.  They put it in their plastic bags and they put it out in

25   the hallway.  The guys from the green team never go in the

N7BZZCLAS-dh

1    rooms and they never touch that stuff in the rooms.  They come.

2    They take that stuff out.  They take it downstairs and they

3    search it.  They run it through an x-ray machine, and they run

4    it through a metal detector.  They find dope and drugs.  They

5    find whatever is in there.

6          The most ganged-up unit on the place -- zero.  Nobody

7    caught anything.  There wasn't a piece of contraband that was

8    caught in the supersonic shakedown that they had worked on for

9    weeks.

10         And while they're shaking down our unit, there's a guy

11   standing beside me in the rec deck who has one of these one and

12   a half inch long folded knives who has been just talking to the

13   guys and they're -- no, they haven't got anything here.  We're

14   cool.  And we're supposed to get all that stuff back on the

15   Saturday and Sunday.

16         Keep in mind, this a Monday when it got called.  Well,

17   what happened -- just to give you little background that we

18   didn't figure out until later on Sunday night -- there's not

19   stupid people that are locked up.  Oh, there are lots of

20   criminals, but they're not stupid.

21         So they took the notes that were used by the COs for

22   under the doors to arrange for payments, and they wrote their

23   own notes instead.  Some of them said: Don't send this money to

24   this Cash App number.  Send it to this different Cash App

25   number.

N7BZZCLAS-dh

```
 1              So the COs start taking our stuff back on the other
 2     floors.  Before they get us, there were some gangs on the third
 3     floor, the fourth floor, and they go: Where's my stuff?  They
 4     go: Well, you didn't pay it.  They say: I sent $2,700, and they
 5     say, well, it didn't show up here.  He goes: Oh, my girlfriend
 6     sent it to this number here, and they say, that's not our
 7     number.
 8              And things start to go to hell in a handbasket really
 9     bad on the other floors.  You can feel the tension in the room.
10     And by Sunday, things are going really, really, really bad, and
11     I'm standing over down by the rec deck, and one of the COs
12     comes in there.  I don't know his name, but Monk sent him.  And
13     he's a CO.  And you can Google him.  He's in prison right now
14     for -- well, you know, doing stuff like we're talking about
15     right here.
16              So they've got these gangs in there going: Where's our
17     stuff?  They were supposed to get it back on Saturday.
18              THE COURT:  Slow down a bit.
19              THE DEFENDANT:  I'm sorry.
20              They were supposed to get it back on Saturday, Sunday
21     at the latest.
22              Never happened.
23              They go: Well, some people didn't pay, and there was
24     some confusion and whatnot.  And then things got really nasty.
25     They've got two COs cornered by their little staff room they've
```

N7BZZCLAS-dh

1    got in there, and they're threatening them that they're going

2    to rip their fucking heads off if they don't get their stuff.

3          They go: I'm sure you're going to get it back Monday.

4    I'm sure Monday.  If not tonight, by Monday.  Monday, nothing

5    happens, and the tension in our unit is palpable, okay?

6          These guys who are looking for it, we've been talking

7    all weekend about how much drugs they had because they talked

8    to us.  I'm really good at math and these guys were talking

9    about it.

10          $35,000 was paid off by people in our unit to save

11   approximately $140,000 in contraband and drugs.  And nobody had

12   any of our stuff back, and they were angry, very, very angry.

13          Monday, still nothing's back, and that's when I had --

14   Monday at five p.m., I fell from my bunk.  I had vertigo.  I

15   had been complaining about vertigo for months.  I said I need a

16   bottom bunk back.  They won't give me one.  They say: Oh, it

17   doesn't cause vertigo, so you're faking it.  That's the only I

18   got.

19          So I had a dizzy spell as I'm climbing up my bunk.

20   They took all of our sheets.  It's the middle of October, but

21   we're not getting them back for ten days because everybody's

22   locked down.  As I'm climbing back and I have a dizzy spell, I

23   just can't get a hold of anything and I fall.

24          And then I smashed my pelvis, and I hit my head, and I

25   crushed by testicles, and I'm broken literally in half.  The

1    left half of my body is not connected to the right half of my

2    body.  My hand is stuck between my legs and I can't move.  My

3    testicles are crushed between my legs, and I can't do anything

4    about it for 19 hours while I lie on the floor.  And then my

5    cellmate comes in and he finds me, and so he goes downstairs

6    and he tells the guys working: This guy needs some help.

7              THE COURT:  You really have to slow down, sir.

8              MR. LIPTON:  Reminding you to slow down.

9              THE DEFENDANT:  My sister wrote you a letter and talks

10   about my father dying in a nursing home.  And she died because

11   she was on a respirator and she had ALS.  And because they were

12   busy and -- he needs to have his throat cleared to clear the

13   thing -- one of the nurses went behind him and touched his

14   stuff so his wheelchair wouldn't move.  He has ALS.  He can't

15   move at all.  He can't even move his hand enough to move the

16   wheelchair, and he died choking to death in a room in a nursing

17   home with medical care 15 feet away.

18             And so I'm thinking about this while I'm lying on the

19   floor with health care a radio call away.

20             And they're doing nothing.

21             At nine o'clock the guy comes and says: I'm sorry.

22   There's nobody here yet, but I'll let the next guy know --

23   medical knows -- and locks the door and locks me in my cell.

24             At ten o'clock is the nationally mandated stand up

25   wellness count.  Three COs are supposed to come around to the

N7BZZCLAS-dh

1    cell with one guy that's working there and does the first count

2    and the other two on the floor.  One follows them, and one sits

3    in the middle of the room and makes sure they do the count.

4          There's 16 cabins on that unit, so you can follow them

5    doing the count if they don't lose that.

6          What happens is, so I'm lying on the floor.  Ten

7    o'clock, there's no ten o'clock wellness count.  It's

8    nationally mandated.  They're supposed to have every single

9    person stand up, lights on, and make sure they're okay, and

10   make sure nobody got beat up or hurt.  Especially a ganged-up

11   unit like ours.  I've never seen them miss a ten o'clock

12   mandated count, but it didn't happen.

13         They didn't have a midnight count and there is no

14   counts all night long.  Some time around one in the morning, CO

15   Morris walks around, and my cellmate sees him and says my

16   cellmate's dying here.  And he says: Is he breathing?  Fuck

17   him.  Wait until the morning.  I won't call medical or

18   anything.

19         But there's action all over the room.  You can hear

20   the doors opening and closing and people talking, and then,

21   under no circumstances is the door supposed to be opened after

22   lock-in without a lieutenant present.

23         But they're bringing all the stuff back, and these

24   guys are finally getting their stuff.  They're getting their

25   drugs back.  They're getting their phones back.  They're

1    getting all of their contraband back while I lie thinking I'm

2    dying on the floor all night long.

3          Then the morning guy comes.  His name is Beckford, and

4    Beckford is one of the good guys.  He comes up.  What the fuck?

5    What am I doing on the floor?  He has no idea.  Night guy

6    hasn't said anything.  He's too busy returning $30,000 worth of

7    stuff that they got off the people.

8          No.  You know what?  I'm not going to talk about that

9    anymore.

10          Now, let's take me to the point when I get to the

11   hospital.  For the next eleven days, I'm trying to talk to my

12   lawyer to tell her what happened as far as the crime that went

13   on there, so we can subpoena both 16 video tapes for the Monday

14   and Tuesday.  I'm not allowed to talk to my lawyer.

15          I want to talk to my wife because I'm told when I got

16   there, another hour, I would be dead.  I was also told I'm not

17   out of the woods yet.  There's a lot wrong with me, and I'm

18   going to be there for a while.

19          The PSR had some errors in there about when they

20   operated.  It was days later before I was operated on because

21   they said, frankly, we have to save your life first.

22          Then a couple days later they came to me and said --

23          THE COURT:  Slow down.

24          THE DEFENDANT:  If we don't operate in the next twelve

25   hours, you're going to die.  You have blood clots and you have

N7BZZCLAS-dh

1    other things going on, and we're going to have to go in and fix

2    them first.  They also said: If you do get the operation,

3    there's still a 25 percent chance you're going to die.  There's

4    a lot wrong with you.

5          And as I've been told several times before, if you

6    want to make peace with your God, now is the time, and also,

7    you might want to talk to your family and friends.  I've been

8    asking every four hours: can I speak to my wife?  Can I speak

9    to my lawyer?  I want to speak to the Canadian embassy.  I have

10   a right to speak to the Canadian embassy.  There's no way to

11   hold me incommunicado.  But they wouldn't.

12         I see the minister, the minister at NYU Langone.  He's

13   standing right outside the door saying: This man wants to speak

14   to me and they are saying you can't.  They're not letting me --

15   on my death bed -- speak to a minister.

16         They wouldn't allow me a pen to write a letter to my

17   wife in case I die.  They wouldn't allow me to write a last

18   will and testament or anything.  For thousands of years, in any

19   civilization up to the point of death, a man has the right to

20   change his will.  Nothing.

21         I was held incommunicado with my wife hung in the

22   balance for 11 days.  And I know why too, because I'm

23   surrounded by U.S. Marshals.  Outside, there was a whole bunch

24   of people from the BOP, guards from MDC all really curious,

25   making sure I'm okay.  And I hear conversations out there.  I'm

N7BZZCLAS-dh

1    not out of it the whole time I'm in there.  They might think

2    I'm sitting there sleeping, but I'm listening.

3            And you know why I couldn't talk to anybody?  Because

4    they were worried if I die, somebody was going to go down for

5    felony murder.  So they wouldn't let me talk to anybody.

6    Eleven days before, finally, my embassy got a hold of me.

7            For the next eight months, I was unable to communicate

8    with my lawyers because the people from the BOP told the people

9    from the USI, a private company, that they wanted to hear

10   everything I said.  I was told that you cannot speak to your

11   lawyer privately, because if you say anything interesting, I

12   have to take that upstairs.

13           So for months I'm in there, and I'm trying to get the

14   information about what happened at MDC.  I've got a guy named

15   Bill sitting beside me, 22 years worked at the MDC.  And I've

16   got my paralegal sitting here.  How am I supposed to tell her

17   about the things that went on at the MDC if I have a guy that's

18   been there for 22 years sitting beside my bedside?  I had to

19   whisper a little bit just for her or, I have to find another

20   way to convey what happened down there and subpoena the case.

21           And for months, MDC puts this off.  Oh, we're still

22   working for them.  Oh, we have them now, but we haven't got the

23   DVDs to burn them.  But the guy that does the DVDs, he's not

24   here today.  They're in his locker.

25           And then finally I talk to Stephanie, and she says:

1    I'll get an order to compel.  And so she goes to get an order

2    to compel from Judge Alison Nathan, and they said: Oh, they

3    don't exist.  No record of those two days.  They just don't

4    exist.

5            And so, for the nine months that I was in there and

6    I'm trying to deal with that and I'm trying to write this stuff

7    out at MDC, here is the thing: I can't write that out with my

8    cellmate because he sees that stuff.  I got caught once last

9    year in October.  They had a sexual offender.  They stuck him

10   with me for ten days, and he rifled through my stuff.  And he

11   read some of what it was like: well, that's kind of cool how

12   you guys technically pulled that off.  And then they came into

13   my cell and said: You're not seriously writing that shit down.

14   We'll kill you.  I said: No. No.  It's just for my lawyer.  So

15   they took my legal work, and they took it away.  Just like

16   that.

17           Now, I've lost my legal work three other times.  And

18   incidentally, when I went to the hospital and realized I was

19   going to be there for a while -- I had a voluminous amount of

20   work that I had done so far because of the conditions of

21   confinement and stuff, the reason I researched all the time and

22   like -- look at that.  They just lost it.

23           And then the months, months, and months that I was in

24   there, probably 30,000 pages of research I had.  Sir, I had

25   books.  You probably have a library, but I had a small one.  I

N7BZZCLAS-dh

1    had Black's Law.  I've got the Georgetown Law Review.  The

2    annual Second Circuit letter -- two, three-thousand page books

3    that cost hundreds of dollars.  I had stacks of those, and they

4    took all those from me and made some "the dog ate my homework"

5    excuse from when I transferred to the nursing home.

6         The man -- when I transferred to the nursing home --

7    that took that stuff away that the prosecuting effort was for,

8    they didn't think I would replace all that stuff -- which I

9    did, eventually.  I found the books.  Replacing those documents

10   never happened.

11        I was post haste and I tried to get the stuff back to

12   them, and I couldn't.

13        THE COURT:  The defendant is referencing counsel.

14        THE DEFENDANT:  So, the chilling effect of trying to

15   get this stuff down -- I mean, I'm just touching the surface of

16   the corruption that caused the problems for me to be there.

17        And when this gets out today, there's no safe of place

18   for me.  I'm not scared of the gangs.  I'm scared of the BOP.

19        THE COURT:  Sir, have you told the government this?

20        THE DEFENDANT:  I told SIS and MDC and they did dick,

21   so --

22        THE COURT:  What is SIS, sir?

23        THE DEFENDANT:  That's their special investigative

24   services.

25        And there's more.

N7BZZCLAS-dh

1          THE COURT:  I would suggest you inform the prosecutors

2     here through Mr. Lipton of the specifics of what you're saying.

3     Because it would be for the executive branch to pursue these

4     complaints which, if true -- and I have no reason to believe

5     one way or the other --

6          THE DEFENDANT:  What happened is: 80 percent of the

7     current staff there are corrupt.  They just have to go down

8     there and find it.  They don't need this case for that.

9          THE COURT:  But in this case, if you inform the

10     prosecutors of what you're telling me now, they will be able to

11     pursue it, and I'm informing you that they will indeed pursue

12     it if you tell them what you're telling me now.

13          I understand that what you're telling me is that your

14     conditions of confinement were more than difficult.

15          THE DEFENDANT:  I'm not half done.  There's more, sir.

16     If could do that really quickly, and then I would like to get

17     on with actually why I should be here.  I'm saving acceptance

18     of responsibility for last because after that, I won't be able

19     to talk, but I do want to talk about that.

20          THE COURT:  I would like you to proceed, and the

21     wrongdoing that you're telling me is best told directly to the

22     government by your lawyer or directly by yourself.

23          THE DEFENDANT:  You're the person I want to know about

24     it.  That's why I was trying to write this down, so you could

25     understand what's going on.

1           And this is the last thing I want to talk about.  I

2     went to the SHU in December.  Okay.  I went to the SHU for all

3     the right reasons.

4           There was a -- Ms. B was her name.  She was the worst

5     or best, depending on the attitude of the COs that were out

6     there.  She would go around and she'd sniff up drugs, phones,

7     like nobody's business.  She'd been there for two months and

8     everybody was just freaking out, because when she walked in the

9     unit, business stopped for twelve hours a day when she was

10    there.

11          And then they got a rumor going on that she was going

12    to be there for another three months.  Long story short, a guy

13    that I know is a killer and another guy I know is a killer and

14    other people -- I gave the names to SIS -- were going to throw

15    her down the stairs to get her off the unit.

16          So because I had no easy way of letting SIS know about

17    it, I checked in.  And after I checked in, it was the worst

18    decision of my life, because not only are SIS incompetent, but

19    I'm here on a moldy mattress and my body started to get covered

20    in rash again.

21          I sent pictures of this, of the rash I had, for two

22    months that I could get nothing for.  I sent begging letters.

23    I have got copies of copouts where I said -- one page said:

24    Listen, my legs are bleeding and everything else.  They said:

25    Are you being assessed for this?  They wouldn't do anything.

N7BZZCLAS-dh

1          Hydrocortisone creams: buck fifty.  You could buy them

2     at Walmart.  My cost: $150 a tube.  My sister and Mrs. Carvlin,

3     my lawyer, has the receipts for money she sent to pay people

4     off to get me that.  $1800 for twelve tubes of cortisone cream.

5     $3,000 for 18 tubes of cortisone cream.  1800 more dollars for

6     tubes of cortisone cream.  My sister, who can't afford it,

7     spent almost $10,000 Canadian getting me $60 worth of cortisone

8     cream for four months -- for January, February, March and April

9     -- without which I could not function.  Because the pictures I

10    have show I'm covered there in a rash.  I'm absolutely bleeding

11    to death.  I can't sleep.  I can't function.  And they still

12    did nothing.

13          That's the place I've been at.  That's the conditions

14    of confinement.

15          THE COURT:  I understand that, sir.

16          THE DEFENDANT:  Okay.

17          THE COURT:  But what's the next area you want to

18    address?

19          THE DEFENDANT:  We'll, really quickly, I'll address

20    the money I made.

21          Ross sent me money when I sent him expenses,

22    basically.  My Lamborghini is a $700 Vespa-style scooter that

23    it entitled.  The most that I spent was $235 a month for a

24    one-bedroom house in Thailand.  My wife lives out there now in

25    a $65-a-month house.  I never spent a lot of money.  I wasn't

1   doing it for the money.

2         I did it for the political reasons, I guess.  I did it

3   for -- it's possible to be ashamed of something and proud at

4   the same time.  I thought I did it for the right reasons at the

5   time, and I'll get to that.

6         I did spend almost a million dollars on a special

7   project, and that was one of ones that came up a lot. You got a

8   letter from somebody, Ireland, that says I went to Ireland to

9   see a friend of mine, Brian.

10         Brian's about five years older than me.  He was born

11   in Ireland.  He was raised in a Catholic orphanage where he was

12   sexually abused and ran away at about the age of ten.

13   Technically, at about 14 or so, he went to Dublin and flew to

14   London and never went back to Ireland after that.  He finally

15   works as a carpenter and that was his job for the rest of his

16   life.  And this would be 2013, mid-2013.

17         When we were in Dublin, Brian asked me: What can you

18   do about all these child predators out there?  And I said:

19   Well, I don't know, but I'll see what I can do.

20         Thaddeus Grugq, he's known as the Grugq and well known

21   to the FBI and CIA.  He sells exploits for computer hacking

22   tools.  Also a company called NSO, it's an Israeli company.

23   They came up with a project called Pegasus that the New York

24   Times did a piece on.  Jamal Khashoggi is dead because of the

25   software they sold him.  And Thaddeus Grugq set me up with

N7BZZCLAS-dh

1    those.

2            I purchased it from Thaddeus Grugq for $175,000.  It

3    was a site browser exploit.  It doesn't reveal the actual IP

4    address of somebody that's using the Tor browser.  For $450,000

5    from NSO, I purchased a VM, a virtual machine exploit.  It

6    would break out of a virtual machine.  So it would hold a Tor

7    browser inside a virtual machine and the virtual machine will

8    give its home address as 1.7001.  If you break out of the

9    virtual machine -- If you break out of the Tor browser and the

10   virtual machine, you can locate that person.

11           And so I took that all and I packed all that up, and I

12   gave it to my friend Brian and he took it to the United Kingdom

13   where his girlfriend worked with Robert Tilder who used it to

14   see if they could use it to find people using Tor and the dark

15   web which I was on, and I was kind of playing and sharing

16   through the dark web share.

17           THE COURT:  As I understand it, sir, you were

18   assisting the dark web in anonymizing users of Silk Road.

19           Is that correct?

20           THE DEFENDANT:  The dark web is the name of the hidden

21   services which was produced by the people who made the Tor

22   browser.  It made hidden services for websites that you

23   couldn't trace possible.  We call that the dark web in general.

24           Silk Road was the first major site on the dark web.  I

25   was involved with the Tor project.  I have very technical

N7BZZCLAS-dh

1    knowledge and things like that.  I got involved with the Tor

2    project because in China -- if you remember the Falun Gong

3    religion -- if you go to a Falun Gong website, you could go to

4    prison for 20 years.  Tor hides that so the Chinese government

5    doesn't know that you're going on the Falun Gong website.

6            THE COURT:  It also hides the purchase and sale of

7    illegal drugs and hidden information?

8            THE DEFENDANT:  No.

9            Just take a step back.  No.  That was Tor browser and

10   all that.  Years later, hidden services came along.  It

11   backpacks.  It goes in the back of the Tor browser.  It's

12   actually two separate things, just with the same name.  But

13   yes, they use the same technology, so that was the technology

14   that we used.

15           And now, I was trying to find a way to break that

16   technology.  We told our users not to use JavaScript so the

17   exploit that I had -- which was a JavaScript exploit -- would

18   not work on something going to a drug site, but I assume the

19   people going to child porn sites might not have the same type

20   or level of knowledge.

21           So to make a long story longer, the UK government

22   wouldn't use it.  They said to do it would be illegal, so the

23   decision was made to give it to the National Center for Missing

24   and Exploited Children, and somebody had contacts over there.

25           All of that through.  Eventually, it ends up in the

N7BZZCLAS-dh

1    hands of the -- well, I believe, the FBI in Virginia where they

2    found a site called Playpen and ran a site called Playpen for

3    13 days and used software identical in nature and description

4    to the software that I supplied.  And it comes to thousands of

5    people using it and over one hundred cases I've gone through,

6    and all that was called NIT warrant for the youth, and because

7    basically it said they got a warrant saying: We're going to

8    search in Virginia for whoever is using this, but actually it

9    didn't.  It sent information back to computers everywhere in

10   the world.

11           The warrant was called unconstitutional, but it was

12   allowed.  And one thing led to another, and they stood.  And

13   I'm proud of that.  So there's 100-some cases in all eleven

14   circuits. People went to prison for child pornography that are

15   in prison because I spent $675,000 and a year writing the

16   software to catch those people.

17           So, I'm not a perfect man.  I'm flawed, deeply flawed,

18   but I do try my best.

19           And I have extensive ethics, and that's some of the

20   reasons for some of the stuff that I wanted to get to.  I'm not

21   going to be popular when people find out: You did what, and

22   cooperated with who, and sent it to where?

23           And I still have copies of that software. I can prove

24   that it's my software.  The government's never released that

25   software anywhere else.  They've been asked to and they said

N7BZZCLAS-dh

1   no, they're not going to do it.  And, of course, they said they

2   don't have to.  There's other exploits out there that I have

3   hacked with, and I haven't seen them use it particularly, but

4   there's one.  Of course there's Tor Chat, and I have no doubt

5   that somewhere --

6           This is a very difficult decision for me, because if

7   you continue to find those people, they'll have to find some

8   through Tor Chat.  And if they decide to sell me something in

9   web anon something that the U.S. government's not happy with,

10  they can get on Tor Chat.  People think these days: It's Tor.

11  Nobody will ever find me except for me and they think: I'm

12  invincible.  And I wasn't too happy about that, but I've long

13  thought about my sister, your Honor.

14          Turning the software over or not, she said: Well, what

15  are you going to do about the kids?  Is the American government

16  going to make use of it?  And I said: In other ways they

17  probably are, and that's probably above my pay grade.  And it

18  was a difficult decision for me, but I went for it.  And that's

19  how I spent my money.  I spent $1.8 million on expenses and

20  things like that.

21          I have lists of all the cases and whatnot.  Do I have

22  proof beyond a reasonable doubt?  No.  But you know what?  In

23  the balance of whatever we have to do, I have 60 pages of stuff

24  that I'm trying to put together.

25          THE COURT:  Sir, what you're telling me at this point

1    is that you spent $1.8 million in developing, essentially, a

2    software system that would deanonymize anonymous transactions

3    on the web and that you attempted to use that in connection

4    with a good thing, that is, finding those who exploited

5    children.

6            I understand that, and you're telling me that of the

7    things that you've done, this is something that's very

8    worthwhile.  And apparently, you're making your computer skills

9    in that area available to the United States government.

10           THE DEFENDANT:  Yes.  Not intentionally, not because I

11   wanted to, but because it was the only people that could do a

12   good job of it to be perfectly honest.  Not 1.8 million.

13   That's how much they got, but in total, I spent $800,000 on

14   that project.

15           THE COURT:  All right.

16           Now, let's move on.  What else do you want to tell me?

17   You've told me about the conditions of confinement and how

18   terrible they were, and you've told me about the good that

19   you've done in connection with missing and exploited children.

20   What else do you want me to know?

21           THE DEFENDANT:  As I said in the beginning, it's

22   possible to be proud and ashamed of something at the same time.

23           Silk Road to me, originally, was a way of getting rid

24   of street crime and violence.  Adulteration and overdose is one

25   of the biggest problems.  Since Silk Road closed, 700,000

N7BZZCLAS-dh

people minimum have died of fentanyl overdoses, and most of
those were caused by adulteration.  People didn't know what was
in it.

          And one of the things we tried to do with Silk Road
was make sure that people sold exactly what they said they
sold.  Nothing more, nothing less.  We sent it to be tested.
If something came back with something wrong, somebody said:
Hey, we think there's something wrong. In Amsterdam you can
mail it to them for free and they email you back a list of
everything, drugs that are in your drugs so you know what
you've got, whether it's ecstasy, a party drug that's
adulterated with speed, or opioid, or fentanyl.  Fentanyl is
popular for adulterating things because it's so strong and has
such a kick.

          And so, the thinking was: If you had a way of
filtering these things and keeping out the bad element so to
speak, that we wouldn't have those problems.  And that's kind
of how I got to sleep at night for years, and that's why I
said: You know what?  Harm reduction.  Harm reduction.  I just
kept repeating to myself: harm reduction.

          And then when I was in the hospital and I had a chance
to look over Ulbricht's appeal -- and as my counsel mentions,
that we objected to the inclusion of the six overdose deaths in
the PSR -- and the Court of Appeals didn't quite excoriate the
prosecuted.  It came close.  It said that there was no reason

N7BZZCLAS-dh

1    to remind the judge that death could happen from overdoses and

2    overshot with appellate issues that didn't need to be raised.

3              And based on that, we thought that I was going to

4    object to that part of the PSR.  But my time in the hospital

5    and my brush with death made me think a lot.

6              And, there was -- because I used to think: Hey, you

7    know what?  We saved thousands of lives from possible overdose.

8              THE COURT:  How?

9              THE DEFENDANT:  Well, because when people buy drugs

10   from Silk Road -- nobody died from fentanyl doped or --

11             How do I put it?  Nobody died from adulterated drugs

12   from the Silk Road.  There are people -- it's not necessarily

13   the direct cause of their death, but if the Silk Road hadn't

14   been operating, would those people be alive today?  I'm going

15   to say probably yes.  My hands aren't clean.  I'm not going to

16   try to dance around that.  I have a responsibility for six

17   people who died, two who were 16 years old.  Okay?

18             Yeah, so, did we save lots and lots and lots of lives?

19   I don't doubt that we did, but we took some too.

20             It was a pacifist dilemma.  There's 2,000 people on a

21   train and there's a bomb, and there's a switch and they pull

22   the switch so the train won't go over the cliff.  But there's

23   six people.  That's the six people that died from overdoses,

24   and they're sitting on the side.  If you pull that switch,

25   you're going to save those 2,000 people and you run over the

N7BZZCLAS-dh

1    six.

2              THE COURT:  Well, that's an age-old philosophical

3    question posed in Philosophy 101.

4              THE DEFENDANT:  Yeah, but it wasn't Philosophy 101 for

5    me.  I pulled the switch.  I didn't realize it at the time.  I

6    was just thinking: Hey, the train's not going to go over the

7    cliff.  The six people died.  I'm sure more than six people

8    died from involvement in drugs, whether it was overdose -- one

9    guy died.  He had six drugs in his system and he died from

10   pneumonia because they said he probably didn't realize it soon

11   enough.  So were drugs the direct cause of it?  I mean, no, but

12   I could agree that it was a proximate cause.  So I own those

13   six deaths.  I have.

14             You got letters from ten people.  I owe apologies to

15   ten people.  You looked at some of Singh Paul's letter he

16   wrote.  He was like a brother to me.  He was like a son to me,

17   and I've disappointed him so much.  My niece and nephew.  My

18   sisters.  You know?

19             When I read those letters, the person that they're

20   writing about, I always strive to be that person, and I let

21   them down.  As I said, I'm flawed.  To say I messed up is to

22   miss it by orders of magnitude.

23             And I'm not here praying for mercy.  I don't pray

24   anymore.  I lost my faith on the floor of my cell 18 months

25   ago, and that hurts too.  So I'm disappointing my family, I've

N7BZZCLAS-dh

1    lost my God and my freedom.  There's really not much more I can

2    screw up here, is there?

3              THE COURT:  Thank you, sir.

4              I appreciate those comments very much.

5              The sentence I intend to impose is 240 months which is

6    the guideline range.

7              Mr. Clark was the leader of the once highly-illicit

8    drug marketplace known as Silk Road.  His technical expertise

9    and professed devotion to ensuring broad access to drugs

10   materially assisted the growth and reliability of the Silk Road

11   website.

12             More than a million transactions took place over Silk

13   Road, including $183 million worth of illegal drugs and

14   millions in commissions for Silk Road.

15             For three years, Mr. Clark facilitated the

16   distribution by means of the internet of enormous quantities of

17   illegal drugs and other illegal items including hacking tools,

18   among others.  He facilitated the sales of such things as fake

19   identification documents and computer hacking tools and

20   services and money laundering services.

21             These offenses were made more serious by Mr. Clark's

22   obstructive conduct when he testified falsely during his

23   interrogation in Thailand that he had no involvement with the

24   Silk Road website, and his urging facilitated an attempted

25   murder for hire of a Silk Road staff member suspected of

N7BZZCLAS-dh

stealing $350,000 in Bitcoin from Silk Road.

The government seeks -- and the probation office has recommended -- the statutory maximum penalty of 20 years' imprisonment.  But for the statutory maximum, the guideline range would have been life imprisonment.  His counsel seeks time served.

Based on his very difficult conditions of confinement in Thailand and at the MDC -- I'm not diminishing those in the slightest --  I've considered the arguments presented to me and the Section 3553(a) factors in determining that a sentence of 240 months is sufficient but not greater than necessary to meet the ends of the criminal justice system and provide just punishment for this offense.

Mr. Clark was a leader of the Silk Road conspiracy which was enormously successful in facilitating the sale of illicit drugs and other branded products.

Silk Road undermined respect for the law by allowing thousands of drug buyers and dealers to operate undetected by law enforcement for years.

Mr. Clark this morning has said that he took steps to be able to deanonymize transactions which he had helped to anonymize through improvements to the Tor browser when he was working with Silk Road and that's all to the good.  I don't think of the materials included his efforts in regard to finding those who abuse children, but again, that's all to the

N7BZZCLAS-dh

good.

          And if he is prepared to assist the government in the
future with helping the government deanonymize anonymous
transactions, I'm sure the government would be interested in
having that assistance.

          The sentence must reflect the consequences of the vast
criminal enterprise in which he has the leader and afford
adequate deterrence not just to others who may seek to
replicate his success, but the thousands of criminal users on
the site who were beyond detection in significant part because
of his dedicated efforts to protect their anonymity.

          The nature and circumstances of Clark's role in this
offense is significant.  He was the right-hand man and senior
adviser to Ross Ulbricht -- also known as Dread Pirate Roberts
-- the creator and owner, in large part, of Silk Road.

          And as the government has said, he continued his
activities -- even after his criminal case, at least -- even
after Mr. Ulbricht was arrested.  His technical abilities and
contributions materially assisted Silk Road as a drug bazaar
focusing on what we've discussed as the dark web.  And, indeed,
Mr. Clark's computer expertise has been quite apparent from his
heartfelt discussion with me today and his serious remorse in
his understanding of the harm that he has done through
assisting illegal transactions.

          I think his remorse is genuine and heartfelt.

N7BZZCLAS-dh

1          Silk Road hosted, as I said, a black market on the

2     internet where illegal drugs and other illegal goods and

3     services were sold.  It was, in fact, the most extensive

4     criminal marketplace at the time it existed, by Clark's

5     computer sophistication and his ability to uncover security

6     vulnerabilities on the site and advise Ulbricht on technical

7     infrastructure, the rules governing users and vendors, and the

8     promotion of sales including the narcotics.

9          I haven't heard much this morning about Mr. Clark's

10     deeply-held beliefs about the need to have drugs available and

11     his deeply-held beliefs into the importance of privacy, I

12     think, in part, because he's changing those as time has gone

13     on, and he realizes the seriousness of the implications of the

14     freely-available use of drugs.

15          But regardless of his, what were deeply-held beliefs

16     around taking down the DEA and the need for all drugs to be

17     legal -- and again, I haven't heard that today, so I think he's

18     moving away from that -- but those beliefs clearly crossed over

19     into patently illegal activity, which Mr. Clark has admitted

20     to.

21          He executed on his plan to take down the DEA and make

22     all drugs legal with calculated intent and enthusiasm.

23          He sought to conceal the Silk Road computer network

24     from detection and prevent its destruction from elaborate cover

25     stories, hacking threats, and even raised the possibility --

N7BZZCLAS-dh

according to the presentence report -- of terminating a
suspected thief of Bitcoin from Silk Road.

So, Ulbricht said, "He," Ulbricht, "would have no
problem wasting this guy," and Clark said he would take care of
it, even adding that if Ulbricht had balked at the inference of
murder, "[He] would have seriously reconsidered [their]
relationship," and Clark said that he was, "perfectly
comfortable with the decision," and would, "sleep like a lamb
tonight and every night and hereafter."  This is serious -- to
say the least -- criminal activity.

As I say, I've taken into consideration what he has
said about the conditions of his confinement.  But for the
statutory cap, his guidelines sentence would have been life.  I
do think 240 months is sufficient, but not greater than
necessary, to meet the ends of the criminal justice system.

I've considered Mr. Clark's history and
characteristics.  He indicated that his father suffered from
ALS and the papers tell me that when he was a teenager -- and
it's something he didn't even mention today -- he had to drop
out of high school and take over the family business.
Certainly, such a role would have been difficult for any young
man, and the letters in his support are quite heartfelt and
tell me about how he helped other people in a variety of small
ways, including letters from his sisters and how he took under
his aegis a young man in -- I think it was Edmonton in Canada

N7BZZCLAS-dh

```
 1   -- in the nightclub business and assisted him greatly and

 2   helped establish him as a manager at a nightclub.

 3            And his personal courage, Mr. Clark has indicated that

 4   he is at some risk because of wrongdoing he is setting forth in

 5   open court.

 6            Again, I would urge you, Mr. Clark -- again, I'm not

 7   aware of the particular group he mentioned here -- but to make

 8   sure that the prosecutors in the Southern District of New York

 9   are informed of the wrongdoing.  Certainly they are partly

10   informed of it now, but I would urge him to assist the

11   government in that regard and to make the government aware of

12   the specific wrongdoing.

13            The role he undertook as a young man to assist his

14   family is admirable, but there's little else reason to afford

15   him sympathy to have committed these crimes 30 years later.

16            He had the support of family, and he was clear-eyed

17   and intentional about his involvement over an extended period

18   of time in the crime to which he has pled guilty, misguidedly

19   turning his belief from the idea that drugs should be legal

20   into material assistance to a major criminal enterprise.

21            The fact remains, his conditions of confinement in

22   Thailand were grave, and while incarcerated at MDC, he dealt

23   with a series of serious injuries and lengthy periods of

24   debilitation and illness.

25            Ultimately, I'm not persuaded that the elements he
```

N7BZZCLAS-dh

1    suffered warrant a substantial reduction in his sentence.  As

2    the government has set forth in its papers, his plea deal

3    already allowed him a significant break, down from a possible

4    life sentence that the government states was, in part, due to

5    his age and, in part, due to health conditions.

6         As I said, I'm sentencing defendant to 240 months

7    incarceration.  Before I formally impose sentence, Mr. Lipton,

8    is there any formal objection that you wish to lodge?

9         MR. LIPTON:  No, Judge.

10        THE COURT:  Government.

11        MR. NEFF:  No, your Honor.

12        Just one very tiny footnote.  There may have been

13   reference to three years of involvement in Silk Road.  I wanted

14   to just note that the website was operational for a little over

15   two and a half years, and Mr. Clark was in close communication

16   withs Ross Ulbricht for a little under two years.

17        THE COURT:  All right.

18        Thank you.  I appreciate that.  I amend my remarks

19   accordingly.

20        Mr. Clark, if you would rise, sir, I will impose

21   sentence.

22        I hereby find that total offense level is 45.  The

23   criminal history category is I.  The guideline range is 240

24   months pursuant to sentencing guideline 5G1.1(a).

25        Pursuant to the Sentencing Reform Act of 1984, it is

N7BZZCLAS-dh

1    the judgment of this Court that the defendant, Roger Thomas

2    Clark, is hereby committed to the custody of the Bureau of

3    Prisons to be imprisoned for a term of 240 months.

4           Upon release from imprisonment, Mr. Clark shall be

5    placed on a term of supervised release for a term of three

6    years with the conditions recommended by the probation

7    department, namely, the mandatory conditions set forth on page

8    48 of the presentence report.

9           In addition, Mr. Clark shall comply with standard

10   conditions 1 through 12 which are set forth on pages 48 and 49

11   of the presentence report, plus the special conditions which

12   are set forth on pages 49 and 50 of the presentence report.

13          They are, specifically: obeying immigration laws and

14   complying with the directives of immigration authorities;

15   participation in an outpatient treatment program which may

16   include testing; permitting the probation office to install any

17   application or software that allows them to survey or monitor

18   activity on his computer and submission to search.

19          Those are the special conditions set forth on pages 49

20   and 50, and I hereby impose them.

21          Within 72 hours of release from the custody of the

22   Bureau of Prisons, Mr. Clark shall report to the probation

23   office in the district to which he is released.  If he is in

24   the custody of the Department of Homeland Security, he does not

25   have to serve his term of supervised release in the United

N7BZZCLAS-dh

1    States.

2          I'm not imposing a fine, because I find Mr. Clark

3    lacks the ability to pay a fine after taking into account the

4    presentence report and his lack of assets.

5          I'm not imposing restitution, because there's no

6    victim, pursuant to 18 USC 3663.

7          I have signed a consent preliminary order of

8    forfeiture in the sum of $1,606,150, and that will become a

9    final order upon the entry of the judgment in this case.

10         I hereby order Mr. Clark to pay the United States a

11   special assessment of $100 which is due immediately.

12         I have stated in full my reason for the sentence and

13   why I've sentenced the defendant within the guideline range.  I

14   believe the sentence is appropriate, given the seriousness of

15   the offense, the need for punishment and deterrence, and all of

16   the reasons I have set forth already.

17         Mr. Lipton, are you aware of any legal reason why the

18   sentence should not be imposed as I have stated it?

19         MR. LIPTON:  I'm not.

20         THE COURT:  Government.

21         MR. NEFF:  I am not.

22         THE COURT:  I hereby order the sentence to be imposed

23   as I have stated it.

24         Mr. Clark, you have the right to appeal the sentence I

25   just imposed on you, sir.  If you are unable to pay the cost of

N7BZZCLAS-dh

```
1    an appeal, you have the right to apply for a leave to appeal in

2    forma pauperis.

3              I take it, government, that there was limited waiver

4    of appeal rights at 240.

5              MR. NEFF:  That's correct, your Honor.  Under the

6    waiver.

7              THE COURT:  Yes.

8              Mr. Clark, I wish to inform you that in your plea

9    agreement, you agreed to waive the right to appeal the

10   sentence, and you agreed to waive the right to collaterally

11   attack the sentence if I sentenced you to 240 months or below,

12   and I've done that.  I've sentenced you to 240 months.

13             If you request, the court of clerk will file a notice

14   of appeal on your behalf immediately.

15             Do you understand your appeal rights?

16             THE DEFENDANT:  I do.

17             THE COURT:  Mr. Clark, if you do wish to appeal, all

18   you have to do is inform Mr. Lipton of that.  And Mr. Lipton,

19   in the event that that occurs, I'm asking you to file a notice

20   of appeal on behalf of your client.  Do you understand, sir?

21             MR. LIPTON:  Yes, of course.

22             THE COURT:  Are there any underlying counts here

23   remaining?

24             MR. NEFF:  Yes, your Honor.

25             At this time, the government moves to dismiss all open
```

N7BZZCLAS-dh

1    counts and underlying indictments against this defendant.

2            THE COURT:  Granted.

3            I am going to make a recommendation to the Bureau of

4    Prisons that Mr. Clark be evaluated for whether it's

5    appropriate to send him to a federal medical center or not, and

6    I'm also going to make a recommendation to the Bureau of

7    Prisons that he be transferred from the Metropolitan Detention

8    Center to a federal correction institute or a federal medical

9    center as expeditiously as possible.

10           Is there anything else, Mr. Lipton?

11           MR. LIPTON:  No, your Honor.

12           THE COURT:  Anything else from the government?

13           MR. NEFF:  No, your Honor.  Thank you.

14           THE COURT:  Mr. Clark, this has been a long process.

15   I think what you've told me is extremely heartfelt. I think you

16   were and I think you realize you were very misguided when you

17   were involved in this very serious criminal activity.

18           You've suggested that you have computer knowledge that

19   will assist the government in its law enforcement efforts, and

20   it seems to be in your interest to get out of the MDC as soon

21   as possible so that you can have better conditions of

22   confinement.

23           And two, it's in your interest to bring to the

24   government's attention the wrongdoing that you've set forth on

25   the record today so that they can proceed accordingly and to

N7BZZCLAS-dh

1    bring to their attention the computer skills you have and the

2    specific applications that you have said that can assist them

3    in wide-ranging law enforcement activities.  But that's

4    entirely up to you, sir.

5             Good luck to you, sir.  Thank you all.

6             I appreciate the length of this and the fact that

7    everybody stayed throughout this proceeding.

8             (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25